# EXHIBIT C

Table of Contents

As filed with the Securities and Exchange Commission on July 22, 2021

Registration No. 333-257604

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

## Amendment No. 2 to
## FORM S-1
## REGISTRATION STATEMENT
#### UNDER
#### THE SECURITIES ACT OF 1933

# Caribou Biosciences, Inc.
#### (Exact name of registrant as specified in its charter)

| **Delaware** | **2836** | **45-3728228** |
|---|---|---|
| (State or other jurisdiction of incorporation or organization) | (Primary Standard Industrial Classification Code Number) | (I.R.S. Employer Identification No.) |

**2929 7th Street, Suite 105**
**Berkeley, California 94710**
**(510) 982-6030**
(Address, including zip code, and telephone number, including area code, of registrant's principal executive offices)

**Rachel E. Haurwitz, Ph.D.**
**President and Chief Executive Officer**
**Caribou Biosciences, Inc.**
**2929 7th Street, Suite 105**
**Berkeley, California 94710**
**(510) 982-6030**
(Name, address, including zip code, and telephone number, including area code, of agent for service)

*Copies to:*

| Ashok W. Mukhey, Esq. | Barbara G. McClung, Esq. | Ilir Mujalovic, Esq. |
|---|---|---|
| Wendy A. Grasso, Esq. | Chief Legal Officer and | Shearman & Sterling LLP |
| Reed Smith LLP | Corporate Secretary | 599 Lexington Avenue |
| 1901 Avenue of the Stars, Suite 700 | Caribou Biosciences, Inc. | New York, New York 10022 |
| Los Angeles, California 90067 | 2929 7th Street, Suite 105 | (212) 848-4000 |
| (310) 734-5200 | Berkeley, California 94710 | |
| | (510) 982-6030 | |

**Approximate date of commencement of proposed sale to the public:** As soon as practicable after this Registration Statement becomes effective.

If any of the securities being registered on this Form are to be offered on a delayed or continuous basis pursuant to Rule 415 under the Securities Act of 1933, as amended, check the following box. ☐

If this Form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act, please check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(c) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(d) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company" and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | |
|---|---|---|
| Large accelerated filer ☐ | | Accelerated filer ☐ |
| Non-accelerated filer ☒ | | Smaller reporting company ☐ |
| | | Emerging growth company ☒ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 7(a)(2)(B) of the Securities Act. ☐

### CALCULATION OF REGISTRATION FEE

| Title of each class of securities to be registered | Amount to be registered(1) | Proposed maximum aggregate offering price per share | Proposed maximum aggregate offering price(2) | Amount of registration fee(3) |
|---|---|---|---|---|
| Common Stock, $0.0001 par value per share | 19,550,000 | $16.00 | $312,800,000 | $34,127 |

(1)   Includes 2,550,000 shares of common stock that the underwriters have the option to purchase.

(2)   Estimated solely for the purpose of computing the amount of the registration fee pursuant to Rule 457(a) under the Securities Act of 1933, as amended.

(3)   The registrant previously paid a total of $27,101 of this amount in connection with the previous filing of the registration statement.

**The registrant hereby amends this Registration Statement on such date or dates as may be necessary to delay its effective date until the registrant shall file a further amendment which specifically states that this Registration Statement shall thereafter become effective in accordance with Section 8(a) of the Securities Act of 1933, as amended, or until the Registration Statement shall become effective on such date as the Commission, acting pursuant to said Section 8(a), may determine.**

**Table of Contents**

**PROSPECTUS SUMMARY**

*This summary highlights information included elsewhere in this prospectus. This summary does not contain all the information you should consider before investing in our common stock. You should read and consider this entire prospectus carefully, including the sections titled "Risk Factors," "Special Note Regarding Forward-Looking Statements" and "Management's Discussion and Analysis of Financial Condition and Results of Operations" and our consolidated financial statements and the related notes included elsewhere in this prospectus, before making any investment decision. Unless the context otherwise requires, the terms "Caribou," "Caribou Biosciences," the "Company," "we," "us" and "our" relate to Caribou Biosciences, Inc., together with its consolidated subsidiaries.*

**Overview**

We are a clinical-stage biopharmaceutical company dedicated to transforming the lives of patients with devastating diseases by applying our novel CRISPR platform, **C**RISPR **h**ybrid **R**NA-**DNA**, or chRDNA, pronounced "chardonnay," toward the development of next-generation, genome-edited cell therapies. Our renowned founders, including a Nobel laureate, are pioneers in CRISPR genome editing. Our chRDNA technology has demonstrated superior specificity and high efficiency in preclinical studies, which enables us to perform multiple, precise genomic edits, while maintaining genomic integrity.

We believe that our technology has broad potential to generate gene and cell therapies in oncology and in therapeutic areas beyond oncology, including immune cell therapies, cell therapies derived from genome-edited iPSCs, and *in vivo* genome-editing therapies.

The genome-editing technologies currently used in the allogeneic cell therapy field generally have limited efficiency, specificity, and versatility for performing the multiple, precise genomic edits necessary to address insufficient persistence. Our chRDNA technology is designed to address these genome-editing limitations and improve cell therapy activity. By applying this approach to allogeneic cell therapies, we believe we can unlock their full potential by improving upon their effectiveness and durability.

We are initially focused on advancing multiple proprietary allogeneic cell therapies for the treatment of both hematologic malignancies and solid tumors against cell surface targets for which autologous CAR-T cell therapeutics have previously demonstrated clinical proof of concept, including both CD19 and BCMA, as well as new targets. We use our chRDNA technology to enhance, or armor, our cell therapies by creating additional genomic edits to improve persistence of antitumor activity. The current status of our programs is summarized below.

### Proprietary pipeline

| Program | Cell type | Target | Editing | Indications | Discovery | IND enabling | Phase 1 | Phase 2 | Phase 3* | Anticipated milestones |
|---------|-----------|--------|---------|-------------|-----------|-------------|---------|---------|----------|------------------------|
| CB-010 | T cell | CD19 | CAR into TRAC armoring: PD-1 KO | r/r B-NHL | ● | ● | ● | ○ | ○ | initial data expected in 2022 |
| CB-011 | T cell | BCMA | CAR into TRAC armoring: B2M KO, B2M-HLA-E insertion | r/r MM | ● | ○ | ○ | ○ | ○ | IND filing 2022 |
| CB-012 | T cell | CD371 | armoring | r/r AML | ● | ○ | ○ | ○ | ○ | IND filing 2023 |
| CB-020 | iNK cell | undisclosed | armoring | solid tumors | ● | ○ | ○ | ○ | ○ | target selection 2022 |

\* Phase 3 may not be required if phase 2 is registrational.

Our first lead product candidate, CB-010, is, to our knowledge, the first clinical-stage allogeneic anti-CD19 CAR-T cell therapy with PD-1 removed from the CAR-T cell surface by a genome-edited knockout of the

1

Table of Contents

*PDCD1* gene. We have demonstrated in preclinical models that the PD-1 knockout improves the persistence of antitumor activity by disrupting a pathway that leads to rapid T cell exhaustion. We have dosed the first patient in our ANTLER phase 1 clinical trial for CB-010, a study in patients with relapsed or refractory B cell non-Hodgkin lymphoma, with initial data expected in 2022.

Our second lead product candidate, CB-011, is an allogeneic CAR-T cell product candidate and is, to our knowledge, the first anti-BCMA CAR-T cell therapy incorporating an immune cloaking approach that includes both the removal of the endogenous B2M protein and insertion of a B2M–HLA-E transgene. This strategy is designed to blunt CAR-T cell rejection by both patient T cells and NK cells to enable more durable antitumor activity. CB-011 is in preclinical development for relapsed or refractory multiple myeloma, with an IND filing expected in 2022.

Our CB-012 program is an allogeneic armored CAR-T cell therapy targeting CD371, currently in preclinical development for the treatment of relapsed or refractory acute myeloid leukemia with an IND filing expected in 2023. CD371 is an attractive target for acute myeloid leukemia due to its expression on myeloid cancer cells, its enrichment in leukemic stem cells, and its absence on hematopoietic stem cells.

We are also developing allogeneic CAR-NK cell therapies derived from genome-edited iPSCs for the treatment of solid tumors. These CAR-NK product candidates will contain genomic edits designed to overcome the challenges of targeting solid tumors, including trafficking, heterogeneity, and the immunosuppressive tumor microenvironment.

We control a robust patent portfolio protecting our chRDNA technology as well as certain of our allogeneic cell therapy targets.

In February 2021, we entered into a collaboration with AbbVie Manufacturing Management Unlimited Company, or AbbVie, to develop two new CAR-T cell therapies for AbbVie. We view this collaboration as an external recognition of the potential for our chRDNA genome-editing technology to significantly improve genome-editing specificity and efficiency.

**Current Challenges in Allogeneic Cell Therapies**

Immune cell therapies have emerged as a revolutionary and potentially curative treatment for hematologic malignancies and solid tumors. The approval and launch of multiple first generation CD19- or BCMA-directed autologous CAR-T cell products have laid the foundation and opened a path for the development of more advanced cell therapeutics, including CAR-T and CAR-NK cell products with next-generation capabilities and approaches. Among these approaches, allogeneic cell therapy is positioned to unlock the broad potential of engineered immune cells as a leading therapeutic modality. However, expansion, persistence, and trafficking of allogeneic CAR-T and CAR-NK cells are critical to achieving long-term efficacy. We believe that the genome-editing technologies currently utilized in the allogeneic cell therapy field have limited efficiency, specificity, and versatility for performing the multiplex editing necessary to address these challenges.

**Genome-Editing Landscape and Limitations**

There are several well-established genome-editing technologies being applied to generate immune cell therapies currently in preclinical research or clinical development, including ZFNs, TALENs, and meganucleases, but each has limitations with respect to both their agility and their ability to generate site-specific gene insertions with high efficiency. More recently, clustered regularly interspaced short palindromic repeats, or CRISPR, genome-editing technology has been used for the generation of *ex vivo* immune cell therapeutics that are in preclinical research or clinical development.

2

**Table of Contents**

*CB-010*

Our most developed product candidate is CB-010, an allogeneic anti-CD19 CAR-T cell therapy. We use Cas9 chRDNA guides to make three edits to manufacture CB-010. We introduce, with high efficiency and specificity, the gene encoding the CD19-specific CAR into the gene encoding the T cell receptor alpha constant, or *TRAC*, a component of the native T cell receptor, or TCR. This simultaneously integrates the CD19 CAR site-specifically into the T cell genome and eliminates TCR expression to reduce the risk of graft versus host disease, or GvHD. We also knock out the gene encoding the PD-1 protein in these cells to boost the persistence of CAR-T cell antitumor activity. We believe that the PD-1 knockout has the potential to reduce the likelihood of rapid tumor recurrence and potentially confer a better therapeutic index compared to other allogeneic CAR-T cells. To our knowledge, CB-010 is the first allogeneic CAR-T cell therapy with a PD-1 knockout in clinical studies and it is being evaluated in our open-label, multicenter ANTLER phase 1 clinical trial in the United States in adults with relapsed or refractory B cell non-Hodgkin lymphoma (NCT04637763). We have dosed the first patient in this clinical trial. We expect to have initial data from this clinical trial in 2022.

*CB-011*

CB-011 is an allogeneic, BCMA CAR-T cell therapy for the treatment of relapsed or refractory multiple myeloma. To our knowledge, CB-011 will be the first allogeneic CAR-T cell therapy immune cloaked to prevent both T- and NK-mediated clearance, or rejection, by the immune system. We expect our immune cloaking strategy to drive CAR-T cell persistence, enabling more durable antitumor activity. We use Cas12a chRDNA guides to make four edits to manufacture CB-011. We introduce the gene that encodes a novel and proprietary humanized anti-BCMA CAR into the *TRAC* locus with high specificity and efficiency, thus eliminating TCR expression to prevent GvHD and integrating the BCMA CAR site-specifically into the T cell genome. In addition, we insert a gene encoding a B2M–HLA-E fusion protein into the native *B2M* gene locus. This approach simultaneously prevents the expression of the native B2M protein, a protein that stabilizes all HLA class I antigens on the cell surface, thereby eliminating endogenous HLA class I presentation on the surface of the CAR-T cells, and stably expresses HLA-E, a minor HLA class I antigen, to blunt both T- and NK-mediated rejection of the CAR-T cell therapy by the patient's immune system. We expect to file an IND for this product candidate in 2022.

*CB-012*

CB-012 is an allogeneic, anti-CD371 CAR-T cell therapy for the treatment of relapsed or refractory acute myeloid leukemia. CD371 is expressed on the surface of acute myeloid leukemia tumor cells and leukemic stem cells, but it is not expressed on normal hematopoietic stem cells which makes it a compelling target for the treatment of acute myeloid leukemia. We are applying our genome-editing expertise to armor the CB-012 CAR-T cell product candidate in order to drive persistence and seek maximum patient benefit in relapsed or refractory acute myeloid leukemia. We expect to file an IND for this product candidate in 2023.

*CB-020*

We believe that edited iNKs, including CAR-iNKs, hold significant potential for treating a variety of solid tumors. We have successfully demonstrated the ability to edit the genome of iPSCs at multiple loci and we have developed a robust differentiation protocol to derive iNKs from iPSCs, providing an optimal system for generating multiplex-edited iNKs that have the potential to address the fundamental challenges facing immune cell therapies in the immunosuppressive tumor microenvironment. We expect to select a cell-surface target for our CB-020 product candidate in 2022.

Table of Contents

Accordingly, undue reliance should not be placed on this preliminary estimate. The preliminary estimate is not necessarily indicative of any future period and should be read together with the sections titled "Risk Factors," "Special Note Regarding Forward-looking Statements" and "Management's Discussion and Analysis of Financial Condition and Results of Operations" for additional information regarding factors that could result in differences between the preliminary estimate and the actual results we will report for cash and cash equivalents as of June 30, 2021.

**Summary of Risk Factors**

Our business is subject to a number of risks of which you should be aware before making a decision to invest in our common stock. These risks are more fully described in the section titled "Risk Factors" immediately following this prospectus summary. These risks include, among others, the following:

- We have incurred significant net operating losses since our inception and anticipate that we will incur continued losses for the foreseeable future.
- Even if this offering is successful, we will need substantial additional financing to develop our product candidates and implement our operating plans. If we fail to obtain additional financing, we may be delayed or unable to complete the development and commercialization of our product candidates.
- We have a limited operating history, which may make it difficult to evaluate our technologies and product candidate development capabilities or to predict our future performance.
- We are early in our development efforts and it will be many years before we commercialize a product candidate, if ever. If we are unable to advance our product candidates through clinical trials, obtain regulatory approval, and ultimately commercialize our product candidates, or experience significant delays in doing so, our business will be materially harmed.
- Our product candidates are cell therapies generated by novel chRDNA genome-editing technologies, which makes it difficult to predict the time and cost of developing our product candidates and obtaining regulatory approval. To date, no other products that use these genome-editing technologies have advanced into clinical trials or received marketing approval in the United States.
- Our business is highly dependent on the success of our lead product candidates, including CB-010 and CB-011, which will require significant additional preclinical and clinical testing before we can seek regulatory approval and potentially commercially launch our product candidates. If we are unable to advance our preclinical studies and clinical trials, obtain approval for, and successfully commercialize, our lead product candidates for the treatment of patients in approved indications or if we are significantly delayed in doing so, our business would be significantly harmed.
- If we experience delays or difficulties enrolling patients in the clinical trials for our product candidates, including our ANTLER phase 1 clinical trial, our ability to advance CB-010 and our other product candidates through clinical development and the regulatory process could be delayed or prevented.
- Our clinical trials may fail to demonstrate adequately the safety and efficacy of any of our product candidates and the development of our product candidates may be delayed or unsuccessful, which could prevent or delay regulatory approval and commercialization.
- If our product candidates cause serious adverse events or undesirable side effects, including injury and death, or have other properties that could delay or prevent regulatory approval, their commercial potential may be limited or extinguished.

9

Table of Contents

- We face significant competition from other biotechnology and pharmaceutical companies, which may result in other companies developing or commercializing products before, or more successfully than, we do, thus rendering our product candidates non-competitive or reducing the size of our market, and our operating results will suffer if we fail to compete effectively.
- If we do not possess intellectual property rights covering our proprietary chRDNA genome-editing technology and product candidates, we may not be able to block competitors or to compete effectively in our markets.
- Third-party claims of intellectual property infringement may prevent or delay our ability to commercialize our product candidates.
- Our rights to develop and commercialize our product candidates are subject to the terms and conditions of licenses and assignments with third parties, and if we fail to comply with our obligations under these agreements, we could lose these intellectual property rights and be subject to litigation from our licensors or assignors.
- Our ability to continue to receive licensing revenues and to enter into new licensing arrangements will be substantially impaired if the CVC IP is limited by administrative patent proceedings.
- We rely on third parties to supply the materials for, and the manufacturing of, our clinical supplies, and we may continue our reliance on third parties for manufacturing of our commercial products, if approved.
- We may not be able to meet our obligations under the AbbVie collaboration or our own product candidates and pipeline may be delayed in light of our obligations to AbbVie. In addition, we have limited control over the achievement of milestones by AbbVie.
- Our future success depends on our ability to retain key executive officers and to attract, retain, and motivate qualified personnel.
- We will incur increased costs as a result of operating as a public company, and our management will be required to devote substantial time to new compliance initiatives and corporate governance practices.

**Corporate and Other Information**

We were founded in October 2011 as a Delaware corporation. Our principal executive offices are located at 2929 7th Street, Suite 105, Berkeley, California 94710 and our telephone number is (510) 982-6030.

Our website address is *www.cariboubio.com*. The information on, or that can be accessed through, our website is not part of this prospectus and is not incorporated by reference herein. We have included our website address as an inactive textual reference only.

**Implications of Being an Emerging Growth Company**

We are an emerging growth company as defined in the Jumpstart Our Business Startups Act of 2012, as amended, or the JOBS Act. We will remain an emerging growth company until the earliest of: (i) the last day of the fiscal year following the fifth anniversary of the consummation of this offering; (ii) the last day of the fiscal year in which we have total annual gross revenue of at least $1.07 billion; (iii) the last day of the fiscal year in which we are deemed to be a "large accelerated filer" as defined in Rule 12b-2 under the Securities Exchange Act of 1934, as amended, or the Exchange Act, which would occur if the market value of our common stock held by non-affiliates exceeded $700 million as of the last business day of the second fiscal quarter of such year; or (iv) the date on which we have issued more than $1 billion in non-convertible debt securities during the prior

Table of Contents

three-year period. An emerging growth company may take advantage of specified reduced reporting requirements and is relieved of certain other significant requirements that are otherwise generally applicable to public companies. As an emerging growth company:

- we will present in this prospectus only two years of audited annual financial statements, plus any required unaudited financial statements, and related management's discussion and analysis of financial condition and results of operations;
- we will avail ourselves of the exemption from the requirement to obtain an attestation and report from our independent registered public accounting firm on the assessment of our internal control over financial reporting pursuant to the Sarbanes-Oxley Act of 2002, as amended, or the Sarbanes-Oxley Act;
- we will provide less extensive disclosure about our executive compensation arrangements; and
- we will not require stockholder non-binding advisory votes on executive compensation or golden parachute arrangements.

In addition, the JOBS Act provides that an emerging growth company can take advantage of an extended transition period for complying with new or revised accounting standards. This provision allows an emerging growth company to delay the adoption of some accounting standards until those standards would otherwise apply to private companies. We have elected to use the extended transition period for any other new or revised accounting standards during the period in which we remain an emerging growth company; however, we may adopt certain new or revised accounting standards early.

11

Table of Contents

Changing circumstances may cause us to consume capital significantly faster than we currently anticipate, and we may need to spend more money than expected because of circumstances beyond our control. We may also need to raise additional capital sooner if we choose to expand programs, personnel, and facilities more rapidly than planned. In any event, we will require additional capital for the further research, development, and commercialization of our product candidates, including potentially establishing our own internal manufacturing capabilities. Any additional fundraising efforts may divert our management from their day-to-day activities, which may adversely affect our ability to research, develop, and commercialize our product candidates.

We cannot be certain that additional funding will be available when needed and on acceptable terms, or at all. If we are unable to obtain funding on a timely basis, we may be required to significantly curtail, delay, or discontinue one or more of our product candidate preclinical studies, clinical trials, or development and commercialization, or we may be unable to expand our operations or otherwise capitalize on our business opportunities, as desired. Any of the above could significantly harm our business, financial condition, results of operations, and prospects and cause the price of our common stock to decline.

*Raising additional capital may cause dilution to our stockholders, including purchasers of common stock in this offering; restrict our operations; or require us to relinquish rights to our technologies or product candidates.*

Until such time, if ever, that we can generate substantial product revenues, we expect to finance our cash needs through a combination of equity offerings, debt financings, and strategic collaboration and licensing arrangements. The terms of any financing may adversely affect the holdings or the rights of our stockholders and the issuance of additional securities, whether equity or debt, by us, or the possibility of such issuance, may cause the market price of our common stock to decline. Debt financing, if available, may involve agreements that include covenants limiting or restricting our ability to take specific actions, such as incurring additional debt, making capital expenditures, licensing or assigning our intellectual property rights, declaring dividends, and possibly other restrictions.

To the extent that we raise additional capital through the sale of equity or convertible debt securities, our stockholders' interest will be diluted, and the terms of these securities may include liquidation or other preferences that adversely affect the rights of our common stockholders.

If we are unable to raise additional funds through equity or debt financings when needed, we may be required to delay, limit, reduce, or terminate our product development or future commercialization efforts. Alternatively, we could be required to seek collaborators for our product candidates at an earlier stage than would otherwise be desirable or on terms that are less favorable than might otherwise be available. We might need to relinquish or license on unfavorable terms our rights to our product candidates in markets where we otherwise would seek to pursue development and commercialization ourselves, or to license our intellectual property to others who could develop products that will compete with our products. Any of these actions could have a material adverse effect on our business, financial condition, results of operations, and prospects.

*We have a limited operating history, which may make it difficult to evaluate our technologies and product candidate development capabilities or to predict our future performance.*

We are a clinical-stage biotechnology company formed in 2011, with no products approved for commercial sale, and we have not generated any revenues from product sales. Our operations to date have been limited to financing and staffing our company, developing our technologies, and identifying and developing our product candidates. Our prospects must be considered in light of the uncertainties, risks, expenses, and difficulties frequently encountered by companies in their early stages of operations. We have not yet demonstrated an ability to obtain marketing approval, manufacture at commercial scale, or conduct sales and marketing activities for our product candidates, which are all necessary for successful product commercialization. Consequently, predictions about our future success or viability may not be as accurate as they could be if we had a longer operating history or

19

Table of Contents

a history of successfully developing and commercializing cell therapy products. Our ability to generate product revenue or profits, which we do not expect to occur for many years, if ever, will depend heavily on the successful development and eventual commercialization of our product candidates, which may never occur. Unless we receive approval from the FDA or other regulatory authorities for our product candidates, we will not have product revenues. We may never be able to develop or commercialize a marketable cell therapy product.

We are early in our development efforts. To date, we have only dosed the first patient in our first clinical trial, which is the ANTLER phase 1 clinical trial for our CB-010 product candidate. All of our programs will require clinical development, regulatory approval, manufacturing at commercial scale, distribution channels, a commercial organization, significant marketing efforts, and substantial investment before we generate any revenue from product sales. In addition, our product candidates must be approved for marketing by the FDA before we may commercialize our products in the United States and, if we wish to commercialize our products outside the United States, by foreign regulatory agencies. Furthermore, following closing of this offering, we expect to incur additional costs associated with operating as a public company, including significant legal, accounting, insurance, investor relations, and other expenses that we did not incur as a private company.

Additionally, the rapidly evolving nature of the genome-editing and cell therapy fields may make it difficult to evaluate our technologies and product candidates as well as to predict our future performance. Our short history as an operating company makes any assessment of our future success or viability subject to significant uncertainty. We will encounter risks and difficulties, known and unknown, that are frequently experienced by early-stage companies in rapidly evolving fields. As we advance our product candidates, we must transition from a company with a research focus to a company capable of supporting clinical development and, if successful, commercial activities. We may not be successful in such transitions. If we do not address these risks successfully, our business will suffer. Similarly, we expect that our financial condition and operating results may fluctuate significantly from quarter to quarter and year to year due to a variety of factors, many of which are beyond our control. As a result, you should not rely upon the results of any quarterly or annual period as an indicator of future operating performance.

**Risks Relating to Our Business, Government Regulation, Technology, and Industry**

***We are early in our development efforts and it will be many years before we commercialize a product candidate, if ever. If we are unable to advance our product candidates through clinical trials, obtain regulatory approval, and ultimately commercialize our product candidates, or experience significant delays in doing so, our business will be materially harmed.***

We are early in the development of our cell therapy product candidates and have focused our research and development efforts to date on various CRISPR genome-editing technologies, including our chRDNA genome-editing technology, as well as identifying our initial chimeric antigen receptor T cell, or CAR-T cell, product candidates. Our future success depends heavily on the successful development of our product candidates. Our ability to generate product revenue, which we do not expect will occur for many years, if ever, will be a result of the successful development and eventual commercialization of our product candidates, which may never occur. Our product candidates may have adverse side effects or fail to demonstrate safety and efficacy. Additionally, our product candidates may have other characteristics that may make them impractical or prohibitively expensive for large-scale manufacturing. Furthermore, our product candidates may not receive regulatory approval or, if they do, they may not be accepted by the medical community or patients or may not be competitive with other products that become available. We currently generate no revenue from sales of any product and we may never be able to successfully develop or commercialize a marketable product.

We must submit investigational new drug, or IND, applications to the FDA to initiate clinical trials in the United States. In late August 2020, the FDA cleared our IND for our first product candidate, CB-010. The filing of future INDs for our other product candidates is subject to additional preclinical research, research-scale and clinical-scale manufacturing, exploration of possible other genome-editing systems, evaluation of potential targets, or other factors yet to be identified. In the case of our CB-012 product, we will need to identify and select

20

Table of Contents

our Cas12a chRDNA guides with acceptable accuracy and efficiency. In addition, commencing any new clinical trial is subject to review by the FDA based on the acceptability and sufficiency of our chemistry, manufacturing, and controls, or CMC, and preclinical information provided to support our IND. In the event that the FDA or foreign regulatory authorities require us to complete additional preclinical studies or we are required to satisfy other requests for additional data or information, our clinical trials may be delayed. Even after we receive and incorporate guidance from the FDA or foreign regulatory authorities, these regulatory authorities could disagree that we have satisfied all requirements to initiate our clinical trial or they may change their position on the acceptability of our trial design or the clinical endpoints selected. They could impose a clinical hold, which may require us to complete additional preclinical studies or clinical trials. The success of our product candidates will depend on several factors, including the following:

- sufficiency of our financial and other resources;
- acceptance of our chRDNA genome-editing technology;
- ability to develop and deploy armoring technologies so that our product candidates have a competitive edge;
- completion of preclinical studies;
- clearance of INDs to initiate clinical trials;
- successful enrollment in, and completion of, our clinical studies;
- data from our clinical trials that support an acceptable risk-benefit profile of our product candidates for our intended patient populations and indications and demonstrate safety and efficacy;
- establishment of agreements with third-party contract manufacturing organizations, or CMOs, for clinical and commercial supplies and scaling up of manufacturing processes and capabilities to support our clinical trials;
- successful development of our internal process development and transfer to larger-scale facilities;
- receipt of regulatory and marketing approvals from applicable regulatory authorities;
- receiving regulatory exclusivity for our product candidates;
- establishment, maintenance, enforcement, and defense of patent and trade secret protection and other intellectual property rights;
- not infringing, misappropriating, or otherwise violating third-party intellectual property rights;
- entry into collaborations to further the development of our product candidates or for the development of new product candidates;
- establishing sales, marketing, and distribution capabilities for commercial launch of our product candidates if and when approved, whether by us or in collaboration with third parties;
- maintenance of a continued acceptable safety profile of products post-approval;
- acceptance of product candidates, if and when approved, by patients, the medical community, and third-party payors;

21

Table of Contents

- effective competition with other therapies and treatment options;
- establishment and maintenance of healthcare coverage and adequate reimbursement; and
- expanding indications and patient populations for our products post-approval.

***Our product candidates are cell therapies generated by novel chRDNA genome-editing technologies, which makes it difficult to predict the time and cost of developing our product candidates and obtaining regulatory approval. To date, no other products that use these genome-editing technologies have advanced into clinical trials or received marketing approval in the United States.***

We are concentrating our initial research, development, and manufacturing efforts on our allogeneic CAR-T cell therapies that are intended to treat patients with certain cancers. Before obtaining regulatory approval for the commercial sale of any of our product candidates, we must demonstrate through lengthy, complex, and expensive preclinical studies and clinical trials that our product candidates are both safe and effective for their intended use. The clinical trial requirements of the FDA and other regulatory authorities, and the criteria these regulators use to determine the safety and efficacy of a product candidate, vary substantially according to the type, complexity, novelty, intended use, and target population of our product candidates. The outcome of preclinical studies and clinical trials is inherently uncertain. Failure can occur at any time during the preclinical study and clinical trial processes and because we have never successfully launched a product and our first product candidate is in an early stage of clinical development, there is a high risk of failure. We may never succeed in developing marketable products.

Approval processes by the FDA or other regulatory authorities for existing autologous anti-CD19 and anti-B cell maturation antigen, or BCMA, CAR-T cell therapies may not be indicative of what these regulatory authorities will require for approval of our allogeneic anti-CD19 CAR-T cell therapy or our other product candidates. Also, although we expect reduced variability in our allogeneic products candidates compared to autologous products, we do not have any clinical data supporting benefits of lower variability, and the use of healthy donor material may create separate variability challenges for us. Moreover, our product candidates may not perform successfully in clinical trials or may be associated with serious adverse events that distinguish them from the autologous anti-CD19 and anti-BCMA CAR-T therapies that have previously been approved. For instance, allogeneic product candidates may result in graft versus host disease, or GvHD, not experienced with autologous products. GvHD results when allogeneic T cells see the patient's normal tissue as foreign and attack and damage those cells. Even if we collect promising initial clinical data for our product candidates, longer-term data may reveal adverse events or responses that are not durable. Unexpected negative clinical outcomes would significantly impact our business.

In addition, approved autologous CAR-T therapies and those under development have shown frequent rates of cytokine release syndrome, neurotoxicity, serious infections, prolonged cytopenia, and hypogammaglobulinemia, and other serious adverse events that have resulted in patient deaths. There may be similar adverse events for our allogeneic CAR-T and CAR-NK cell therapy product candidates, including patient deaths. Moreover, patients eligible for allogeneic CAR-T cell therapies but ineligible for autologous CAR-T cell therapies due to aggressive cancer or an inability to wait for autologous CAR-T cell therapies may be at greater risk for complications and death from therapy. Our allogeneic CAR-T cell product candidates may also cause unique adverse events related to the differences between the donor and patients, such as GvHD or infusion reactions. Our product candidates may not be successful in limiting the risk of GvHD, exhaustion of the CAR-T cells, or premature rejection by the patient's immune system. If significant GvHD or other serious adverse events are observed with the administration of our product candidates, or if any of our product candidates are viewed as less safe or effective than autologous therapies or other allogeneic therapies, our ability to develop other allogeneic therapies may be adversely affected.

We use our chRDNA genome-editing platform to generate our product candidates, and we believe chRDNAs significantly improve the specificity of CRISPR genome editing (*e.g.*, reduce the number of off-target

22

Table of Contents

events). CRISPR genome editing generally is relatively new; to date, no genome-editing technologies have been approved in the United States although clinical trials of product candidates based on CRISPR and other genome-editing technologies are underway. As a result, the regulatory approval process for cell therapy product candidates such as ours is uncertain and may be more expensive and take longer than the approval process for product candidates based on better known or more extensively studied technologies. As such, it is difficult to accurately predict the developmental challenges we may face as we progress our product candidates through preclinical studies and clinical trials. There may be long-term adverse effects from treatment with our product candidates resulting from the use of our chRDNA genome-editing technology that we cannot predict at this time. Also, animal models may not exist for some of the diseases we choose to pursue in our programs, which may complicate and increase the cost of preclinical research. As a result of these factors, it is difficult for us to predict the time and cost of our product candidate development, and we cannot predict whether the application of our chRDNA genome-editing technology, or other genome-editing technologies we may use in the future, will result in the identification, development, preclinical studies, and clinical trials to support regulatory approval of any of our cell therapy product candidates. There can be no assurance that any development problems we experience in the future related to our chRDNA genome-editing technology or any of our research programs will not cause significant delays or unanticipated costs, or that such development problems can be solved. We may not achieve the desired safety and efficacy of our product candidates. Also, we may not sufficiently improve genome-editing specificity and our genome editing may have off-target events. Moreover, we may not be able to achieve a high degree of on-target gene knockout and insertion efficiency in developing our product candidates. While we expect to have initial clinical data from the CB-010 clinical trial in 2022, any of these factors may prevent us from completing our clinical trials, delay or cause us to fail to meet our clinical trial endpoints, or lead us to fail to commercialize any of our cell therapy product candidates.

We may also experience delays in developing robust, reproducible, and scalable manufacturing processes and transferring those processes to CMOs, which may prevent us from completing our clinical studies or commercializing our products on a timely or profitable basis, if at all. Currently, we have only manufactured our CB-010 product candidate for clinical trials. In addition, since we are in the early stages of clinical development, we do not know the doses to be used in later phase 2 or pivotal trials needed to evaluate the efficacy of our product candidates, which will impact the manufacturing requirements for our product candidates. Finding a suitable dose for our cell therapy product candidates may delay our anticipated clinical development timelines and prolong our clinical trials. Accordingly, our expectations with regard to our costs of manufacturing may vary significantly as we develop our product candidates and understand these critical factors. Such factors may delay or keep us from bringing a product candidate to market and could decrease our ability to generate sufficient product revenue, which could harm our business, financial condition, results of operations, and prospects.

***Manufacturing of our product candidates is complex and we could experience manufacturing problems during our clinical trials, which could delay or limit our market launch or commercial distribution.***

The manufacturing processes used to produce our cell therapy product candidates are and will be complex, as our product candidates are novel products and only our CB-010 product candidate has been manufactured according to current good manufacturing processes, or cGMPs, to date. Several factors could cause production interruptions including facility contaminations; shortages or quality problems; contamination of healthy donor cells, chRDNA guides, Cas proteins, viruses, or induced pluripotent stem cell, or iPSC, master cell banks or working cell banks; natural disasters, including the COVID-19 pandemic; labor shortages and strikes; lack of experienced scientific, quality control, and manufacturing personnel; human error; or other disruptions in the operations of our suppliers and CMOs. We conduct process development activities at our facility and we may experience personnel and supply shortages. Problems with our manufacturing process, even minor deviations from the normal process, could result in product defects or manufacturing failures that result in lot failures, product recalls, product liability claims, or insufficient inventory. We may encounter problems achieving adequate quantities and quality of clinical grade materials that meet FDA or other applicable standards or specifications with consistent and acceptable production yields and costs.

23

Table of Contents

As our product candidates proceed through preclinical studies to clinical trials to regulatory review, and potential marketing approval and commercialization, it is common that various aspects of our manufacturing methods will be altered along the way in an effort to optimize processes and results. Such changes carry the risk that they will not achieve these intended objectives. If we make any of these changes, they could cause our product candidates to perform differently and affect the results of clinical trials conducted with the altered materials. Such changes may also require additional testing as well as notification to or approval from the FDA or other regulatory authorities, which could delay completion of our clinical trials, require bridging clinical trials, require repetition of one or more clinical trials, increase clinical trial costs, delay approval of our product candidates, if any, and ultimately jeopardize commercialization.

If we receive marketing approval for a product candidate, the FDA and other regulatory authorities may require us to submit samples of any lot of any approved product together with the protocols showing the results of applicable tests at any time. Under some circumstances, the FDA or other regulatory authorities may require that we not distribute a lot until the relevant agency authorizes its release. Slight deviations in the manufacturing process, including those affecting quality attributes and stability, may result in unacceptable changes in the product that could result in lot failures or product recalls. Problems in our manufacturing processes could restrict our ability to meet market demand for our products. All of these factors could be costly to us and otherwise harm our business, financial condition, results of operations, and prospects.

***Our business is highly dependent on the success of our lead product candidates, including CB-010 and CB-011, which will require significant additional preclinical and clinical testing before we can seek regulatory approval and potentially commercially launch our product candidates. If we are unable to advance our preclinical studies and clinical trials, obtain approval for and successfully commercialize our lead product candidates for the treatment of patients in approved indications, or if we are significantly delayed in doing so, our business would be significantly harmed.***

Our business and future success depends on our ability to advance our product candidates through preclinical studies and clinical trials, obtain regulatory approval for, and successfully commercialize, our product candidates. Because CB-010 is our first allogeneic cell therapy product to be evaluated in the clinic, the failure of our lead product candidate, or the failure of other companies' allogeneic anti-CD19 CAR-T cell therapies, including for reasons due to safety, efficacy, or durability, may impede our ability to develop not only CB-010 but our other CAR-T and CAR-NK product candidates as well, and may significantly influence physicians' and regulatory authorities' opinions with regard to the viability of our entire pipeline of allogeneic cell therapies. In order to submit INDs for our other product candidates, we will need to complete many objectives, such as our preclinical research of product candidates still in discovery and advancement of cGMP conditions for our product candidates. If we are unable to achieve any of these objectives, we may not be able to submit other INDs in a timely manner or at all, which would significantly harm our business. Specifically, in terms of our lead product candidates:

*CB-010*

CB-010 is our allogeneic anti-CD19 CAR-T cell therapy for the treatment of relapsed or refractory B cell non-Hodgkin lymphoma, or B-NHL. We use our Cas9 chRDNA genome-editing technology to eliminate the T cell receptor from healthy donor T cells to reduce the risk of GvHD and to remove the PD-1 checkpoint from the CAR-T cell surface to reduce exhaustion of the CAR-T cells. We have manufactured CB-010 under cGMP conditions and are enrolling patients for our ANTLER phase 1 clinical trial. We do not know if the preclinical animal results we observed will be borne out in human patients or if CB-010 will ultimately prove to be safe and effective.

*CB-011*

CB-011 is our allogeneic anti-BCMA CAR-T cell therapy for the treatment of relapsed or refractory multiple myeloma, or MM. We are currently in preclinical animal studies with CB-011, using CB-011 cell

24

Table of Contents

therapy materials which we have produced under current Good Laboratory Practices, or cGLP. We use our Cas12a chRDNA genome-editing technology to eliminate the T cell receptor from healthy donor cells to reduce the risk of GvHD. Additionally, we use our Ca12a chRDNA technology to remove endogenous HLA class I presentation from the CAR-T cells and insert an HLA-E-B2M fusion protein into the *B2M* gene, which we believe immune cloaks the CAR-T cells and blunts T- and NK cell-mediated rejection of the allogeneic CAR-T cells by the patient's immune system, potentially resulting in greater persistence, although we have no clinical evidence for this hypothesis. We anticipate filing our IND for our CB-011 product candidate in 2022; however, there can be no assurances that we will be able to produce CB-011 under cGMP conditions or that we will not experience delays in filing our IND.

*CB-012*

CB-012 is our allogeneic anti-CD371 CAR-T cell therapy for the treatment of acute myeloid leukemia. We are currently considering various armoring strategies, which will then drive our selection of Cas12a chRDNA guides. We do not anticipate filing our IND for our CB-012 product candidate until 2023; however, there can be no assurances that we will be able to produce CB-012 under cGLP or cGMP conditions or that we will not experience delays in filing our IND.

*CB-020*

We are conducting preclinical discovery research on natural killer, or NK, cells derived from iPSCs, and whether we can edit such iNK cells for solid tumor-targeted cell therapy development. We have not yet chosen which genome-editing technology we will use to edit the iNK cells nor do we know whether such editing will be successful. To date, we have focused on Cas12a chRDNA editing of iPSCs and on differentiating iPSCs into iNKs. We anticipate selecting a cell-surface target for our CB-020 product candidate in 2022.

Thus, although our product candidates are in various stages of research and development, only our CB-010 product candidate is in a phase 1 clinical trial, and we have substantial hurdles to overcome before any of our product candidates are approved, commercialized, and generate revenues, if at all.

***We may not be successful in our efforts to identify and successfully research and develop additional product candidates and may expend our limited resources to pursue particular product candidates or indications while failing to capitalize on other product candidates or indications that may be more profitable or for which there is a greater likelihood of commercial success.***

Part of our business strategy involves identifying and developing new cell therapy product candidates. The process by which we identify product candidates may fail to yield successful product candidates for a number of reasons, including:
- we may not be able to assemble sufficient resources to identify or acquire additional product candidates;
- competitors may develop alternative therapies that render new product candidates obsolete or less attractive;
- product candidates we develop or acquire may be covered by third-party intellectual property rights;
- new product candidates may, on further study, be shown to have adverse side effects, toxicities, or other characteristics that indicate that they are unlikely to receive marketing approval or achieve market acceptance;
- new product candidates may not be safe or effective;

25

Table of Contents

- the market for a new product candidate may change so that the continued development of that product candidate is no longer reasonable; and
- we may not be able to produce new product candidates in commercial quantities at an acceptable cost, or at all.

We have limited financial and managerial resources. We are focused initially on allogeneic CAR-T and CAR-NK cell therapies and, as a result, we may forego or delay pursuit of opportunities with other product candidates or for other indications that later prove to have greater commercial potential. Our resource allocation decisions may cause us to fail to timely capitalize on viable commercial products or profitable market opportunities. Our spending on current and future product candidates for specific indications may not yield any commercially viable products. If we do not accurately evaluate the commercial potential or target market for a particular product candidate, we may relinquish valuable rights to that product candidate through collaboration, licensing, or other royalty arrangements when it would have been more advantageous for us to retain sole development and commercialization rights to such product candidate.

*If we experience delays or difficulties enrolling patients in the clinical trials for our product candidates, including our ANTLER phase 1 clinical trial, our ability to advance CB-010 and our other product candidates through clinical development and the regulatory process could be delayed or prevented.*

The timely completion of clinical trials depends, among other things, on our ability to enroll a sufficient number of patients who remain in the trial until its conclusion. We may encounter delays in enrolling or be unable to enroll a sufficient number of patients to complete any of our clinical trials and, even if patients are enrolled, they may withdraw from our clinical trials before completion. We have dosed the first patient in our ANTLER phase 1 clinical trial for our CB-010 product candidate. For our ANTLER phase 1 clinical trial, we have entered into a contract with a clinical research organization, or CRO, as well as clinical trial agreements with the sites participating in our trial. Patient selection and enrollment may be challenging. Our clinical protocol excludes many non-Hodgkin lymphoma patients from the ANTLER phase 1 clinical trial, including patients previously treated with anti-CD19-targeted therapy or allogeneic stem cell transplantation, patients with active or chronic GvHD requiring therapy, or patients unwilling to follow extended safety monitoring.

Our ANTLER phase 1 clinical trial, as well as any future clinical trials for our other product candidates, will compete for enrollment of patients with other clinical trials for product candidates that are in the same cell therapeutic areas with the same or similar study populations as our product candidates. Our clinical trials will also compete for enrollment of patients with other clinical trials for product candidates based on non-cellular modalities, such as small molecules and antibodies, that are intended for the same or similar study populations as our product candidates. This competition will reduce the number and types of patients available to us because some patients who might opt to enroll in our trials may instead opt to enroll in a trial being conducted by one of our competitors. Additionally, since the number of qualified and experienced clinical investigators for therapeutic areas is limited, some of our clinical trial sites may be also conducting clinical trials for some of our competitors, which may reduce the number of patients who are available for our clinical trials at that clinical trial site. Moreover, because our product candidates represent a departure from more commonly used methods for cancer treatment, potential patients and their doctors may be inclined to use conventional therapies, such as chemotherapy, hematopoietic stem cell transplantation, or autologous CAR-T cell therapies, rather than refer patients to our clinical trials. Because our cell therapy product candidates are edited with chRDNA guides, our products may be perceived to have additional or greater safety risks. Patients eligible for allogeneic CAR-T cell therapies but ineligible for autologous CAR-T cell therapies may be difficult to treat due to advanced and aggressive cancers and may fail to experience improved outcomes and be at greater risk for complications and death from our product candidates. If patients are unwilling to participate in our cell therapy trials, the timeline for recruiting patients, conducting clinical trials, and obtaining regulatory approval of any of our product candidates may be delayed.

26

Table of Contents

In addition, the enrollment of patients depends on many factors, including:
- severity or stage of the type of cancer under investigation;
- size of the patient population and process for identifying patients;
- design of the clinical trial protocol;
- availability of eligible prospective patients who are otherwise eligible patients for competitive clinical trials;
- availability and efficacy of approved alternative treatments for the disease under investigation;
- ability to obtain and maintain patient consent;
- risk that enrolled patients will drop out before completion of the trial;
- eligibility and exclusion criteria for the trial in question;
- perceived risks and benefits of our product candidates;
- perceived risks and benefits of genome-editing and cell therapies;
- perceived risks and benefits of participating in a clinical trial;
- efforts by clinical sites and investigators to facilitate timely enrollment in clinical trials;
- patient referral practices of physicians;
- ability to monitor patients adequately during and after treatment;
- proximity and availability of clinical trial sites for prospective patients; and
- business interruptions resulting from the COVID-19 pandemic.

Enrollment delays in our clinical trials may result in increased development costs for any product candidates we may develop, which may cause our stock price to decline and limit our ability to obtain additional financing. If we have difficulty enrolling a sufficient number of patients to conduct our clinical trials as planned, we may need to delay, limit, or terminate our ANTLER phase 1 clinical trial or future clinical trials, and postpone or forgo seeking marketing approval, any of which would have an adverse effect on our business, financial condition, results of operations, and prospects.

***Clinical testing is expensive, time consuming, and subject to uncertainty. We cannot guarantee that any clinical studies will be conducted as planned or completed on schedule, if at all. Issues may arise that could suspend or terminate our clinical trials. A failure of one or more clinical studies may occur at any stage of testing, and our future clinical studies may not be successful.***

Events that may prevent successful or timely completion of clinical development include:
- the FDA or comparable foreign regulatory authorities disagreeing as to the design or implementation of our clinical trials;

27

Table of Contents

- delays or failure to obtain regulatory clearance to initiate our clinical trials, as well as delays or failures to obtain any necessary approvals by the clinical sites;
- delays, suspension, or termination of our clinical trials by the clinical sites;
- modification of clinical trial protocols;
- delays in reaching agreement on acceptable terms with prospective CROs and clinical trial sites, the terms of which can be subject to extensive negotiation and may vary significantly among different CROs and clinical trial sites, as well as possible future breaches of such agreements;
- failure to manufacture sufficient quantities of our product candidates for use in our clinical trials;
- failure by third-party suppliers, CMOs, CROs, and clinical trial sites to comply with regulatory requirements or meet their contractual obligations to us in a timely manner, or at all;
- imposition of a temporary or permanent clinical hold by us, the investigational review boards, or IRBs, for the institutions at which such trials are being conducted, or by the FDA or other regulatory authorities for safety or other reasons, such as a result of a new safety finding in a clinical trial on a similar product by one of our competitors, that presents unreasonable risk to clinical trial participants;
- changes in regulatory requirements and guidance that require amending or submitting new clinical protocols;
- changes in the standard of care on which we developed our clinical development plan, which may require new or additional trials;
- the cost of clinical trials of our product candidates being greater than we anticipated;
- insufficient funding to continue clinical trials with our product candidates;
- the emergence of unforeseen safety issues or undesirable side effects;
- clinical trials of our product candidates producing negative or inconclusive results, which may result in our deciding, or regulators requiring us, to conduct additional clinical trials or abandon development of our product candidates;
- inability to establish clinical trial endpoints that applicable regulatory authorities consider clinically meaningful, or, if we seek accelerated approval, that applicable regulatory authorities consider likely to predict clinical benefit;
- regulators withdrawing their approval of a product or imposing restrictions on its distribution; and
- business interruptions resulting from the COVID-19 pandemic.

If we are required to extend the duration of any clinical trials or to conduct additional preclinical studies or clinical trials or other testing of our product candidates beyond those that we currently contemplate; if we are unable to successfully complete preclinical studies or clinical trials of our product candidates or other testing; if the results of these trials, studies, or tests are negative or produce inconclusive results; if there are safety

28

Table of Contents

concerns; or if we determine that the observed safety or efficacy profile would not be competitive in the marketplace, we may:

- abandon the development of one or more product candidates;
- incur unplanned costs;
- be delayed in obtaining marketing approval for our product candidates or not obtain marketing approval at all;
- obtain marketing approval in some jurisdictions and not in others;
- obtain marketing approval for indications or patient populations that are not as broad as intended or designed;
- obtain marketing approval with labeling that includes significant use restrictions or safety warnings, including black box warnings;
- be subject to additional post-marketing requirements; or
- have regulatory agencies remove the product from the market or we voluntarily withdraw the product from the market after obtaining marketing approval.

***Our clinical trials may fail to adequately demonstrate the safety and efficacy of any of our product candidates and the development of our product candidates may be delayed or unsuccessful, which could prevent or delay regulatory approval and commercialization.***

Our product candidates are in various stages of preclinical and clinical development. If we encounter safety or efficacy problems in our ongoing or future studies, our developmental plans and business could be significantly harmed. Product candidates in later stages of clinical trials may fail to show the desired safety profiles and efficacy results despite having progressed through initial clinical trials. A number of companies in the biopharmaceutical industry have suffered significant setbacks in advanced clinical trials due to lack of efficacy or adverse safety profiles, notwithstanding promising results in earlier trials. Based upon negative or inconclusive results, we may decide, or regulatory agencies may require us, to conduct additional clinical trials or preclinical studies. In addition, data obtained from clinical trials are susceptible to varying interpretations, and regulatory agencies may not interpret our data as favorably as we do, which may delay, limit, or prevent regulatory approval.

In addition, the design of a clinical trial can determine whether its results will support approval of our product candidates, and flaws in the design of a clinical trial may not be apparent until the clinical trial is well advanced. We have limited experience designing clinical trials and may be unable to design and execute a clinical trial that will support regulatory approval.

From time to time, we may publish initial, interim, or preliminary data from our clinical trials. Initial, interim, or preliminary data from clinical trials are subject to the risk that one or more of the clinical outcomes may materially change as patient enrollment continues and more patient data become available. We also make assumptions, estimations, calculations, and conclusions as part of our analyses of data, and we may not have received or had the opportunity to fully evaluate all data at the time of publishing initial, interim, or preliminary data. These data also remain subject to audit and verification procedures that may result in the final data being materially different from the data we previously published. As a result, initial, interim, and preliminary data should be viewed with caution until the final data are available. Moreover, initial, interim, and preliminary data are subject to the risk that one or more of the clinical outcomes may materially change as more patient data

29

Table of Contents

become available when patients mature on study, patient enrollment continues, or, for final data, as other ongoing or future clinical trials with a product candidate further develop. Past results of clinical trials may not be predictive of future results. Unfavorable differences between initial, interim, or preliminary data and final data could significantly harm our business prospects and may cause the trading price of our common stock to fluctuate significantly.

Because of these risks, our product candidates may fail or encounter difficulties in clinical trials. If we are unable to advance our product candidates through clinical trials to seek marketing approval, our business, financial condition, results of operations, and prospects may be materially harmed.

***If our product candidates cause serious adverse events or undesirable side effects, including injury and death, or have other properties that could delay or prevent regulatory approval, their commercial potential may be limited or extinguished.***

Product candidates we develop may be associated with undesirable or unacceptable side effects, unexpected characteristics, or other serious adverse events, including death. Immunotherapy, and its method of action of harnessing the immune system, is powerful and could lead to serious side effects that we only discover in clinical trials. In addition to potential serious adverse events from the immune system or side effects caused by our CB-010 product, or any product candidate we may develop and advance into one more clinical trials, the product candidate administration process and related procedures may also cause undesirable side effects. Patients who enroll in our ANTLER phase 1 clinical trial, and potentially future trials, will undergo a lymphodepletion regimen, including administration of fludarabine and cyclophosphamide, which can lead to serious adverse events. Because these regimens will cause a transient and sometimes prolonged immune suppression, patients will have an increased risk of certain infections, which could ultimately lead to death. We expect to have to educate clinical site personnel administering our cell therapy product candidates to understand the side effect profiles for our product candidates. Inadequate recognition or management of the potential side effects of our product candidates could result in patient injury or death. If any undesirable or unacceptable side effects, unexpected characteristics, or other serious adverse events occur, our clinical trials could be suspended or terminated, and our business and reputation could suffer substantial harm.

There can be no assurance that we will resolve any adverse event issues related to any of our products to the satisfaction of the FDA or any regulatory agency in a timely manner or at all. If in the future we are unable to successfully demonstrate that such adverse events were caused by factors other than our product candidates, the FDA or other regulatory authorities could order us to cease further clinical trials of, or deny approval of, our product candidates. Even if we are able to demonstrate that such serious adverse events are not product candidate-related, such occurrences could affect patient recruitment or the ability of enrolled patients to complete our clinical trials. Moreover, if we elect, or are required, to delay, suspend, or terminate any clinical trial of any of our product candidates, the commercial prospects of such product candidates may be harmed and our ability to generate product revenues from these product candidates may be delayed or eliminated. Any of these occurrences may harm our business, financial condition, results of operations, and prospects.

***The FDA may disagree with our regulatory plans and we may fail to obtain regulatory approval of our cell therapy product candidates.***

If and when our ANTLER phase 1 clinical trial for our CB-010 product candidate is completed and, assuming positive data, we will propose to advance to a pivotal clinical trial. Although the FDA has found substantial evidence to support approval outside of the traditional phase 1, phase 2, and phase 3 framework for the approved anti-CD19 and anti-BCMA CAR-T cell therapies, the general approach for FDA approval of a new biologic is for the sponsor to provide dispositive data from at least two adequate and well-controlled clinical trials of the relevant biologic in the applicable patient population. Such clinical trials typically involve hundreds of patients, have significant costs, and take years to complete. We do not have agreement or guidance from the FDA that our regulatory development plans will be sufficient for submission of a biologics license application, or

30

Table of Contents

Affordable Care Act may be brought. The extent to which any such changes may impact our business or financial condition is uncertain.

Other legislative changes have been proposed and adopted since the Affordable Care Act was enacted. The American Taxpayer Relief Act of 2012, or ATRA, among other things, reduced Medicare payments to several providers, including hospitals, imaging centers, and cancer treatment centers, and increased the statute of limitations period for the government to recover overpayments to providers from three to five years. New laws may result in additional reductions in Medicare and other healthcare funding, which may materially adversely affect customer demand and affordability for our product candidates and, accordingly, our business, financial condition, results of operations, and prospects. Additional changes that may affect our business include the expansion of new programs such as Medicare payment for performance initiatives for physicians under the Medicare Access and CHIP Reauthorization Act of 2015, or MACRA, which first affected physician payment in 2019. At this time, it is unclear how the introduction of the Medicare quality payment program will impact overall physician reimbursement.

Also, there has been heightened governmental scrutiny over the manner in which drug manufacturers set prices for their marketed products, which have resulted in several congressional inquiries and proposed bills and initiatives, as well as state efforts, designed to, among other things, bring more transparency to product pricing, review the relationship between pricing and manufacturer patient programs, and reform government program reimbursement methodologies for drug products.

We expect that these and other healthcare reform measures in the future, may result in more rigorous coverage criteria and lower reimbursement, and in addition, downward pressure on the price that we receive for any approved product. Any reduction in reimbursement from Medicare or other government-funded programs may result in a similar reduction in payments from private payors. The implementation of cost containment measures or other healthcare reforms may hinder us in generating revenue, attaining profitability, or commercializing our cell therapy products once, and if, marketing approval is obtained.

In the EU, coverage and reimbursement status of any product candidates for which we obtain regulatory approval are provided for by the national laws of EU member states. The requirements may differ across the EU member states. In markets outside the United States and the EU, reimbursement and healthcare payment systems vary significantly by country, and many countries have instituted price ceilings on specific products and therapies. Also, at the national level, actions have been taken to enact transparency laws regarding payments between pharmaceutical companies and healthcare professionals.

We cannot predict the likelihood, nature, or extent of government regulation that may arise from future legislation or administrative action in the United States, the EU, or any other jurisdiction. If we or any third parties we may engage are slow or unable to adapt to changes in existing requirements or the adoption of new requirements or policies, or if we or such third parties are not able to maintain regulatory compliance, our product candidates may lose any regulatory approval that we may have obtained and we may not achieve or sustain profitability.

***We face significant competition from other biotechnology and pharmaceutical companies, which may result in other companies developing or commercializing products before, or more successfully than, we do, thus rendering our product candidates non-competitive or reducing the size of our market, and our operating results will suffer if we fail to compete effectively.***

The biopharmaceutical industry, and the genome-editing, cell therapy, and immuno-oncology industries specifically, is characterized by intense competition and rapid innovation. Our potential competitors include major multi-national pharmaceutical companies, established biotechnology companies, specialty pharmaceutical companies, and universities and other research institutions. Many of our competitors have substantially greater financial, technical, and other resources, such as larger research and development staffs, established

43

Table of Contents

manufacturing capabilities and facilities, and experienced marketing organizations with well-established sales forces. Smaller or early-stage companies may also prove to be significant competitors, particularly through collaborative arrangements with large, established companies that have greater resources. Mergers and acquisitions in the biotechnology and pharmaceutical industries may result in even more resources being concentrated on our competitors. Competition may increase further as a result of advances in the commercial applicability of genome editing or other new technologies and greater availability of capital for investment in these industries. These competitors also compete with us in recruiting and retaining qualified scientific and management personnel and establishing clinical trial sites and patient enrollment for participation in clinical trials, as well as in acquiring technologies complementary to, or necessary for, our development programs. In addition, due to the intense research and development taking place in the genome-editing field, including by us and our competitors, the intellectual property landscape is in flux and highly competitive. There may be significant intellectual property-related litigation and proceedings relating to our owned and in-licensed, and other third-party, intellectual property rights in the future. Our commercial opportunities could be reduced or eliminated if our competitors develop and commercialize products that are safer, more effective, have fewer or less severe side effects, are more convenient to administer, have broader acceptance and higher rates of reimbursement by third-party payors, or are less expensive than any product candidates that we may develop. Our competitors also may obtain FDA or other regulatory approval for their products more rapidly than we may obtain approval for ours, which could result in our competitors establishing a strong market position before we are able to enter the market. Additionally, genome-editing technologies developed by our competitors may render our product candidates uneconomical or obsolete, and we may not be successful in marketing any product candidates we may develop against competitor products. The key competitive factors affecting the success of all of our product candidates are likely to be their efficacy, safety, and availability of reimbursement.

Our focus is on the development of cell therapies using our chRDNA genome-editing technology. We are aware of several companies focused on developing therapies for various indications using CRISPR-Cas9 genome-editing technology including CRISPR Therapeutics AG, Editas Medicine, Inc., and Intellia. In addition, several academic groups have developed new genome-editing technologies based on CRISPR-Cas9, such as base editing and prime editing, as well as alternative CRISPR systems, which may have utility in therapeutic development. We believe companies such as Beam Therapeutics Inc., Metagenomi Technologies, LLC, Prime Medicine, Inc., and Scribe Therapeutics, Inc. are developing alternative CRISPR systems. Multiple academic labs and companies have also published on other CRISPR-associated nuclease variants that can edit human DNA. There are also companies developing therapies using non-CRISPR genome-editing technologies, such as transcription activator-like effector nucleases, meganucleases, and zinc finger nucleases. These companies include Allogene Therapeutics, Inc., bluebird bio, Inc., Cellectis S.A., Precision BioSciences, Inc., and Sangamo Therapeutics. In addition to competition from other genome-editing therapies or gene or cell therapies, any product we may develop may also face competition from other types of therapies, such as small molecule, antibody, or protein therapies.

Our allogeneic CAR-T and CAR-NK cell therapy product candidates face significant competition from multiple companies, including Allogene, Atara Biotherapeutics, Inc., Cellectis, Celyad Oncology SA, CRISPR Therapeutics AG, Fate Therapeutics, Inc., Poseida Therapeutics, Inc., Precision BioSciences, and Sangamo Therapeutics. There are over 200 preclinical- and clinical-stage autologous and allogeneic anti-CD19 CAR-T programs, some of which will be competitive with our CB-010 product candidate, and over 90 preclinical- and clinical-stage autologous and allogeneic anti-BCMA CAR-T programs, some of which will be competitive with our CB-011 product candidate. Additionally, other companies are developing allogeneic CAR-T cell therapies for AML.

To become and remain profitable, we must develop and eventually commercialize product candidates with significant market potential, which will require us to be successful in a range of challenging activities. These activities can include completing preclinical studies and clinical trials of our product candidates; obtaining marketing and reimbursement approval for these product candidates; manufacturing, marketing, and selling those products that are approved; and satisfying any post-marketing requirements. We may never succeed in any or all

44

Table of Contents

of these activities and, even if we do, we may never generate revenues that are significant or large enough to achieve profitability. If we do achieve profitability, we may not be able to sustain or increase profitability on a quarterly or annual basis. Our failure to become and remain profitable would decrease the price of our common stock and could impair our ability to raise capital, maintain our research and development efforts, expand our business, or continue our operations. A decline in the price of our common stock also could cause stockholders to lose all or part of their investment.

***Our business operations and current and future relationships with clinical site investigators, healthcare professionals, consultants, third-party payors, patient organizations, and customers will be subject to applicable healthcare regulatory laws, which could expose us to penalties.***

Our business operations and current and future arrangements with clinical site investigators, healthcare professionals, consultants, third-party payors, patient organizations, and customers may expose us to broadly applicable fraud and abuse and other healthcare laws and regulations. These laws may constrain the business or financial arrangements and relationships through which we conduct our operations, including how we market, sell, and distribute our product candidates, if approved. Such laws include:

- the U.S. federal Anti-Kickback Statute, which prohibits, among other things, persons or entities from knowingly and willfully soliciting, offering, receiving, or providing any remuneration (including any kickback, bribe, or certain rebate), directly or indirectly, overtly or covertly, in cash or in kind, to induce or reward, or in return for, either the referral of an individual for, or the purchase, lease, order, or recommendation of, any good, facility, item, or service, for which payment may be made, in whole or in part, under U.S. federal and state healthcare programs such as Medicare and Medicaid. A person or entity does not need to have actual knowledge of the statute or specific intent to violate it in order to have committed a violation;
- the U.S. federal civil and criminal false claims laws, including the civil False Claims Act, which, among other things, impose criminal and civil penalties, including through civil whistleblower or qui tam actions, against individuals or entities for knowingly presenting, or causing to be presented, to the U.S. government, claims for payment or approval that are false or fraudulent; knowingly making, using, or causing to be made or used a false record or statement material to a false or fraudulent claim; or from knowingly making a false statement to avoid, decrease, or conceal an obligation to pay money to the U.S. government. In addition, the government may assert that a claim including items and services resulting from a violation of the U.S. federal Anti-Kickback Statute constitutes a false or fraudulent claim for purposes of the False Claims Act;
- the U.S. federal civil monetary penalties laws, which impose civil fines for, among other things, the offering or transfer of remuneration to a Medicare or state healthcare program beneficiary if the person knows or should know it is likely to influence the beneficiary's selection of a particular provider, practitioner, or supplier of services reimbursable by Medicare or a state healthcare program, unless an exception applies;
- the U.S. Health Insurance Portability and Accountability Act of 1996, or HIPAA, which imposes criminal and civil liability for, among other things, knowingly and willfully executing, or attempting to execute, a scheme to defraud any healthcare benefit program, or knowingly and willfully falsifying, concealing, or covering up a material fact or making any materially false statement, in connection with the delivery of, or payment for, healthcare benefits, items, or services; similar to the U.S. federal Anti-Kickback Statute, a person or entity does not need to have actual knowledge of the statute or specific intent to violate it in order to have committed a violation;
- HIPAA, as amended by the Health Information Technology for Economic and Clinical Health Act of 2009 and its implementing regulations, which also imposes certain obligations, including

45

Table of Contents

***The market price of our common stock may be volatile, which could result in substantial losses for investors purchasing shares in this offering.***

The initial public offering price for our common stock was determined through negotiations between us and the underwriters. The market price of our common stock following the offering may vary significantly from the initial public offering price. As a result, you may not be able to sell your common stock at or above the initial public offering price. Some of the factors that may cause the market price of our common stock to fluctuate include:

- the timing and results of preclinical and clinical studies for any product candidates that we develop;
- delay, failure, or discontinuation of any of our product candidates or research programs;
- results of preclinical studies, clinical trials, or regulatory approvals of product candidates of our competitors, or announcements about new research programs or product candidates of our competitors;
- adverse regulatory decisions, including failure to receive regulatory approval of one or more of our product candidates;
- unanticipated or serious safety concerns related to our product candidates;
- developments or changing views regarding the use of biologics, including those that involve genome editing;
- commencement or termination of collaborations;
- regulatory or legal developments in the United States and other countries;
- assertions that our product candidates infringe third-party patents;
- invalidity challenges to our intellectual property;
- manufacturing delays;
- acceptance or lack of acceptance of allogeneic products;
- inability to meet the obligations under our collaboration agreement with AbbVie;
- inability to obtain additional collaboration partners;
- the recruitment and retention of key personnel;
- the level of expenses related to any of our product candidates, including preclinical studies and clinical trials, as well as the level related to our research programs;
- the results of our efforts to develop additional product candidates or technologies;
- actual or anticipated changes in estimates as to financial results, development timelines, or recommendations by securities analysts;
- announcements or expectations of additional financing efforts;

77

Table of Contents

- significant lawsuits, including contract disputes with our licensors, licensees, assignors, assignees, suppliers, CMOs, CROs, clinical sites, or stockholder litigation;
- sales of our common stock by us, our insiders, or other stockholders;
- expiration of market stand-off or lock-up agreements;
- variations in our financial results or those of companies that are perceived to be similar to us;
- changes in the structure of healthcare payment systems;
- market conditions in the pharmaceutical and biotechnology sectors;
- general economic, industry, and market conditions; and
- the other factors described in this "Risk Factors" section.

In recent years, the stock market in general, and the market for pharmaceutical and biotechnology companies in particular, has experienced extreme price and volume fluctuations that have often been unrelated or disproportionate to changes in the operating performance of the companies whose stock is experiencing those price and volume fluctuations, including recently in connection with the ongoing COVID-19 pandemic. Broad market and industry factors, including potentially worsening economic conditions and other adverse effects or developments, may seriously affect the market price of our common stock, regardless of our actual operating performance. These fluctuations may be even more pronounced in the trading market for our stock shortly following this offering. Following periods of such volatility in the market price of a company's securities, securities class action litigation has often been brought against that company. Because of the potential volatility of our stock price, we may become the target of securities litigation in the future. Securities litigation could result in substantial costs and divert our management's attention and resources from our business.

*If securities analysts do not publish research or reports about our business or if they publish negative evaluations of our stock, the price of our stock could decline.*

The trading market for our common stock will rely in part on the research and reports that industry or financial analysts publish about us or our business. We do not currently have, and may never obtain, research coverage by industry or financial analysts. If no or few analysts commence coverage of us, the trading price of our stock would likely decrease. Even if we do obtain analyst coverage, if one or more of the analysts covering our business downgrade their evaluations of our stock, the price of our stock could decline. If one or more of these analysts cease to cover our stock, we could lose visibility in the market for our stock, which in turn could cause our stock price to decline.

*A significant portion of our total outstanding shares is, and will be, restricted from immediate resale following this offering, but may be sold into the market in the near future, which could cause the market price of our common stock to decline significantly, even if our business is doing well.*

Sales of a substantial number of shares of our common stock in the public market could occur at any time. These sales, or the perception in the market that the holders of a large number of shares of common stock intend to sell shares, could reduce the market price of our common stock. After this offering and after giving effect to the conversion of all outstanding shares of our preferred stock into 26,234,654 shares of our common stock upon the closing of this offering, we will have 54,709,191 shares of common stock outstanding, or 57,259,191 shares if the underwriters exercise their option to purchase additional shares in full, in each case based on the 37,709,191 shares of our common stock outstanding as of July 12, 2021. Of these shares, the 17,000,000 shares (or 19,550,000 shares if the underwriters exercise their option to purchase additional shares in full) we are selling in this offering may be resold in the public market immediately. The remaining 37,709,191

Table of Contents

**SPECIAL NOTE REGARDING FORWARD-LOOKING STATEMENTS**

This prospectus contains forward-looking statements. All statements other than statements of historical facts contained in this prospectus, including statements regarding our future results of operations and financial position, future revenue, business strategy, prospects, product candidates, planned and ongoing preclinical studies and clinical trials, results of preclinical studies and clinical trials, research and development costs, regulatory approvals, timing and likelihood of success, as well as plans and objectives of management for future operations, are forward-looking statements. In some cases, you can identify forward-looking statements by terms such as "may," "will," "should," "expect," "plan," "anticipate," "could," "intend," "target," "project," "contemplate," "believe," "estimate," "predict," "potential," or "continue" or the negative of these terms or other similar expressions, although not all forward-looking statements contain these words. Forward-looking statements include, but are not limited to, statements concerning:

- the initiation, timing, progress and results of our product candidate preclinical studies, clinical trials, and research programs;
- our ability to demonstrate, and the timing of, preclinical proof-of-concept *in vivo* for our product candidates;
- our ability to successfully develop our product candidates and to obtain and maintain regulatory approval for our product candidates;
- our ability to successfully complete our clinical trials;
- our ability to quickly leverage our initial product candidates and to progress additional candidates;
- the prevalence of certain diseases and conditions we intend to treat and the size of the market opportunity for our product candidates;
- estimates of the number of patients with certain diseases and conditions we intend to treat and the number of patients that we will enroll in our clinical trials;
- the likelihood of our clinical trials demonstrating safety and efficacy of our product candidates;
- the beneficial characteristics, safety, efficacy, therapeutic effects, and potential advantages of our product candidates;
- the timing or likelihood of regulatory filings and approval for our product candidates;
- our ability to meet future regulatory standards with respect to our product candidates;
- our plans relating to the further development and manufacturing of our product candidates, including additional indications for which we may pursue;
- our ability to identify additional products, product candidates, or technologies with significant commercial potential that are consistent with our commercial objectives;
- the rate and degree of market acceptance and therapeutic benefits of our product candidates;
- the implementation of our strategic plans for our business, product candidates, research programs, and technologies;

84

Table of Contents

- the scope of protection we are able to establish and maintain for intellectual property rights covering our product candidates and genome-editing technology;
- assertions that our product candidates infringe third-party patents;
- invalidity challenges to our intellectual property;
- the impact of COVID-19 on our business and operations;
- anticipated developments related to our competitors and our industry;
- our competitive position and ability to leverage the clinical, regulatory, and manufacturing advancements made by our genome-editing technologies to accelerate our clinical trials and regulatory approval of product candidates;
- the success of competing therapies that are or may become available;
- our ability to identify and enter into future license agreements and collaborations;
- the expected potential benefits of strategic collaborations with third parties and our ability to attract collaborators with development, regulatory, manufacturing, or commercialization expertise;
- our reliance on third parties to conduct clinical trials of our product candidates;
- our reliance on third parties for the manufacture of our product candidates;
- our plans relating to sales strategy, manufacturing and commercializing our product candidates;
- our ability to attract and retain sales personnel, or to contract with a sales organization, if our product candidates are approved;
- anticipated regulatory developments in the United States and foreign countries in which we may seek regulatory approval for our product candidates in the future;
- our ability to attract and retain key scientific and management personnel;
- our financial performance;
- the sufficiency of our existing capital resources to fund our future operating expenses and capital expenditure requirements;
- our expectations regarding the period during which we will qualify as an emerging growth company under the JOBS Act; and
- our anticipated use of our existing resources and the proceeds from this offering, estimates of our expenses, capital requirements, and needs for additional financing.

The forward-looking statements in this prospectus are only predictions and are based largely on our current expectations and projections about future events and financial trends that we believe may affect our business, financial condition and results of operations. These forward-looking statements speak only as of the date of this prospectus and are subject to a number of known and unknown risks, uncertainties and assumptions, including those described under the sections in this prospectus entitled "Risk Factors" and "Management's

85

Table of Contents

Discussion and Analysis of Financial Condition and Results of Operations" and elsewhere in this prospectus. Because forward-looking statements are inherently subject to risks and uncertainties, some of which cannot be predicted or quantified and some of which are beyond our control, you should not rely on these forward-looking statements as predictions of future events. The events and circumstances reflected in our forward-looking statements may not be achieved or occur and actual results could differ materially from those projected in the forward-looking statements. Moreover, we operate in a very competitive and rapidly evolving environment. New risk factors and uncertainties may emerge from time to time, and it is not possible for management to predict all risk factors and uncertainties. Except as required by applicable law, we do not plan to publicly update or revise any forward-looking statements contained herein, whether as a result of any new information, future events, changed circumstances or otherwise.

Table of Contents

**INDUSTRY AND MARKET DATA**

Unless otherwise indicated, information contained in this prospectus concerning our industry and the markets in which we operate, including our general expectations about our product candidates, market position, market opportunity, market size, and the incidence of certain medical conditions, is based on industry information and other third-party sources. Our estimates of the potential market opportunities for our product candidates include a number of key assumptions based on our industry knowledge and industry publications, which we believe to be reasonable. However, any projections, assumptions, and estimates of our future performance and the future performance of the industry in which we operate are necessarily subject to risks and uncertainties due to a variety of factors, including those described in "Risk Factors" and elsewhere in this prospectus. These and other factors could cause results to differ materially from those expressed in the estimates made by independent third parties and by us.

87

Table of Contents

**MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS**

*You should read the following discussion and analysis of our financial condition and results of operations together with the section titled "Summary Consolidated Financial Data," and our consolidated financial statements and the related notes included elsewhere in this prospectus. This discussion and analysis and other parts of this prospectus contain forward-looking statements based upon current beliefs, plans and expectations related to future events and our future financial performance that involve risks, uncertainties and assumptions, such as statements regarding our intentions, plans, objectives and expectations for our business. Our actual results and the timing of selected events could differ materially from those described in or implied by these forward-looking statements as a result of several factors, including those set forth in the section titled "Risk Factors." See also the section titled "Special Note Regarding Forward-Looking Statements."*

**Overview**

We are a clinical-stage biopharmaceutical company dedicated to transforming the lives of patients with devastating diseases by applying our novel CRISPR platform, **C**RISPR **h**ybrid **R**NA-**DNA**, or chRDNA, pronounced "chardonnay," toward the development of next-generation, genome-edited cell therapies. Our renowned founders, including a Nobel laureate, are pioneers in CRISPR genome editing. Our chRDNA technology has demonstrated superior specificity and high efficiency in preclinical studies, which enables us to perform multiple, precise genomic edits, while maintaining genomic integrity.

We believe that our technology has broad potential to generate gene and cell therapies in oncology and in therapeutic areas beyond oncology, including immune cell therapies, cell therapies derived from genome-edited induced pluripotent stem cells, or iPSCs, and *in vivo* genome-editing therapies.

The genome-editing technologies currently used in the allogeneic cell therapy field generally have limited efficiency, specificity, and versatility for performing the multiple, precise genomic edits necessary to address insufficient persistence. Our chRDNA technology is designed to address these genome-editing limitations and improve cell therapy activity. By applying this approach to allogeneic cell therapies, we believe we can unlock their full potential by improving upon their effectiveness and durability.

We are initially focused on advancing multiple proprietary allogeneic cell therapies for the treatment of both hematologic malignancies and solid tumors against cell surface targets for which autologous CAR-T cell therapeutics have previously demonstrated clinical proof of concept, including both CD19 and B cell maturation antigen, or BCMA, as well as new targets. We use our chRDNA technology to enhance, or armor, our cell therapies by creating additional genomic edits to improve persistence of antitumor activity.

Our first lead product candidate, CB-010, is, to our knowledge, the first clinical-stage allogeneic anti-CD19 chimeric antigen receptor T cell, or CAR-T cell, therapy with programmed cell death protein 1, or PD-1, removed from the CAR-T cell surface by a genome-edited knockout of the *PDCD1* gene. We have demonstrated in preclinical models that the PD-1 knockout improves the persistence of antitumor activity by disrupting a pathway that leads to rapid T cell exhaustion. CB-010 is being evaluated in a phase 1 clinical trial in patients with relapsed or refractory B cell non-Hodgkin lymphoma, or B-NHL, with initial data expected in 2022.

Our second lead product candidate, CB-011, is an allogeneic CAR-T cell product candidate and is, to our knowledge, the first anti-BCMA CAR-T cell therapy incorporating an immune cloaking approach that includes both the removal of the endogenous beta-2-microglobulin, or B2M, protein and insertion of a beta-2-microglobulin–human-leukocyte-antigen-E–peptide, or B2M–HLA-E, transgene. This strategy is designed to blunt CAR-T cell rejection by both patient T cells and natural killer, or NK, cells to enable more durable antitumor activity. CB-011 is in preclinical development for relapsed or refractory multiple myeloma, or MM, with an investigational new drug, or IND, filing expected in 2022.

**Table of Contents**

***Operating Expenses***

*Research and Development Expenses*

Our research and development expenses consist of internal and external expenses incurred in connection with the development of our product candidates, development of our platform technologies, and our in-licensing and assignment agreements.

External costs include:
- costs associated with acquiring technology and intellectual property licenses that have no alternative future uses;
- costs incurred in connection with the preclinical and clinical development of our product candidates, including under agreements with CROs and other third parties that conduct clinical trials on our behalf;
- costs of supplying the components for, and the manufacturing of, our product candidates for use in our preclinical studies and clinical trials; and
- other research and development costs, consisting of laboratory materials and supplies consulting services, and the Memorial Sloan Kettering Cancer Center, or MSKCC, success payments liability.

Internal costs include:
- employee-related costs, including salaries, benefits, and share-based compensation expense, for our research and development personnel; and
- facilities and other overhead expenses, including expenses for rent and facilities maintenance and depreciation.

We expense research and development costs as incurred. Costs of certain activities are recognized based on an evaluation of the progress to completion of specific tasks. Payments made prior to the receipt of goods or services that will be used or rendered for future research and development activities are deferred and capitalized as prepaid expenses and other current assets on our balance sheet. The capitalized amounts are recognized as expense as the goods are delivered or the related services are performed. Historically, we have not tracked external costs by clinical program. In late August 2020, the U.S. Food and Drug Administration, or the FDA, cleared our IND for our CB-010 product candidate. Following this offering, we intend to separately track certain external costs for each clinical program. However, we do not currently track, and do not intend to track, costs that are deployed across multiple programs.

Research and development activities are central to our business model. Product candidates in later stages of clinical development generally have higher development costs than those in earlier stages of clinical development, primarily due to the increased size and duration of later-stage clinical trials. We expect that our research and development expenses will increase substantially for the foreseeable future as we continue to implement our business strategy; advance our CB-010 product candidate through clinical trials and later stages of development; conduct clinical trials for our other product candidates; seek regulatory approvals for any product candidates that successfully complete clinical trials; expand our research and development efforts; incur expenses associated with hiring additional personnel to support our research and development efforts; and seek to identify, acquire, and develop additional product candidates.

The successful development of CB-010, CB-011, CB-012, CB-020, and our other potential future product candidates is highly uncertain. Accordingly, at this time, we cannot reasonably estimate or know the

100

Table of Contents

**BUSINESS**

**Overview**

We are a clinical-stage biopharmaceutical company dedicated to transforming the lives of patients with devastating diseases by applying our novel CRISPR platform, **C**RISPR **h**ybrid **R**NA-**DNA**, or chRDNA, pronounced "chardonnay," toward the development of next-generation, genome-edited cell therapies. Our renowned founders, including a Nobel laureate, are pioneers in CRISPR genome editing. Our chRDNA technology has demonstrated superior specificity and high efficiency in preclinical studies, which enables us to perform multiple, precise genomic edits, while maintaining genomic integrity.

We believe that our technology has broad potential to generate gene and cell therapies in oncology and in therapeutic areas beyond oncology, including immune cell therapies, cell therapies derived from genome-edited induced pluripotent stem cells, or iPSCs, and *in vivo* genome-editing therapies.

The genome-editing technologies currently used in the allogeneic cell therapy field generally have limited efficiency, specificity, and versatility for performing the multiple, precise genomic edits necessary to address insufficient persistence. Our chRDNA technology is designed to address these genome-editing limitations and improve cell therapy activity. By applying this approach to allogeneic cell therapies, we believe we can unlock their full potential by improving upon their effectiveness and durability.

We are initially focused on advancing multiple proprietary allogeneic cell therapies for the treatment of both hematologic malignances and solid tumors against cell surface targets for which autologous CAR-T cell therapeutics have previously demonstrated clinical proof of concept, including both CD19 and B cell maturation antigen, or BCMA, as well as new targets. We use our chRDNA technology to enhance, or armor, our cell therapies by creating additional genomic edits to improve persistence of antitumor activity.

Our first lead product candidate, CB-010, is, to our knowledge, the first clinical-stage allogeneic anti-CD19 chimeric antigen receptor T cell, or CAR-T cell, therapy with programmed cell death protein 1, or PD-1, removed from the CAR-T cell surface by a genome-edited knockout of the *PDCD1* gene. We have demonstrated in preclinical models that the PD-1 knockout improves the persistence of antitumor activity by disrupting a pathway that leads to rapid T cell exhaustion. CB-010 is being evaluated in a phase 1 clinical trial in patients with relapsed or refractory B cell non-Hodgkin lymphoma, or B-NHL, with initial data expected in 2022.

Our second lead product candidate, CB-011, is an allogeneic CAR-T cell product candidate, and is, to our knowledge, the first anti-BCMA CAR-T cell therapy incorporating an immune cloaking approach that includes both the removal of the endogenous beta-2 microglobulin, or B2M, protein and insertion of a beta-2-microglobulin–human-leukocyte-antigen-E–peptide, or B2M–HLA-E, transgene. This strategy is designed to blunt CAR-T cell rejection by both patient T cells and natural killer, or NK, cells to enable more durable antitumor activity. CB-011 is in preclinical development for relapsed or refractory multiple myeloma, or MM, with an investigational new drug, or IND, filing expected in 2022.

CB-012 is an allogeneic armored CAR-T cell product candidate targeting CD371, currently in preclinical development for the treatment of relapsed or refractory acute myeloid leukemia, or AML, with an IND filing expected in 2023. CD371 is an attractive target for AML due to its expression on myeloid cancer cells, its enrichment in leukemic stem cells, and its absence on hematopoietic stem cells.

We are also developing allogeneic CAR-NK cell therapies derived from genome-edited iPSCs for the treatment of solid tumors. These CAR-NK products will contain genomic edits designed to overcome the challenges of targeting solid tumors, including trafficking, heterogeneity, and the immunosuppressive tumor microenvironment.

We control a robust patent portfolio protecting our chRDNA technology as well as certain of our allogeneic cell therapy targets.

119

**Table of Contents**



*Figure 7. We employ multiple armoring strategies to improve allogeneic CAR-T cell persistence.*



*Figure 8. In vivo preclinical mouse xenograft data demonstrate that the PD-1 knockout results in a significant survival advantage relative to a conventional allogeneic CAR-T cell therapy that expresses PD-1.*

**Our Pipeline**

### Proprietary pipeline

| Program | Cell type | Target | Editing | Indications | Discovery | IND enabling | Phase 1 | Phase 2 | Phase 3* | Anticipated milestones |
|---|---|---|---|---|---|---|---|---|---|---|
| CB-010 | T cell | CD19 | CAR into TRAC armoring: PD-1 KO | r/r B-NHL | ● | ● | ● | ○ | ○ | initial data expected in 2022 |
| CB-011 | T cell | BCMA | CAR into TRAC armoring: B2M KO, B2M-HLA-E insertion | r/r MM | ● | ○ | ○ | ○ | ○ | IND filing 2022 |
| CB-012 | T cell | CD371 | armoring | r/r AML | ● | ○ | ○ | ○ | ○ | IND filing 2023 |
| CB-020 | iNK cell | undisclosed | armoring | solid tumors | ● | ○ | ○ | ○ | ○ | target selection 2022 |

\* Phase 3 may not be required if phase 2 is registrational.

*Figure 9. Caribou is developing a robust oncology pipeline of immune cell therapies.*

### *CB-010*

Our most developed product candidate is CB-010, an allogeneic anti-CD19 CAR-T cell therapy. See figure 10. We use Cas9 chRDNA guides to make three edits to manufacture CB-010. We introduce, with high efficiency and specificity, the gene encoding the CD19-specific CAR into the gene encoding the T cell receptor alpha constant, or *TRAC*, a component of the native T cell receptor, or TCR. This simultaneously integrates the CD19 CAR site-specifically into the T cell genome and eliminates TCR expression to reduce the risk of graft versus host disease, or GvHD. We also knock out the gene encoding the PD-1 protein in these cells to boost the persistence of CAR-T cell antitumor activity. We believe that the PD-1 knockout has the potential to reduce the likelihood of rapid tumor recurrence and potentially confer a better therapeutic index compared to other

122

Table of Contents

allogeneic CAR-T cells. To our knowledge, CB-010 is the first allogeneic CAR-T cell therapy with a PD-1 knockout in clinical studies and it is being evaluated in our open-label, multicenter ANTLER phase 1 clinical trial in the United States in adults with relapsed or refractory B-NHL (NCT04637763). We have dosed the first patient in this clinical trial. We expect to have initial data from this clinical study in 2022.



*Figure 10. CB-010 is a healthy donor leukapheresis-derived CAR-T cell targeting the CD19 tumor antigen.*

### CB-011

CB-011 is an allogeneic, anti-BCMA CAR-T cell therapy for the treatment of relapsed or refractory MM. See figure 11. To our knowledge, CB-011 will be the first allogeneic CAR-T cell therapy immune cloaked to prevent both T- and NK-mediated clearance, or rejection, by the immune system. We expect our immune cloaking strategy to drive CAR-T cell persistence, enabling more durable antitumor activity. We use Cas12a chRDNA guides to make four edits to manufacture CB-011. We introduce the gene that encodes a novel and proprietary humanized anti-BCMA CAR into the *TRAC* locus with high specificity and efficiency, thus eliminating TCR expression to prevent GvHD and integrating the BCMA CAR site-specifically into the T cell genome. In addition, we insert a gene encoding a B2M–HLA-E fusion protein into the native *B2M* gene locus. This approach simultaneously prevents the expression of the native B2M protein, a protein that stabilizes all HLA class I antigens on the cell surface, thereby eliminating endogenous HLA class I presentation on the surface of the CAR-T cells, and stably expresses HLA-E, a minor HLA class I antigen, to blunt both T- and NK-mediated rejection of the CAR-T cell therapy by the patient's immune system. We expect to file an IND for this product candidate in 2022.



*Figure 11. CB-011 is a healthy donor leukapheresis-derived CAR-T cell targeting the BCMA tumor antigen. It is in the advanced discovery stage and will be developed for clinical evaluation in r/r MM.*

Table of Contents

reproducible efficacy in solid tumors to date. While multiple CAR-T cell approaches are being evaluated in clinical trials for the treatment of solid tumors, the efficacy observed to date is limited and lower than that observed when treating hematologic malignancies. This may be due to poor CAR-T cell trafficking and infiltration into tumors and metastases, and their limited antitumor function within the immunosuppressive tumor microenvironment.

### *Persistence is the Key to Unlocking the Full Potential of Allogeneic Cell Therapies*

We believe greater persistence is necessary for the realization of the full potential of allogeneic cell therapies, as shown in figure 7. CAR-T cells will generally proliferate in response to tumor antigen engagement via their respective CAR. However, allogeneic CAR-T cells are rapidly rejected by a patient's immune system due to their genetically divergent donor-derived immune profile.

Data from patients treated with autologous CAR-T cell therapies suggest that sustained, longer-term remission is associated with the persistence of CAR-T cells. We believe that allogeneic cell therapies must persist in either their antitumor activity before exhaustion or remain in circulation within a patient's bloodstream and lymphatics for an extended period of time, or both, to meaningfully compete with the response rates of autologous cell therapies.

Development of an allogeneic CAR-T cell therapy requires genome editing to remove proteins from donor T cells that may recognize and attack a patient's tissue that, without removal, would pose a risk of graft versus host disease, or GvHD. Further, the donor T cells will express surface proteins that signal that they are "foreign" to the patient's immune system such that they are rapidly rejected by the patient's immune system. We believe allogeneic CAR-T cells must be modified via genome editing to enable them to safely and sufficiently persist to provide therapeutic benefit to rival the response rates of autologous CAR-T cells.

**Our Approach: Armor Cell Therapies to Increase the Persistence of Antitumor Activity**

We believe that improving CAR-T cell persistence is the key to long-term efficacy in the allogeneic setting. Our strategy to improve CAR-T cell persistence is two-fold: (i) knock out PD-1 to significantly reduce CAR-T cell exhaustion and/or (ii) immune cloak the CAR-T cells to prevent rapid rejection by the patient's immune system. Similar strategies may be used for our CAR-NK platform where persistence will be key for long-term duration of antitumor activity.

### *PD-1 Knockout Strategy*

One of the approaches we deploy to increase the persistence of CAR-T cell antitumor activity is to remove PD-1 from the CAR-T cell surface. The PD-1/PD-L1 pathway leads to rapid exhaustion in T cells. This occurs when a T cell expressing PD-1 engages with another cell expressing PD-L1. Tumor cells and the patient's own cells can express PD-L1, leading to interaction with PD-1 and subsequent exhaustion of the CAR-T cells. We use our chRDNA technology to knock out the PD-1 gene and eliminate PD-1 expression from the CAR-T cell surface, thereby preventing PD-1/PD-L1-mediated exhaustion. We believe that knocking out PD-1 will maintain the CAR-T cells in a higher antitumor state for a longer period of time, and we believe this will result in greater initial tumor debulking in the patient which will lead to long-term durability of CAR-T cell antitumor activity. As shown above in figure 8, our preclinical *in vivo* data from experiments conducted in mouse xenograft models submitted as part of our CB-010 IND demonstrate that knocking out PD-1 leads to a significant increase in the durability of antitumor activity and therefore overall mouse survival. To our knowledge, our lead product candidate is the first allogeneic CAR-T cell therapy in a clinical study with a PD-1 knockout, and we believe will drive the durability of allogeneic CAR-T cell antitumor activity.

### *Immune-Cloaking Strategy*

Another approach we deploy to increase the persistence of CAR-T cell antitumor activity is to immune cloak our CAR-T cells to prevent rapid immune-mediated rejection. The goal of immune cloaking is to maintain

Table of Contents

*Preclinical Data*

In our preclinical studies, we demonstrated that the removal of the PD-1 checkpoint from the CB-010 CAR-T cells provided a statistically significant survival advantage in mice bearing robust and metastatic B cell tumors. In an effort to evaluate the impact of the PD-1 knockout on CB-010 CAR-T cell exhaustion and antitumor activity, we compared CB-010 CAR-T cells to conventional allogeneic CD19 CAR-T cells that express PD-1 in a long-term established tumor xenograft model. We engrafted immunodeficient mice in an orthotopic manner (by intravenous injection to ensure distribution within the bloodstream, lymphatics, and bone marrow) with the acute lymphocytic leukemia, or ALL, tumor model NALM-6 that expresses PD-L1. We allowed the tumors to engraft in the mice for 23 days to ensure that the tumors were metastatic to reflect the human condition with B-NHL. Once the tumors were well-established and metastatic, we treated the mice in three separate groups with the following different materials:

- Phosphate-buffered saline, or PBS, a negative control;
- Conventional allogeneic CD19 CAR-T cells, T cells with the anti-CD19 CAR used in CB-010 inserted into the *TRAC* locus, but without the PD-1 knockout; and
- CB-010.

As shown in figure 21 below, all of the mice had robust tumor burden after 23 days of tumor engraftment as shown by imaging (color bar indicates more tumor growth, from blue to red). On day 0, each cohort of animals received a single dose of either PBS, the conventional allogeneic CD19 CAR-T cells, or CB-010 cells. By day 14 following dosing (D14 post CAR-T), animals that received PBS had become more metastatic, whereas both CD19-specific CAR-T cell therapies had eradicated the established tumors. Following initial tumor clearance, the animals treated with the conventional allogeneic CD19 CAR-T cell therapy experienced a rapid recurrence of their tumor. For example, by day 108 following dosing, half the mice treated with the conventional allogeneic CD19 CAR-T cell therapy had expired from their recurrent tumor burden, and the surviving mice in that cohort had metastatic disease. In contrast, by day 108 following dosing, all of the CB-010-treated mice were alive and roughly half had no detectable tumor burden. As shown in the survival curve in figure 21 below, all of the mice treated with the conventional allogeneic CD19 CAR-T cells had succumbed to their tumors by approximately day 135, while all but one of the CB-010 treated mice were still alive by day 160.

Overall, our data demonstrate that the removal of the PD-1 checkpoint from the CB-010 CAR-T cells provided a statistically significant survival advantage in mice bearing robust and metastatic B cell tumors. Our data suggest that the PD-1 knockout may have led to a more robust debulking of the tumor by CB-010 during the early part of the study compared to the conventional allogeneic CD19 CAR-T cells, leading to a reduction in the recurrence of the tumor cells. Based on these data, we believe CB-010 has the potential for a better therapeutic index compared to other allogeneic CAR-T cells. If a lower dose of CB-010 has meaningful activity in the clinical setting, it would lead to several potential advantages including limited toxicity, increased numbers of doses per manufacturing run, and a reduced cost of goods.

138

Table of Contents

will depend significantly on our ability to obtain and maintain patent and trade secret protection for our technology, our ability to defend and enforce our intellectual property rights and our ability to operate without infringing any valid and enforceable intellectual property rights of third parties.

As of the date of this prospectus, we own 48 issued U.S. patents, including 7 U.S. patents covering our chRDNA technology; 218 issued foreign patents; and 85 pending patent applications throughout the world. The patent portfolio owned by us includes U.S. and foreign patents and patent applications covering methods and compositions relating to our Cas9 chRDNA and Cas12a chRDNA guides (which, without patent term adjustment or patent term extension, will expire in 2036). Additionally, our portfolio includes U.S. and foreign patents and patent applications covering methods and compositions relating to the anti-BCMA binding domain of our CB-011 product candidate (which, without patent term adjustment or patent term extension, will expire in 2040). In general, we file our patent applications in the United States and the European Patent Office as well as in numerous other foreign patent jurisdictions. We have exclusively in-licensed intellectual property covering the anti-CD371 binding domains of our CB-012 product from MSKCC (which, without patent term adjustment or patent term extension, will expire in 2040).

Additionally, we have extensive patent protection on CRISPR Type I systems, CRISPR-Cas9 methods and compositions, and other genome-editing technologies. The patent term in the United States and other countries is 20 years from the date of filing of the first non-provisional application to which priority is claimed. In the United States, patent term may be lengthened by patent term adjustment, or PTA, which compensates a patentee for administrative delays by the United States Patent and Trademark Office in granting a patent, or may be shortened if a patent is terminally disclaimed over an earlier-filed patent. Additionally, under the Hatch-Waxman Act, the term of a patent that covers an FDA-approved biologic may also be eligible for a patent term extension, or PTE, of up to five years, which is designed to compensate for the patent term lost during clinical trials and the FDA regulatory review process. A patent term extension cannot extend the remaining term of a patent beyond a total of 14 years from the date of product approval and only one patent claiming the drug product, methods of use or methods of manufacturing may be restored. Moreover, a patent can only be restored once, and thus, if a single patent is applicable to multiple products, it can only be extended based on one product. Similar provisions are available in Europe and certain other foreign jurisdictions to extend the term of a patent that covers an approved product. Without any patent term extension, the earliest expiration dates of our granted U.S. patents are in 2032 and the latest expiration dates of our granted U.S. patents are in 2040.

As of the date of this prospectus, our trademark portfolio contains 12 trademark registrations, including four U.S. trademark registrations. We have registered "CARIBOU," "CARIBOU BIOSCIENCES," and the Caribou logo as trademarks in relevant classes and jurisdictions in the United States, European Union, and United Kingdom.

Furthermore, we rely upon trade secrets, know-how, continuing technological innovation and potential in-licensing opportunities to develop and maintain our competitive position. We seek to protect these trade secrets and other proprietary technology, in part, by entering into confidentiality agreements with parties who have access to them. We also enter into confidentiality and invention assignment agreements with our employees and our agreements with consultants include invention assignment obligations.

**Competition**

We currently compete across the fields of genome editing and cell therapy. We believe that our novel and proprietary chRDNA genome-editing platform has broad potential applicability across human therapeutic indications, and our strategy is to demonstrate our platform's capability by first developing improved allogeneic cell therapies in hematologic oncology indications.

The biopharmaceutical industry, and in particular the genome-editing and cell therapy fields, are characterized by intense investment and competition aimed at rapidly advancing new technologies. Our platform and therapeutic product candidates are expected to face substantial competition from multiple technologies, marketed products, and numerous other therapies being developed by other biopharmaceutical companies, academic research institutions, governmental agencies, and private research institutions. Many of our competitors

Table of Contents

have substantially greater financial, technical, and other resources, such as larger research and development staff, established manufacturing capabilities and facilities, and experienced marketing organizations with well-established sales forces. In addition, there is substantial patent infringement litigation in the biopharmaceutical industry and, in the future, we may bring or defend such litigation against our competitors.

Compared to first generation genome-editing approaches, our chRDNA platform has shown improved specificity, a reduction in off-target edits and translocations and advanced capability to perform multiplexed edits, in particular multiplexed insertions. While we believe that our scientific expertise, novel technology, and intellectual property position offer competitive advantages, we face competition from multiple other genome-editing technologies and companies. Other companies developing CRISPR-based technologies include, among others, Beam Therapeutics Inc., CRISPR Therapeutics AG, Editas Medicine, Inc., Intellia Therapeutics, Inc., Metagenomi Technologies, LLC, Poseida Therapeutics, Inc., and Scribe Therapeutics, Inc. Companies developing other genome-editing technologies include, among others, Allogene Therapeutics, Inc., bluebird bio, Inc., Cellectis S.A., Precision BioSciences, Inc., and Sangamo Therapeutics, Inc.

We believe that our CAR-T cell therapy product candidates have the potential to offer a superior product to patients due to genome edits we make to improve their persistence with the goal of extending robust CAR-T cell antitumor activity in patients. Additionally, our pioneering scientific expertise in iPSC-derived NK cells sets the foundation for our first CAR-iNK cell therapy to target and antigen present on multiple solid tumor malignancies. Due to the promising therapeutic effect of cell therapies, and the potential benefit of allogeneic treatment alternatives, we expect increasing competition from new and existing companies across four major fronts, which include, among others:

- *Autologous T cell therapy*: Adaptimmune Therapeutics plc, Autolus Therapeutics plc, bluebird, Bristol-Myers Squibb Company, Gracell Biotechnologies Inc., Kite, a Gilead Company, Novartis International AG, Poseida, TCR2 Therapeutics Inc., and Vor Biopharma Inc.;
- *Allogeneic T cell therapy*: Allogene, Atara Biotherapeutics, Inc., Cellectis, Celyad Oncology SA, CRISPR Therapeutics, Fate Therapeutics, Inc., Gracell, Kite, Legend Biotech Corporation, Poseida, Precision Bio, Sana Biotechnology, Inc., and Vor;
- *Allogeneic NK therapy*: Artiva Biotherapeutics, Inc., Celularity Inc., Editas, Fate, Fortress Biotech, Inc., ImmunityBio, Inc., Nkarta, Inc., NKGen Biotech, Inc., and Takeda Pharmaceutical Company Limited;
- *Other cell therapies:* Other companies are developing CAR-expressing immune cell therapies derived from natural killer T cells, or NKT cells, including Kuur Therapeutics; from macrophages, including Carisma Therapeutics; and from gamma-delta T cells, including Adicet Bio, GammaDelta Therapeutics, Cytomed Therapeutics, TC Biopharm, Hebei Senlang Biotechnology, and Beijing Doing Biomedical Technology Co., Ltd.; and
- *Other oncology therapeutics*: Multiple biotechnology and pharmaceutical companies developing other directly competitive technologies, such as small molecule, antibody, bi-specific antibody, and antibody-drug conjugates.

**Government Regulation**

As a biotechnology company, we are subject to extensive legal and regulatory requirements. For example, we may need approval from regulatory agencies for our research, development, testing, manufacture, quality control, approval, packaging, storage, recordkeeping, labeling, advertising, promotion, distribution, marketing, post-approval monitoring and reporting and import and export of our product candidates. Relevant regulatory authorities include, but are not limited to, the FDA, the European Medicines Agency, or EMA, an agency of the European Union in charge of the evaluation and supervision of medicinal products, the European Commission, which is the executive arm of the European Union, or EU, and other national regulatory authorities. The United States and certain jurisdictions outside the United States also regulate the pricing and reimbursement of such products. The processes for obtaining marketing approvals in the United States and in other countries and jurisdictions, along with subsequent compliance with applicable statutes and regulations and other regulatory authorities, require the expenditure of substantial time and financial resources.