**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen (SBN 219683)
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 225-4684
Email: lrosen@rosenlegal.com

*Co-Lead Counsel for Plaintiffs*

*[Additional Counsel on Signature Page]*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| RON BERGMAN, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>CARIBOU BIOSCIENCES, INC., RACHEL E. HAURWITZ, JASON V. O'BYRNE, RYAN FISCHESSER, SCOTT BRAUNSTEIN, ANDREW GUGGENHIME, JEFFREY LONG-MCGIE, NATALIE R. SACKS, BOFA SECURITIES INC., CITIGROUP GLOBAL MARKETS, INC., and SVB SECURITIES LLC,<br><br>Defendants. | Case No.:  3:23-cv-01742-RFL<br><br>CLASS ACTION<br><br>**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO THE CARIBOU DEFENDANTS' MOTION TO DISMISS**<br><br>JUDGE:  Rita F. Lin<br>DATE:    April 23, 2024<br>TIME:    10:00 a.m.<br>CTRM:   15, 18th Floor |

PLAINTIFFS' OPPOSITION TO CARIBOU DEFENDANTS' MOTION TO DISMISS; 3:23-cv-01742-RFL

**TABLE OF CONTENTS**

INTRODUCTION.................................................................................................................1

FACTUAL BACKGROUND .............................................................................................4

    A.    Caribou's IPO and Defendants' Material Misrepresentations in the Offering Documents.................................................................................................................5

    B.    Materially False and Misleading Statements Issued During the Class Period......6

    C.    The Truth Begins to Emerge...................................................................................7

ARGUMENT .......................................................................................................................8

    A.    Legal Standard .......................................................................................................8

Plaintiffs Have Adequately Alleged Falsity .....................................................................9

    A.    The AC States A § 11 Claim Against All Defendants Because The IPO Registration Statement Contains Material Misstatements and Omissions .........10

    B.    The AC Adequately Alleges Falsity as to the Exchange Act Defendants' Statements Concerning CB-010 Following the IPO...............................................14

    C.    Plaintiffs Also State Viable Claims Under Items 105 and 303 ............................15

    D.    Defendants' Various Boilerplate Defenses Fail ...................................................16

        1.    Defendants' Statements Are Not Inactionable Opinions..............................16

        2.    Defendants' Statements Are Not Immaterial Puffery ...................................17

        3.    Statements Defendants Challenge as Forward-Looking Are Actionable ......19

The AC Adequately Pleads the Exchange Act Defendants' Scienter ...................................21

    A.    The Core Operations Doctrine Contributes to the Inference of Scienter ............22

        1.    Defendants' Motive to Raise Capital Contributes to Scienter ........................22

        2.    Signatures, Quotes, SOX Certifications and Admissions Contribute to Scienter.......................................................................................................23

        3.    Defendants' Other Arguments Do Not Undermine Scienter ..........................23

The AC Adequately Pleads Loss Causation As to the §10 Claim ..........................................24

The AC Sufficiently Pleads Control Person Liability.............................................................25

CONCLUSION...........................................................................................................................25

PLAINTIFFS' OPPOSITION TO CARIBOU DEFENDANTS' MOTION TO DISMISS; 3:23-cv-01742-RFL

**Glossary of Terms**

| Term | Definition |
|---|---|
| AC or Complaint | The Amended Class Action Complaint for Violations of the Federal Securities Laws filed on September 18, 2023 (Dkt. No. 35) |
| Allogene | Allogene Therapeutics, Inc. |
| allogeneic | Derived from healthy cells from a donor, rather than cells from the patient's own body |
| autologous | Derived from cells from a patient's own body |
| ANTLER/ANTLER Trial | A Phase 1, open-label, multicenter clinical trial evaluating the safety and efficacy of Caribou's lead product candidate, CB-010, in patients with relapsed or refractory B cell non-Hodgkin lymphoma |
| Caribou or Company | Caribou Biosciences, Inc. |
| Caribou Defendants or Defendants | Caribou, Rachel Haurwitz, Jason O'Byrne, Ryan Fischesser, Scott Braunstein, Andrew Guggenheime, Jeffrey Long-McGie, and Natalie Sacks |
| CAR-T Therapy | Chimeric antigen receptor (CAR) T-cell therapy is a therapy aimed at getting immune cells called T cells, which are a type of white blood cell, to fight cancer by altering them in the lab so they can locate and destroy cancer cells |
| CB-010 | Caribou's lead product candidate, an allogeneic therapeutic genome editing biologic undergoing Phase 1 clinical trials |
| Class Period | July 23, 2021 through July 13, 2023, both dates inclusive |
| CRISPR | Clustered Regularly Interspace Short Palindromic Repeats, a type of genome "editing" in which a CRISPR molecule finds a precise location in the target DNA, a CRISPR enzyme cuts the DNA at the target point, and then an "edit" is made where a new custom sequence is added when the DNA is repaired |
| CRISPR Therapeutics | CRISPR Therapeutics AG |
| Exchange Act | The Securities Exchange Act of 1934 |
| Exchange Act Defendants | Defendants Caribou, Caribou's CEO Rachel Haurwitz, and Caribou's CFO Jason O'Byrne |
| Gracell | Gracell Biotechnologies, Inc. |
| Gracell Trial | Gracell's open-label, proof of concept clinical trial which began in 2018 and was completed |

| | in May 2021 that tested a treatment that knocked out PD-1 in relapsed cancer patients |
|---|---|
| IPO or Offering | Caribou's initial public offering, conducted on July 23, 2021 |
| Item 105 | Item 105 of SEC Regulation S-K , 17 C.F.R. § 229.503I (2011). |
| Item 303 | Item 303 of SEC Regulation S-K, 17 C.F.R. § 229.303(a)(3)(ii)(2017) |
| MTD | Caribou Defendants' Notice of Motion and Motion to Dismiss Amended Complaint and Memorandum of Points and Authorities In Support Thereof, filed on November 14, 2023 (Dkt. No. 50) |
| Offering Documents | Caribou's registration statement and prospectus issued in connection with Caribou's IPO |
| PD-1 | programmed cell death protein 1, a protein on the surface of T cells and B cells that has a role in regulating the immune system's response to the cells of the human body by down-regulating the immune system and promoting self-tolerance by suppressing T cell inflammatory activity. The molecule that bonds to PD-1 is highly expressed in several cancers, and prevents the immune system from killing cancer cells. |
| PD-1 knockout | Removing the PD-1 protein from the CAR-T cell through a genome edited knockout of the gene containing the PD-1 protein (the PDCD1 gene) |
| Plaintiffs | Lead Plaintiff Ron Bergman and named Plaintiff Carl D. Cooper |
| Precision | Precision Biosciences, Inc. |
| PSLRA | Private Securities Litigation Reform Act of 1995 |
| Registration Statement or "Reg. Stmt." | Caribou's registration statement on Form S-1 filed with the SEC on July 1, 2021, which was subsequently amended twice and became effective on July 22, 2021 |
| r/r B-NHL | Relapsed or refractory B cell non-Hodgkin lymphoma |
| Securities Act | The Securities Act of 1933 |
| Shapiro Dec. | The Declaration of Jonathan A. Shapiro in Support of Caribou Defendants' Motion to Dismiss the Amended Complaint (Dkt. No. 51) |
| 8(a) | Federal Rule of Civil Procedure 8(a) |

iii

| 9(b) | Federal Rule of Civil Procedure 9(b) |
|---|---|
| §10(b) or Section 10 | Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j |
| §11 or Section 11 | Section 11 of the Securities Act of 1933, 15 U.S.C. § 77k |
| §15 | Section 15 of the Securities Act of 1933, 15 U.S.C. § 77o(15) |
| §20(a) | Section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t |
| 10-K | Annual Report filed with the SEC pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 |
| 10-Q | Quarterly Report filed with the SEC pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 |

PLAINTIFFS' OPPOSITION TO CARIBOU DEFENDANTS' MOTION TO DISMISS; 3:23-cv-01742-RFL

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Baker v. SeaWorld Entm't, Inc.*,
423 F. Supp. 3d 878 (S.D. Cal.2019) .............................................................................................. 23

*Berson v. Applied Signal Tech., Inc.*,
527 F.3d 982 (9th Cir. 2008) ..................................................................................................... 9, 22

*Bos. Ret. Sys. v. Uber Techs., Inc.*,
2020 WL 4569846 (N.D. Cal. Aug. 7, 2020) ................................................................................ 11

*Chen v. Missfresh Ltd.*,
2023 WL 7289750 (S.D.N.Y. Nov. 6, 2023) ................................................................................. 13

*City of Birmingham Relief & Ret. Sys. v. Acadia Pharms., Inc.*,
2023 WL 1769810 (S.D. Cal. Feb. 2, 2023) ............................................................................ 10, 12

*City of Miami Gen. Emp'ees' Ret. Trust v. RH, Inc.*,
302 F. Supp. 3d 1028 (N.D. Cal. 2018) .......................................................................................... 3

*City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*,
450 F. Supp. 3d 379 (S.D.N.Y. 2020) ....................................................................................... 4, 22

*City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*,
527 F. Supp. 3d 1151 (N.D. Cal. 2021) ........................................................................................ 24

*Eminence Capital, LLC v. Aspeon, Inc.*,
316 F.3d 1048 (9th Cir. 2003) ...................................................................................................... 25

*Fecht v. Price Co.*,
70 F.3d 1078 (9th Cir. 1995) ........................................................................................................ 10

*Frater v. Hemispherx Biopharma, Inc.*,
996 F. Supp. 2d 335 (E.D. Pa. 2014) ............................................................................................ 18

*Fresno Cnty. Employees' Ret. Ass'n v. comScore, Inc.*,
268 F. Supp. 3d 526 (S.D.N.Y. 2017) ............................................................................................ 9

*Gebhart v. S.E.C.*,
595 F.3d 1034 (9th Cir. 2010) ...................................................................................................... 21

*Gerneth v. Chiasma, Inc.*,
2018 WL 935418 (D. Mass. Feb. 15, 2018) ................................................................................. 16

*Harris v. Amgen, Inc.*,
573 F.3d 728 (9th Cir. 2009)..............................................................................................25

*Herman & MacLean v. Huddleston*,
459 US. 375 (1983) ...............................................................................................................8

*Hildes v. Arthur Andersen LLP*,
734 F.3d 854 (9th Cir. 2013) ................................................................................................8

*Hoang v. ContextLogic, Inc.*,
2023 WL 8879263 (N.D. Cal. Dec. 22, 2023) ......................................................................1

*Homyk v. ChemoCentryx, Inc.*,
2023 WL 3579440 (N.D. Cal. Feb. 23, 2023)................................................................passim

*In re Amgen, Inc. Sec. Litig.*,
2014 WL 12585809 (C.D. Cal. Aug. 4, 2014)......................................................................21

*In re Amylin Pharmaceuticals, Inc. Sec. Litig.*,
2002 WL 31520051 (S.D. Cal. Oct. 10, 2002) ....................................................................20

*In re Amylin Pharm., Inc. Sec. Litig.*,
2003 WL 21500525 (S.D. Cal. May 1, 2003).......................................................................19

*In re Apple Inc. Sec. Litig.*,
2020 WL 6482014 (N.D. Cal. 2020).....................................................................................23

*In re BioMarin Pharmaceutical Inc. Sec. Litig.*,
2022 WL 164299 (N.D. Cal. Jan. 6, 2022) .....................................................................18, 24

*In re Celera Corp. Sec. Litig.*,
2013 WL 4726097 (N.D. Cal. Sept. 3, 2013) ......................................................................20

*In re Cutera Sec. Litig.*,
610 F.3d 1103 (9th Cir. 2010)................................................................................................2

*In re Fibrogen, Inc.*,
2022 WL 2793032 (N.D. Cal. July 15, 2022).................................................................18, 20

*In re Gilat Satellite Networks, Ltd.*,
2005 WL 2277476 (E.D.N.Y. 2005).....................................................................................23

*In re Gilead Scis. Sec. Litig.*,
536 F.3d 1049 (9th Cir. 2008)................................................................................................8

*In re Immune Response Sec. Litig.*,
375 F. Supp. 2d 983 (S.D. Cal. 2005)..............................................................................passim

PLAINTIFFS' OPPOSITION TO CARIBOU DEFENDANTS' MOTION TO DISMISS; 3:23-cv-01742-RFL

*In re Iso Ray, Inc. Sec. Litig.*,
  189 F. Supp. 3d 1057 (E.D. Wash. 2016) ...............................................................................18, 19

*In re Nektar Therapeutics,*
  2020 WL 3962004 (N.D. Cal. 2020).........................................................................................22

*In re Nektar Therapeutics Sec. Litig.*,
  34 F.4th 828 (9th Cir. 2022)...............................................................................................19, 25

*In re Nuvelo, Inc. Sec. Litig.*,
  2008 WL 5114325 (N.D. Cal. Dec. 4, 2008) ...........................................................................21

*In re NVIDIA Corp. Sec. Litig.*,
  768 F.3d 1046 (9th Cir. 2014)..................................................................................................12

*In re Quality Sys., Inc. Sec. Litig.*,
  865 F.3d 1130 (9th Cir. 2017)............................................................................................17, 20

*In re Quantumscape Sec. Litig.*,
  2022 WL 137729 (N.D. Cal. Jan. 14, 2022) ............................................................................16

*In re Rigel Pharms., Inc. Sec. Litig.*,
  697 F.3d 869 (9th Cir. 2012)....................................................................................................17

*In re Snap Inc. Sec. Litig.*,
  2018 WL 2972528 (C.D. Cal. June 7, 2018) ..............................................................................8

*In re Syntex Corp. Sec. Litig.*,
  1993 WL 476646 (N.D. Cal. 1993)...........................................................................................19

*In re Twitter, Inc. Sec. Litig.*,
  506 F. Supp. 3d 867 (N.D. Cal. 2020) .....................................................................................21

*In re WageWorks, Inc. Sec. Lit.*,
  2020 WL 2896547 (N.D. Cal. June 1, 2020) ...........................................................................24

*Kaplan v. Rose*,
  49 F.3d 1363 (9th Cir. 1994)....................................................................................................15

*Knollenberg v. Harmonic, Inc.*,
  152 F. App' x 674 (9th Cir. 2005) ..............................................................................................9

*Kovtun v. VIVUS, Inc.*,
  2012 WL 4477647 (N.D. Cal. Sept. 27, 2012) ...................................................................20, 21

*Lorenzo v. Sec. & Exch. Comm'n,*
  139 S. Ct. 1094 (2019).................................................................................................................4

PLAINTIFFS' OPPOSITION TO CARIBOU DEFENDANTS' MOTION TO DISMISS; 3:23-cv-01742-RFL

*Markette v. XOMA Corp.*,
2017 WL 4310759 (N.D. Cal. 2017)..................................................................................17

*Matrixx Initiatives, Inc. v. Siracusano*,
563 U.S. 27 (2011) ..............................................................................................................8

*Medina v. Tremor Video, Inc.*,
640 F. App'x 45 (2d Cir. 2016) .........................................................................................15

*Miller v. Thane Int'l, Inc.*,
519 F.3d 879 (9th Cir. 2008).............................................................................................10

*Mulligan v. Impax Lab'ys, Inc.*,
36 F. Supp. 3d 942 (N.D. Cal. 2014) ...........................................................................17, 22

*Nguyen v. Radient Pharms. Corp.*,
2011 WL 13141630 (C.D. Cal. Oct. 26, 2011) .................................................................22

*Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal.*,
730 F.3d 1111 (9th Cir. 2013)...........................................................................................24

*Omnicare, Inc. v. Lab. Dis. Council Constr. Indus. Pens. Fund*,
135 S. Ct. 1318 (2015) ......................................................................................................16

*Panther Partners, Inc. v. Ikanos Comm's., Inc.,*
681 F.3d 114 (2d Cir. 2012)..............................................................................................15

*Pardi v. Tricida, Inc.*,
2022 WL 3018144 (N.D. Cal. July 29, 2022) .....................................................................4

*Retail Wholesale & Dept. Store Union Loc. 338 Ret. Fund. v. Hewlett-Packard Co.*,
845 F.3d 1268 (9th Cir 2017).............................................................................................18

*Rubke v. Capitol Bancorp Ltd.*,
551 F.3d 1156 (9th Cir. 2009)..............................................................................................8

*S. Ferry LP, No. 2 v. Killinger*,
542 F.3d 776 (9th Cir. 2008)..............................................................................................22

*Sapir v. Averback*,
2016 WL 554581 (D.N.J. 2016)........................................................................................17

*Schueneman v. Arena Pharms., Inc.*,
840 F.3d 698 (9th Cir. 2016).....................................................................................8, 9, 11

*Shanawaz v. Intellipharmaceutics Int'l Inc.*,
348 F Supp.3d 313 (S.D.N.Y. 2018)..................................................................................17

PLAINTIFFS' OPPOSITION TO CARIBOU DEFENDANTS' MOTION TO DISMISS; 3:23-cv-01742-RFL

*Skiadas v. Acer Therapeutics Inc.*,
  2020 WL 3268495 (S.D.N.Y. 2020) ............................................................................................ 23

*Skiadas v. Acer Therapeutics Inc.*,
  2020 WL 4208442 (S.D.N.Y. July 21, 2020) ............................................................................ 23

*Slomnitsky v. Caldwell*,
  743 F. App'x 887 (9th Cir. 2018) .............................................................................................. 16

*Tellabs v. Makor Issues & Rts. Ltd*,
  551 U.S. 308 (2007) ................................................................................................................ 8, 21

*Westley v. Oclaro, Inc.*,
  897 F. Supp. 2d 902 (N.D. Cal. 2012) ....................................................................................... 20

*Weston Fam. P'ship LLLP v. Twitter, Inc.*,
  29 F.4th 611 (9th Cir. 2022) ...................................................................................................... 21

*Winter v. Stronghold Digital Mining, Inc.*,
  2023 WL 5152177 (S.D.N.Y. Aug. 10, 2023) ........................................................................... 13

*WPP Luxembourg Gamma Three Sarl v. Spot Runner, Inc.*,
  655 F.3d 1039 (9th Cir. 2011) .................................................................................................... 22

*Yanek v. Staar Surgical Co.*,
  388 F. Supp. 2d 1110 (C.D. Cal. 2005) ................................................................................ 19, 20

*Yannes v. SCWorx Corp.*,
  2021 WL 2555437 (S.D.N.Y. June 21, 2021) .............................................................................. 3

*Zucco Partners, LLC v. Digimarc Corp.*,
  552 F.3d 981 (9th Cir. 2009) ........................................................................................................ 9

**<u>Statutes</u>**

15 U.S.C. § 77k(a) ............................................................................................................................. 8

15 U.S.C. § 78j(b) .............................................................................................................................. 8

15 U.S.C. §78u-4(b) ...................................................................................................................... 9, 21

15 U.S.C. § 78u-5(c)(1)(A) .............................................................................................................. 19

**<u>Regulations</u>**

17 C.F.R. §229.105 ........................................................................................................................... 16

17 C.F.R. §229.303(a)(3)(ii) ............................................................................................................ 15

PLAINTIFFS' OPPOSITION TO CARIBOU DEFENDANTS' MOTION TO DISMISS; 3:23-cv-01742-RFL

**INTRODUCTION**[1]

Caribou, a clinical stage biopharmaceutical company with no products on the market, sold investors nearly $300 million of company stock in an initial public offering based upon 5.3 months of data from a study it performed in mice. Capitalizing on the market's enthusiasm for cell therapies that use CRISPR genome editing, Defendants issued IPO Offering Documents that gave investors a misleading impression of Caribou's lead product candidate, CB-010. Caribou developed CB-010 as a cell therapy to treat non-Hodgkin lymphoma, where T-cells from a donor are modified in a lab and then injected into the patient. The modifications, or genomic "edits," Caribou makes to the T-cell in the lab to produce CB-010 are intended to increase antitumor activity. Caribou described the last of the three genomic edits, removing or "knocking out" the PD-1 from the T-cell surface, as responsible for increasing antitumor activity.

First, the AC adequately alleges a §11 claim, where liability is "virtually absolute, even for innocent misstatements," so long as a registration statement contains "either an untrue statement of material fact or material omission." *Hoang v. ContextLogic, Inc.*, 2023 WL 8879263, at *6 (N.D. Cal. Dec. 22, 2023). In the Offering Documents, Defendants: 1) represented that CB-010 was the "first" product candidate of its kind in a clinical trial with the "PD-1 knockout"; 2) touted Caribou's mice study, representing that preclinical data showed that "knocking out PD-1" led to a "significant increase in the durability of antitumor activity"; and 3) compared Caribou as superior to direct competitors given the purported "limited efficiency" of competitors' treatments in clinical trials. These statements (among others in the Offering Documents) were materially misleading when made given Defendants' omission of existing material facts. CB-010 was not the first product candidate in a clinical trial to test the "PD-1 knockout." Gracell Biotechnologies began a proof-of-concept clinical

---

[1] All capitalized terms herein have the meanings set forth in the glossary of terms attached hereto. References to "¶" are to paragraphs in the AC. With respect to materials and legal authorities cited herein, all internal alterations, citations, and quotation marks are omitted unless noted and all emphasis is added.

PLAINTIFFS' OPPOSITION TO CARIBOU DEFENDANTS' MOTION TO DISMISS; 3:23-cv-01742-RFL

trial in 2018 that generated a "poor clinical response," and showed that knocking out PD-1 was insufficient to "induce promising outcomes." The Offering Documents omitted to disclose the Gracell Trial or its implications, which undermined the basis for CB-010's concept. Additionally, in touting evidence of CB-010's "durability" based upon Caribou's mice study, Defendants failed to disclose that the clinically accepted minimum necessary to demonstrate "durability" is six months. Caribou therefore had no basis to claim CB-010 demonstrated durability based on only 5.3 months of data. And, contrary to Caribou's purported superiority to competitors, at the time of the IPO, two competitors Caribou specifically named in the Registration Statement had already released clinical data on par with *approved* autologous cell therapies. Each of these omitted facts was material, and absent their disclosure Defendants' statements in the Offering Documents gave "the reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists." *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1109 (9th Cir. 2010).

Second, the AC adequately alleges a §10(b) claim against the Exchange Act Defendants. After the IPO, Caribou continued to repeat the same misleading statements contained in the Offering Documents. Additionally, Defendants misleadingly released three-month data in CB-010's phase 1 clinical trial in humans showing purportedly stellar results when they had in hand 6-month data showing that CB-010 lacked durability. Defendants' disclosure of this incomplete and misleading data caused Caribou's stock price to surge 27%. Then, even when Caribou released 6-month data showing CB-010's lack of durability, Defendants represented that higher dosing of CB-010 would demonstrate durability, despite knowing of facts undermining the basis for CB-010's mechanism of action. Third, the AC adequately alleges scienter. The Exchange Act Defendants were experts in the field who were able to appreciate the misleadingly optimistic picture their statements and omissions created. CB-010 was Caribou's lead product candidate and a core operation. Given that Caribou was operating at a loss and desperate for funding, the nearly $300 million IPO served as a powerful motive

2

for Defendants to misleadingly oversell investors on CB-010's commercial prospects. Fourth, the AC amply alleges loss causation. On both corrective disclosure dates Caribou released clinical data far out of line with investors' expectations given Defendants' misleading statements concerning CB-010. Caribou's stock price declines following these disclosures were materializations of the risks associated with investing in Caribou that Defendants concealed from investors; *e.g.*, that because of what the Gracell Trial showed, CB-010's PD-1 knockout mechanism would not "induce promising outcomes," and that 5.3 months of data in mice was an insufficient proxy for durability. Courts do not require that a corrective disclosure be a "mirror image" of defendants' misleading statements. *City of Miami Gen. Emp'ees' Ret. Trust v. RH, Inc.*, 302 F. Supp. 3d 1028, 1046 (N.D. Cal. 2018).

In support of dismissal, Defendants mischaracterize the AC as a "hindsight" pleading. But the AC pleads with particularity the reasons Defendants' statements were false when made. "The incantation of fraud-by-hindsight will not defeat an allegation of misrepresentations and omissions that were misleading and false at the time they were made." *Yannes v. SCWorx Corp.*, 2021 WL 2555437, at *7 (S.D.N.Y. June 21, 2021) (denying dismissal of §10(b) claim). Defendants also cite the fact that investing in experimental drugs is "inherently risky," asserting that they cannot be held liable for "overly optimistic statements" about future clinical trial results. But as courts recognize, "all investing is based to some degree on investors' perceptions about the future." *In re Immune Response Sec. Litig.,* 375 F. Supp. 2d 983, 1019-21 (S.D. Cal. 2005). The AC does *not* allege that "investors' perceptions were based solely on defendants predictions about the future," but instead that "Defendants misstatements of fact formed a false basis for investors' perceptions." *Id.* (denying dismissal of §10(b) claim). Defendants' boilerplate falsity defenses also fail. For example, Defendants generic warnings of a "rapidly competitive environment" and the potential "failure of its lead product candidate" could apply to any clinical stage biopharmaceutical company, and failed to apprise investors of the known specific risks associated with the Gracell Trial or competitors' relevant trial

3

results. Additionally, Defendants' truth-on-the-market defense that competitors' data was "equally available" to Caribou's investors is "[a] defense not available at the motion to dismiss stage." *Pardi v. Tricida, Inc.*, 2022 WL 3018144, at *6 (N.D. Cal. July 29, 2022). Moreover, the purpose of the Securities Act and the Exchange Act is to "substitute a philosophy of full disclosure for the philosophy of *caveat emptor*…" *Lorenzo v. Sec. & Exch. Comm'n,* 139 S. Ct. 1094, 1103 (2019).

As to scienter, courts routinely reject Defendants' assertion that the AC's theory is "illogical." *See. e.g., Homyk v. ChemoCentryx, Inc.*, 2023 WL 3579440, at *19-20 (N.D. Cal. Feb. 23, 2023). Indeed, the AC's theory is not that Defendants knew CB-010 would fail, but that they concealed adverse facts from investors that increased the risks of non-approval and undermined CB-010's commercial viability. Nor is the motive to raise funds in an IPO in the case of a company operating at a loss with no saleable products too "generic" to support scienter. *See, e.g., City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, 450 F. Supp. 3d 379, 379, 419-20 (S.D.N.Y. 2020).

The Court should deny Defendants' MTD in its entirety.

## FACTUAL BACKGROUND

Caribou is a clinical stage biopharmaceutical company with no saleable products, operating at a loss since its inception. ¶2; Shapiro Dec. Ex. E at 19. Caribou develops gene-edited cell therapies to treat cancer, using a proprietary CRISPR gene editing platform, "chRDNA," to develop its product candidates. ¶¶2, 41-42. CB-010 is Caribou's lead product candidate. ¶43. CB-010 is an anti-CD 19 chimeric antigen receptor (CAR)-T cell therapy to treat a type of non-Hodgkin lymphoma (r/r B-NHL). ¶¶2, 43. CAR-T cell therapy aims to get T cells to fight cancer by editing the genes inside the T-cells in a lab and then injecting them in the patient. ¶¶2-4, fn.5 Most CAR-T cell therapies are autologous – they use T-cells from a patient's own blood. In contrast, CB-010 is allogeneic, *i.e.*, it is manufactured from donor T-cells. ¶¶3, 42. Despite the tremendous cost and time-saving benefits allogeneic cell therapies would provide, they have struggled in clinical studies to generate lasting or "durable" responses. ¶¶4, 48. In Oncology, Complete Response (CR) indicates the absence of

4

detectable cancer after therapy, but does not tell the whole story. ¶4. For remission to be considered real, a treatment must show a Durable Response (DR). *Id*. In gene-edited cancer therapies, six months is considered the minimum durability or DR threshold. ¶¶4, 15, 135. To improve durability, Caribou designed CB-010 with a purportedly unique CRISPR edit which consisted of "knocking out" PD-1 from the CAR-T cell surface.¶¶5, 45, 85. Analysts noted that CB-010 could "change the potential treatment landscape for CAR-T," with annual revenues of $168 million by 2037 if approved. ¶46.

**A.     <u>Caribou's IPO and Defendants' Material Misrepresentations in the Offering Documents</u>**

To fund the Company's operations, Defendants raised $282.72 million in Caribou's July 23, 2021 IPO, selling 19 million shares of Caribou common stock at $16.00/share. ¶52. At the time of the IPO, Caribou had only dosed one patient in its phase 1 clinical trial for CB-010, ANTLER. ¶87. Accordingly, in purchasing shares in the IPO, investors relied on Defendants' representations concerning CB-010's pre-clinical data, unique mechanism of action, and competitive position. In the Offering Documents, Defendants represented that CB-010 was "the **<u>first</u>** allogeneic CAR-T cell therapy **with a PD-1 knockout in clinical studies,**" and represented that Caribou "ha[s] *demonstrated* in preclinical models that the PD-1 knockout [effect of CB-010] improves the persistence of antitumor activity." ¶¶85, 93, 112, 184. Touting a study Caribou performed in mice, Defendants stated that Caribou's preclinical data "**demonstrated that knocking out PD-1 leads to a significant increase in the <u>durability</u> of antitumor activity** and therefore overall mouse survival." ¶¶55, 93. Defendants further touted CB-010's PD-1 knockout mechanism as "boost[ing] the persistence of CAR-T cell antitumor activity," which "has the potential to reduce the likelihood of rapid tumor recurrence and potentially **confer a better therapeutic index compared to other allogeneic CAR-T cells**." ¶¶85, 209. As to Caribou's competitive standing, the Offering Documents disclosed a list of thirteen competitor companies as a "risk factor," while maintaining that Caribou "has the potential to offer a superior product due to the genome edits we make to improve their persistence…" and noting that "the genome editing technologies currently used in the allogeneic cell

5

therapy field generally have limited efficiency….to address insufficient persistence" ¶¶88, 213. Finally, the Offering Documents led investors to believe that higher doses of CB-010 would increase its treatment effect and durability because Caribou's *in vitro* studies showed that "CB-010 cells demonstrated *dose-dependent*" cancer fighting activity. ¶¶59, 190.

The foregoing representations in the Offering Documents misstated and failed to disclose that two months prior to the IPO Gracell concluded a "proof of concept" clinical study (which began in 2018) of a cell therapy treatment that knocked out PD-1. ¶¶69-70; Shapiro Dec. Ex. V at 5. The trial generated a "poor clinical response [implying that] knocking out PD-1 in CAR-T cells, may not be enough to induce promising outcomes in the treatment of patients" ¶71; Defendants omitted any mention of the trial's existence or its implications, *i.e.*, that it contradicted Caribou's conclusions concerning the PD-1 knockout mechanism and therefore CB-010's treatment potential, and accordingly nullified Caribou's claims that increased dosing would yield better durability. *e.g.*, ¶¶86, 199-200. Second, because the pre-clinical data in the Registration Statement did not go past 5.3 months, Caribou had no basis to claim that the PD-1 knockout/CB-010 would improve durability, given that 6 months is the minimum threshold for durability – a fact which Defendants also did not disclose. *e.g.*, ¶¶68, 88, 92. Third, prior to the IPO, Caribou competitors CRISPR Therapeutics and Allogene had already published data showing comparable or better durability than FDA-approved autologous therapies, contrary to Caribou's representation that it could offer a superior product due to the "limited efficiency" of other technologies in the allogeneic cell therapy field. ¶¶63-65, 89, 213.

**B.    Materially False and Misleading Statements Issued During the Class Period**

The Exchange Act Defendants also issued materially misleading statements in Caribou's Class Period 10-Ks, 10-Qs, and press releases, repeating the same false statements contained in the Offering Documents. ¶¶101-31. May 13, 2022 marked the cutoff date for six-month data in the ANTLER Trial, in which 6 patients were dosed with CB-010. ¶114. The Exchange Act Defendants could easily digest these results given their access to the Trial data in real-time. Yet just one day shy

6

of the six-month cutoff, Caribou issued a press release based on three-month data, touting the results as demonstrating a 100% overall response rate (5 of 5 patients achieved a "response" after 28 days of treatment). ¶¶110-12. Despite then possessing the six-month data, which was far less impressive (yet far more meaningful), Defendant Haurwitz touted these results as validating Caribou's plan "for future development of CB-010 and our broader pipeline." ¶112. This caused Caribou's stock to surge 27%. ¶114. Then, on June 10, 2022, Caribou released the 6-month data, which showed that by six months, three of six patients relapsed with progressive disease and only two of five patients were responding to treatment. ¶115. Despite this, the Exchange Act Defendants continued to assure investors that CB-010's unique mechanism of action boosted anti-tumor activity, characterizing the six-month results as "a big motivator for moving to [a double dose of CB-010] for the second cohort," while failing to disclose that it was unlikely that higher dosing would yield durable responses given that the Gracell Trial called into question CB-010's PD-1 knockout concept. ¶¶117-18.

### C. The Truth Begins to Emerge

After Caribou reported on June 10, 2022 that 2 of 5 patients remained in Complete Response at six months of treatment following a single dose of CB-010, investors understood, as an analyst reported that, "Unfortunately, this does not tell the whole story…few of the remissions are durable….by six months, three of the patients relapsed with progressive disease." ¶¶134-5. On this news, Caribou's stock price fell $3.62 a share, or 41.51%, damaging investors. ¶137. Despite this, Caribou's common stock continued to trade at prices artificially inflated by the Exchange Act Defendants' continued misstatements and omissions, which caused investors to hold on to hope that increasing the dosage of CB-010 would yield durable responses. ¶138.

Then, on July 13, 2023, Caribou reported long-term follow up data from the dose escalation portion of ANTLER, showing that patients continued relapsing despite receiving higher doses, with one analyst aptly remarking that it was "puzzling [ ]that patients continue relapsing in spite of CB-010 being dosed higher." ¶¶139-40. And despite consistently comparing its results to those of

7

competitors throughout the Class Period, Caribou for the first time disclosed that "the results of these other clinical trials may not be comparable to clinical results for CB-010," because the Company has only reviewed publicly available reports of those trials. ¶139. On this news, Caribou's stock price fell $1.84, or 22.6%, further damaging investors. ¶141.

## ARGUMENT

### A.    Legal Standard

Plaintiffs "need only allege enough facts to state a claim to relief that is plausible on its face." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 45 n.12 (2011). "[S]o long as the plaintiff alleges facts to support a theory that is not facially implausible, the court's skepticism is best reserved for later stages of the proceedings." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008). In applying this standard, courts must accept as true all well-pled factual allegations, draw all reasonable inferences in plaintiff's favor, and determine whether plaintiff may be entitled to relief under any reasonable reading of the complaint. *Tellabs v. Makor Issues & Rts. Ltd*, 551 U.S. 308, 322-23 (2007).

To state a claim under § 10(b) of the Exchange Act (15 U.S.C. § 78j(b)), Plaintiffs must plead: (1) a material misrepresentation or omission; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 704 (9th Cir. 2016). Section 11, on the other hand, "'places a relatively minimal burden on a plaintiff,'" *Hildes v. Arthur Andersen LLP*, 734 F.3d 854, 859 (9th Cir. 2013), requiring only that "any part of the registration statement ... contain[] an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k(a). Issuers can therefore be liable for what the registration statement says as well as what it leaves out. *See In re Snap Inc. Sec. Litig.*, 2018 WL 2972528, at *8 (C.D. Cal. June 7, 2018). **Liability "is virtually absolute, even for innocent misstatements."** *Herman & MacLean v. Huddleston*, 459 US. 375, 382 (1983).

Section 11 does not require proof of scienter, reliance, or loss causation. *See Rubke v. Capitol Bancorp Ltd.*, 551 F.3d 1156, 1161 (9th Cir. 2009).

Plaintiffs' § 11 claim does not "sound in fraud" and is, therefore, subject to the permissive notice pleading standards of Rule 8(a). *See Knollenberg v. Harmonic, Inc.*, 152 F. App' x 674, 683-84 (9th Cir. 2005) (finding Rule 9(b) inapplicable where "claims [were] not 'grounded in fraud' because Plaintiffs allege[d] a basis for [§] 11 liability other than fraud; *i.e.*, the omission of a material fact from the Registration Statement"). Rule 8(a)(2) only requires a "short and plain statement of the claim showing that the pleader is entitled to relief." Plaintiffs alleged non-fraudulent bases for § 11 liability, including the fact that Defendants negligently signed the Offering Documents which contained untrue facts and material omissions. *E.g.*, ¶¶168-74, 35-36, 162, 196-97.

In addition, Plaintiffs separated the AC into two parts, with distinct sections for the fraud-based Exchange Act claims and the strict liability-based Securities Act claims. Moreover, the AC expressly disclaims that its Securities Act claims are based in fraud. ¶¶26, 163, 227, 236. Indeed, the Securities Act Counts explicitly exclude the paragraphs related to the Exchange Act claims. ¶¶157-59. *See Fresno Cnty. Employees' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 558 (S.D.N.Y. 2017). Regardless, the AC meets even Rule 9(b)'s higher pleading standard as Plaintiffs "specify each statement alleged to have been misleading, the...reasons why..., and if an allegation...is made on information and belief, ... all facts on which that belief is formed."' *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990-91 (9th Cir. 2009), (quoting 15 U.S.C. § 78u-4(b)(1)).

### Plaintiffs Have Adequately Alleged Falsity

A statement is false or misleading "if it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists." *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008)."[O]nce defendants cho[o]se to tout positive information to the market, they [are] bound to do so in a manner that wouldn't mislead investors, including disclosing adverse information that cuts against the positive information." *Arena*, 840 F.3d

9

at 705-6 ("[S]tatements literally true on their face may nonetheless be misleading [] in context."). *Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 886 (9th Cir. 2008). "[W]hether a public statement is misleading, or whether adverse facts were adequately disclosed is a mixed question to be decided by the trier of fact." *Fecht v. Price Co.*, 70 F.3d 1078, 1081 (9th Cir. 1995).

### A. The AC States A § 11 Claim Against All Defendants Because The IPO Registration Statement Contains Material Misstatements and Omissions

In the Offering Documents, Defendants misled investors by omitting three critical pieces of information: 1) the Gracell Trial; 2) data from CRISPR's and Allogene's trials; and 3) the six-month durability threshold. As Judge Hayes in the Southern District of California stated, "A defendant can rebut allegations that an omission was misleading by either showing that no omission occurred or that the omission was not material." *City of Birmingham Relief & Ret. Sys. v. Acadia Pharms., Inc.*, 2023 WL 1769810 at *4 (S.D. Cal. Feb. 2, 2023) (denying reconsideration and rejecting assertion that omissions amounted to disagreement with study design). Defendants have failed to do so here.

First, at the time of the IPO, two Caribou competitors had released clinical data showing that their allogeneic cell therapies successfully demonstrated dose-dependent efficacy and response rates. ¶¶63-65. Second, and contrastingly, at the time of the IPO, Gracell, a competitor Caribou specifically named in the Registration Statement, had demonstrated in a clinical trial that CB-010's primary selling point and differentiator – the PD-1 knockout – conferred no benefit. ¶¶69-71. Third, in gene-edited cell therapies for cancer, six-months is the minimum threshold for durability, *i.e.,* a demonstration that the treatment effect is "real." ¶¶4, 15, 135.

Despite this, Defendants omitted these facts from investors, representing that CB-010 was the first to test the PD-1 knockout in a clinical study, and that Caribou's allogeneic cell therapy was superior to the current allogeneic technology which has "limited efficiency and specificity." ¶¶209, 211, 213, 215, 217. Defendants also omitted any mention of the six-month durability threshold, discouraged investors from doing any outside research, and represented – based on 5.3 months of

10

mice data – that CB-010's purportedly novel PD-1 knockout demonstrated not only the persistence of antitumor activity but an increase in the durability of antitumor activity. ¶¶7, 55, 87, 93, 196, 217. Defendants additionally represented that CB-010's cancer-fighting activity was dose-dependent, *i.e.,* a higher dose yields a greater treatment effect. ¶¶9, 190.

Defendants' omission of the six-month durability threshold while touting CB-010's purported demonstration of antitumor activity and durability is actionable. Once Defendants chose to speak comprehensively about CB-010's durability, they incurred a duty to disclose what the durability threshold was, so as not to mislead investors. *See Arena* 840 at 705-706 (once a company speaks, it is "bound to do so in a manner that wouldn't mislead investors"); *Bos. Ret. Sys. v. Uber Techs., Inc.*, 2020 WL 4569846 at *4 (N.D. Cal. Aug. 7, 2020) ("[T]he information defendants *did* disclose created an impression of a state of affairs that differed in a material way from the one that actually exist[ed].") Likewise, once Defendants chose to tout Caribou's technology as superior and CB-010 as the *first* treatment candidate to test the PD-1 knockout, they were duty bound to disclose the positive results CRISPR and Allogene released as well as the negative results of the Gracell Trial.

Indeed, in the context of seeking to bring a drug to market, courts find material, and actionable, the omission of adverse facts that increase the risk of non-approval or undermine the product's commercial viability. *See, e.g., Homyk*, 2023 WL 3579440, at *10 (despite not affecting drug's approval, omitted facts were material because they increased risks, aside from FDA approval, that could be important to a reasonable investors); *In re Immune Response*, 375 F.Supp 2d at 1019-21 (rejecting Defendants' assertion that they reasonably believed omitting certain efficacy data was unimportant because it was "subject to scientific dispute," and holding that "[w[hether Defendants had to predict the efficacy of [drug] is irrelevant…" because a reasonable juror could find the omission materially misleading).

PLAINTIFFS' OPPOSITION TO CARIBOU DEFENDANTS' MOTION TO DISMISS; 3:23-cv-01742-RFL

First, Defendants assert they disclosed "undisputedly accurate preclinical and early clinical data." MTD 3. But it is black letter law that even a literally true statement can still mislead if it omits material information or "would give a reasonable investor the 'impression of a state of affairs that differs in a material way from the one that actually exists.'" *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1054 (9th Cir. 2014). Defendants' statements (whether made negligently or even innocently, as § 11 imposes strict liability) did not reveal that: 6 months was the threshold for DR; the Gracell Trial undermined CB-010's PD-1 knockout concept; and two direct competitors had already published data rivaling what Caribou *hoped* to show, making its claims of superiority baseless. Defendants' omission of the Gracell Trial – which undermined the PD-1 knockout concept – also made their statements concerning dose dependency misleading. *See In re Immune Response*, 375 F. Supp. 2d at 1019 (finding falsity where, "Plaintiffs' criticism is not that what was said was inaccurate, but that it was incomplete, thus portraying the results of the clinical trial in an unduly optimistic light" and "[w]hether Defendants' statements were accurate is not an issue at this stage").

Similarly, Defendants assert that Plaintiffs' claim is a dispute over "Caribou's interpretations of data." MTD 13. Courts have rejected this argument where, as here, the AC alleges that "several of Defendants' statements were plausibly misleading because they omitted existing adverse information." *Acadia Pharms.*, 2023 WL 1769810, at *4. In *Acadia*, the Court denied reconsideration over defendants' argument that its decision was based on the complaint's allegations that defendants should have used different statistical methodologies, holding that the allegations concerned omissions of adverse information. *Id.* Accordingly, the Court stated that its "analysis was governed by the binding authority that 'once defendants choose to tout' positive information to the market, 'they [are] bound to do so in a manger that wouldn't mislead investors,' including disclosing adverse information that cuts against the positive information.'" *Id.* The same is true here. Once Defendants chose to tout 5.3 months of data as demonstrating durability, they were required to disclose the 6-month durability

12

PLAINTIFFS' OPPOSITION TO CARIBOU DEFENDANTS' MOTION TO DISMISS; 3:23-cv-01742-RFL

threshold. Once Defendants chose to tout the PD-1 knockout concept and the potential for higher durability at higher doses, they were required to disclose the Gracell Trial. And once Defendants chose to tout CB-010 as superior, they were required to disclose direct competitors' results.

Second, Defendants assert that their omission of the Gracell Trial is inactionable because: (1) the full results of the Gracell Trial were not officially published until one month after the IPO, and (2) they prefaced their statement that CB-010 was the first treatment with a PD-1 knockout with "to our knowledge." MTD 12. Defendants ignore that although the results were published in July, the Trial was completed in May, and had been registered on clinicaltrials.gov since February 2018, its official start date (Shapiro Dec. Ex. V). [2] In the context of a § 11 claim, a plaintiff need only allege that a defendant "'***could have known*** of an alleged misstatement or omission'" at the time of the offering. *Chen v. Missfresh Ltd.*, 2023 WL 7289750, at *9 (S.D.N.Y. Nov. 6, 2023) (quoting *Winter v. Stronghold Digital Mining, Inc.*, 2023 WL 5152177, at *7 (S.D.N.Y. Aug. 10, 2023) (emphasis original). Here, Defendants – who closely monitored Caribou's competition in the crowded but highly specialized field of allogeneic cell therapies – not only ***could*** have known of the Gracell Trial. That they named Gracell as a competitor in the Registration Statement demonstrates that they ***did*** know of the Trial. And while Defendants point to differences in Caribou's trial versus Gracell's, the AC's well-pleaded allegations (which the Court much accept as true) demonstrate the Gracell Trial's critical relevance. *See, e.g., Homyk*, 2023 WL 3579440, at *9 (refusing to consider defendants' dispute of allegations that their analysis departed from clinical trial protocol because the Court must assume the allegations are true). Similarly, Defendants contend that the AC's allegations concerning the six-month durability threshold derive solely from a post-Class Period analyst report. Not so. The AC generally alleges that six months is the accepted DR threshold. ¶¶4, 15, 135. As Defendants well

---

[2] *See also* https://clinicaltrials.gov/study/NCT03545815?term=NCT03545815&rank=1

PLAINTIFFS' OPPOSITION TO CARIBOU DEFENDANTS' MOTION TO DISMISS; 3:23-cv-01742-RFL

know, that 6 months is the accepted measure of DRR is not new.[3]

Third, Defendants assert they had no duty to disclose competitors' trial results, and that in any event, these results were publicly available. MTD 16. The AC does not allege a freestanding duty to disclose competitors' information. Rather, once Defendants chose to tout their technology as superior, and to emphasize the limited efficiency of current technology in allogeneic cell therapy, they were duty bound to disclose that two competitors recently released data showing comparable or better results than current technology. Further, Defendants' assertion that the market was already apprised of this information is a truth-on-the market defense which courts uniformly reject as a basis for dismissal at the pleadings stage. *See, e.g., Homyk*, 2023 WL 3579440, at *12 (finding truth-on-the-market defense intensely fact specific and holding that "[b]ecause the adequacy of Defendants' disclosures is not obvious, the Court finds that the adequacy of Defendants' disclosures is a factual issue that the Court may not resolve at this stage.").

## B. The AC Adequately Alleges Falsity as to the Exchange Act Defendants' Statements Concerning CB-010 Following the IPO

After the IPO, the Exchange Act Defendants continued to mislead investors concerning CB-010, repeating the same misleading statements regarding CB-010 being the first clinical stage allogeneic anti-CD19 CAR-T cell therapy with PD-1 knocked out; representing that CB-010 improved the persistence of anti-tumor activity, representing that Caribou's data demonstrated that knocking out PD-1 leads to a "significant increase in the durability of antitumor activity," and representing that CB-010's cancer fighting activity was dose dependent. ¶¶101, 103, 105-07, 109.

---

[3] Indeed, a 2017 article from *Journal for ImmunoTherapy of Cancer* notes the definition of durable response rate "DRR" as "a continuous response [complete or partial objective response] beginning within 12 months of treatment and lasting ≥6 months)" *See* Kaufman, et al., Durable Response Rate as an endpoint in cancer immunotherapy: insights from oncolytic virus clinical trials; *Journal for ImmunoTherapy of* Cancer (2017) 5:72, available at: https://www.readcube.com/articles/10.1186/s40425-017-0276-8

14

PLAINTIFFS' OPPOSITION TO CARIBOU DEFENDANTS' MOTION TO DISMISS; 3:23-cv-01742-RFL

Despite having access to the data from ANTLER Trial in real-time – which consisted of only six patients – on the eve of the six-month data cutoff, Caribou issued a press release reporting *three*-month data which showed stellar results and caused Caribou's stock price to soar 27%. Then, after disclosing the disappointing six-month data, Defendants continued to mislead investors into believing that increasing the dosage of CB-010 would yield durable responses, continuing to omit that the Gracell Trial strongly undermined Caribou's PD-1 knockout concept.

In the context of clinical trials, courts have held that issuers have a duty to disclose material adverse information concerning the progress or results of a clinical trial. For example, in *Kaplan v. Rose*, 49 F.3d 1363, 1374 (9th Cir. 1994), the Ninth Circuit rejected the assertion that clinical data was too speculative or preliminary to create a duty to disclose, holding that "this information was not trivial, as the efficacy and competitiveness of [company's system for treating kidney stones] was essential to the company's performance." *See also In re Immune Response*, 375 F. Supp. 2d at 1021 (rejecting argument there was no duty to disclose study data that was not considered fatal by various scientists or subject to scientific dispute). Here, given Defendants' positive statements concerning CB-010, they were duty bound to disclose facts and data essential to CB-010's commercial viability.

## C.    Plaintiffs Also State Viable Claims Under Items 105 and 303

Item 303 of Regulation S-K imposes an independent and affirmative duty to disclose "any known trends or uncertainties that have had or that the [registrant] reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."17 C.F.R. §229.303(a)(3)(ii). ¶219. Moreover, because Item 303 claims are brought under §11, claims alleging nondisclosure of such adverse trends, events or uncertainties are governed by the basic notice pleading Rule 8. *Panther Partners, Inc. v. Ikanos Comm's., Inc.* 681 F.3d 114, 120-22 (2d Cir. 2012). Defendants assert that Plaintiffs have not shown that Defendants knew of competitors' results. MTD 19. But Courts require only "facts from which we [can] draw the 'plausible inference' that defendants had actual knowledge of the trends or uncertainties [as of] the registration statement."

15

*Medina v. Tremor Video, Inc.*, 640 F. App'x 45, 48 (2d Cir. 2016). Here, it is implausible to suggest Defendants were unaware of direct competitors' trial results. Defendants' assertion that these results were not "reasonably likely" to have a material effect on Caribou's financial condition is disingenuous, given their extensive warnings that competition and other companies "developing or commercializing products before" Caribou would cause "operating results [to] suffer." (Reg. Stmt. p. 9-10). Item 105 of Reg. S-K requires disclosure of "the material factors that make an investment in the registrant or offering speculative or risky." 17 C.F.R. §229.105. ¶223. Accordingly, it is hardly surprising that an issuer also violates Item 105 when its risk disclosures present risks as contingent when they have already come to fruition. *See Gerneth v. Chiasma, Inc.*, 2018 WL 935418, at *4-5 (D. Mass. Feb. 15, 2018) (Item 503 [now Item 105] violation adequately alleged where risk warnings concerning possible FDA rejection of new drug application in offering documents failed to disclose that "the FDA had already stated its disagreement with the Phase 3 trial design" by the time of the offering.). At the time of the IPO, the risk that CB-010 therapy would not prove durable in humans was already likely to occur, given what the Gracell Trial showed.

**D.    Defendants' Various Boilerplate Defenses Fail**

*1.    Defendants' Statements Are Not Inactionable Opinions*

Defendants cannot escape liability by claiming their statements are mere "expressions of opinion or belief" (MTD 12). To begin, simply prefacing a statement with the words "we believe" or "to our knowledge" does not provide carte blanche to omit facts from that statement such that it will mislead investors. *See, e.g., In re Quantumscape Sec. Litig.*, 2022 WL 137729, at *16 (N.D. Cal. Jan. 14, 2022) (holding that facts contained in statements starting with "we believe" were actionable). Statements of opinion are actionably false, such as those regarding CB-010's superiority, uniqueness, and market opportunity, where there are "particular (and material) facts going to the basis for the issuer's opinion—facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not have—whose omission makes the opinion statement at issue misleading to a reasonable person

16

fairly and in context." *Slomnitsky v. Caldwell*, 743 F. App'x 887, 887-88 (9th Cir. 2018) (citing *Omnicare, Inc. v. Lab. Dist. Council Constr. Indus. Pens. Fund*, 135 S. Ct. 1318, 1332-33 (2015)). To the extent Defendants' statements are opinions, they are actionable under *Omnicare*, due to the material omissions discussed herein.

Next, Defendants' statements concerning CB-010's clinical and preclinical performance are statements of fact not couched as statements of belief, and are distinguishable from the statements in the cases Defendants cite. For example, in *Shanawaz v. Intellipharmaceutics Int'l Inc.*, 348 F Supp. .3d 313, 328 (S.D.N.Y. 2018) (MTD 13), the Court held that the company's statement that it had demonstrated bioequivalence was not actionable because it had "meaningful scientific data" to support the opinion about bioequivalence.[4] Here, Defendants had no basis to represent that ANTLER was the first trial to employ the PD-1 knockout given the existence of the Gracell Trial, and no basis to claim that knocking out PD-1 led to a significant increase in the durability of anti-tumor activity given the relevant durability threshold. *Markette v. XOMA Corp.*, 2017 WL 4310759 at *4 (N.D. Cal. 2017) (MTD 14) is consistent with liability where, as here, Plaintiffs allege that information in Defendants' possession undermined their statements concerning preclinical testing, *i.e.* that durability cannot be assessed based on less than six-months data, and that the Gracell Trial showed that knocking out PD-1 was not linked to enhanced clinical performance.

### 2. Defendants' Statements Are Not Immaterial Puffery

Even statements expressing corporate optimism and utilizing "feel-good monikers" are **not** immaterial puffery where they "provide 'concrete description[s] of the past and present' that affirmatively create a plausibly misleading impression of a 'state of affairs that differed in a material

---

[4] Likewise, *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869 (9th Cir. 2012) (MTD 14) is inapposite because Plaintiffs are not second guessing the design of Caribou's clinical trial; instead, they allege Defendants' touting of CB-010's commercial prospects absent additional disclosures about the limitations of 5.3 months of mice data was misleading. And in *Sapir v. Averback*, 2016 WL 554581, at *8 (D.N.J. 2016) (MTD 14), the court did not even analyze falsity, dismissing for lack of scienter.

17

way from the one that actually existed.'" *Homyk*, 2023 WL 3579440 at *16, (quoting *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1144 (9th Cir. 2017)). Whether a statement is puffery depends on the context in which it is made. *Mulligan v. Impax Lab'ys, Inc.*, 36 F. Supp. 3d 942, 966-67 (N.D. Cal. 2014). Beyond that determining materiality "entail[s] fact-intensive assessments that are more properly left to the jury," *id.* at 966, several facts belie Defendants' puffery argument (MTD 14-16). As discussed above, the misstatements are all concrete historical facts about CB-010's performance and commercial prospects based on the then-current status of Caribou's competitive position. In the drug trial context, courts across the country routinely reject assertions that statements concerning a product's marketability or clinical trial results constitutes puffery. *In re Fibrogen, Inc.*, 2022 WL 2793032, at *12 (N.D. Cal. July 15, 2022) (holding actionable "Defendants' expressions of confidence [which were] in the context of discussing the safety analyses of the existing data"); *In re Iso Ray, Inc. Sec. Litig.*, 189 F. Supp. 3d 1057, 1071 (E.D. Wash. 2016) (holding CEO's opinion about drug not "vague so as to be inactionable. The Press Release makes apparent that his opinion was 'moored' to the objective measures of the Study…"); *In re BioMarin Pharmaceutical Inc. Sec. Litig.*, 2022 WL 164299, at *12 (N.D. Cal. Jan. 6, 2022) (statements were not "empty opinions similar to puffery" where "they were undergirded by factual assertions"); *ChemoCentryx,* 2023 WL3579440 at *11-12 (statements that trial "really changed the landscape", "really validated out entire approach", and "gratifyingly this trial turned out really well", not puffery). Moreover, the misstatements at issue here concerned Caribou's most important product candidate. *See, e.g., Frater v. Hemispherx Biopharma, Inc.*, 996 F. Supp. 2d 335, 347 (E.D. Pa. 2014) (statements "underplay[ing] FDA negative feedback" of company's "flagship drug" were "material").[5]

---

[5] *Retail Wholesale & Dept. Store Union Loc. 338 Ret. Fund. v. Hewlett-Packard Co.*, 845 F.3d 1268, 1276 (9th Cir 2017) (MTD 15) held that plaintiffs could not base securities claims on an "inherently aspirational" code of conduct. Statements concerning trial data of a company's lead product candidate cannot be characterized as aspirational simply because they incorporate adjectives.

18

PLAINTIFFS' OPPOSITION TO CARIBOU DEFENDANTS' MOTION TO DISMISS; 3:23-cv-01742-RFL

Nor are Plaintiffs asserting that Defendants had a "duty to disparage Caribou's business prospects or competitive position in the market." MTD 15. Rather, as discussed above, having spoken about Caribou's superiority and competitors, and having touted CB-010 as the first to employ the PD-1 knockout, Defendants were specifically required to disclose the Gracell Trial. Simply listing Gracell alongside 12 other Caribou competitors did nothing to alert investors of the Gracell Trial and its significance.[6] Further, Defendants are not absolved of liability because the Gracell Trial was technically available to investors. To apply this "truth-on-the market" defense "defendants must *prove* that the information that was withheld or misrepresented was transmitted to the public with a degree of intensity and credibility sufficient to effectively counterbalance any misleading impression created by insider's one-sided representations." *In re Immune Response,* 375 F. Supp. 2d at 1036. This "heavy burden of proof" is nearly impossible at the motion to dismiss stage because Defendants must "show that no rational jury could find that the market was misled." *Id.* Defendants have not met their burden here. *See, e.g., In re Isoray*, 189 F.Supp.3d at 1073 (rejecting truth-on-the market defense based on journal publication of company's *own* clinical trial where company's press release touted trial results).

### 3.    *Statements Defendants Challenge as Forward-Looking Are Actionable*

The bespeaks caution doctrine (applicable to §11 claims) and PSLRA Safe Harbor (applicable to §10 claims) immunizes statements from liability that are "forward-looking" **and** "accompanied by **meaningful** cautionary statements identifying important factors that could cause actual results to

---

[6] Unlike in *In re Syntex Corp. Sec. Litig.*, 1993 WL 476646, at *7 (N.D. Cal. 1993) (MTD 15), which involved sales of an already established product where the company disclosed "hard data" about its products and sales, the results of the Gracell Trial were not "transmitted to investors with the same degree of intensity and credibility" to counterbalance Defendants' misleading claims about Caribou's superiority or CB-010's uniqueness. Defendants miscite *In re Nektar Therapeutics Sec. Litig.*, 34 F.4th 828, 836, 838 (9th Cir. 2022) (MTD 16), which did not hold that allegedly undisclosed information was already in the "total mix." Instead, the *Nektar* Court held that plaintiffs did not show how including outlier data would alter the total mix of information because it did not relate to the "viability of [the drug candidate] or "[the company's] attractiveness as an investment." *Id.* at 838. By contrast, disclosure of the Gracell Trial would have alerted investors that Caribou was not the first to test the PD-1 knockout and that it failed to increase durability, undermining CB-010's viability and making investing in Caribou's IPO less attractive.

19

differ materially from those in the forward-looking statement." 15 U.S.C. § 78u-5(c)(1)(A).To be "meaningful," the accompanying cautionary language must be company-specific and "must adequately disclose both the risks involved and the assumptions upon which the optimistic, forward-looking language is based." *Yanek v. Staar Surgical Co.*, 388 F. Supp. 2d 1110, 1122 (C.D. Cal. 2005). Vague or boilerplate disclaimers are insufficient. *In re Amylin Pharm., Inc. Sec. Litig.*, 2003 WL 21500525, at *7 (S.D. Cal. May 1, 2003). Dismissal is not warranted where "there is a legitimate factual dispute as to whether that cautionary language is sufficient." *Westley v. Oclaro, Inc.*, 897 F. Supp. 2d 902, 920 (N.D. Cal. 2012). Further, where a statement is "mixed" and contains both a forward looking and non-forward-looking portion the safe harbor does not apply to the non-forward looking component. *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1150 (9th Cir. 2017).

The statements Defendants identify as protected (MTD 17) are mixed statements ("initial dose level of CB-010 *demonstrated,*"; "initial outcomes *represent* important steps…), which are actionably false because they are based upon existing pre-clinical data. *In re Fibrogen,* 2022 WL 2793032, at *[] ("statements about the potential approval of the NDA" actionable because "based on existing data"). Indeed, "[t]he safe harbor applies to forward-looking statements only ***and not to material omissions or misstatements of historical fact.*" *In re Celera Corp. Sec. Litig.*, 2013 WL 4726097, at *2 (N.D. Cal. Sept. 3, 2013). In addition, Defendants' cautionary language is not meaningful because it relies on vague and impermissibly generic disclosures. The risk disclosures Defendants cite (MTD at 17-18) could apply to any biotechnology company. *See Yanek*, 388 F. Supp. 2d at 1123 (C.D. Cal. 2005) (rejecting safe harbor where "the need to obtain regulatory approval for new product" reflected "factors that are so broad that they apply to any business that sells products to consumers"); *In re Immune Response*, 375 F.Supp.2d at 1034 (warnings that results could materially differ from those expected, including whether additional clinical trials would be conducted, too vague); *In re Amylin Pharmaceuticals, Inc. Sec. Litig.*, 2002 WL 31520051, at * 9 (S.D. Cal. Oct. 10,

PLAINTIFFS' OPPOSITION TO CARIBOU DEFENDANTS' MOTION TO DISMISS; 3:23-cv-01742-RFL

2002) ("data collected from our clinical trials may not be sufficient to support approval"; "FDA may also require additional testing for safety and efficacy"; and "risk and uncertainties …. regarding the ... timing of applications and marketing approval..." are not meaningful).

Defendants' reliance on *Kovtun v. VIVUS, Inc.*, 2012 WL 4477647 (N.D. Cal. Sept. 27, 2012) (MTD 18) is misplaced. In *Kovtun*, the Court reasoned that "[p]rojections about the likelihood of FDA approval" were inactionable "in the absence of any facts indicating that defendants made statements about the trial results that *were false at the time they were made*." *Id*. at *13. Similarly, plaintiffs in *In re Nuvelo, Inc. Sec. Litig.*, 2008 WL 5114325 (N.D. Cal. Dec. 4, 2008) did not allege that statements regarding the likelihood of success of a clinical trial for a drug, subsequent approval of the drug by the FDA, and ultimate commercialization of the drug were false *at the time they were made*. *Id*. at *15-16. As discussed herein, Plaintiffs have established that by the beginning of the Class Period the Exchange Act Defendants either knew or recklessly disregarded that the PD-1 knockout would not lead to greater durability and that the mice data was inadequate evidence of durability.[7]

### The AC Adequately Pleads the Exchange Act Defendants' Scienter

The PSLRA requires a complaint to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. §78u-4(b)(2)(A). That inference "need not be irrefutable, i.e., of the 'smoking gun' genre, or even the 'most plausible of competing inferences'" (*Tellabs*, 551 U.S. at 324) and "can be established by direct or circumstantial evidence" (*Gebhart v. S.E.C.*, 595 F.3d 1034, 1041 (9th Cir. 2010)). Between competing inferences, "a tie goes to the plaintiff." *In re Amgen, Inc. Sec. Litig.*, 2014 WL 12585809, at *8 (C.D. Cal. Aug. 4, 2014). "[A]bsence of actual knowledge is not fatal to a [§] 10(b) claim involving misstatements in

---

[7] In *In re Twitter, Inc. Sec. Litig.*, 506 F. Supp. 3d 867 (N.D. Cal. 2020); *Weston Fam. P'ship LLLP v. Twitter, Inc.*, 29 F.4th 611, 621-22 (9th Cir. 2022) (MTD 17), the 9th Circuit affirmed the district court's finding that the risks warned of had not materialized yet because plaintiffs had not demonstrated Twitter discovered software bugs when warning of the potential of software errors. Defendants here knew of the Gracell Trial and the durability threshold.

PLAINTIFFS' OPPOSITION TO CARIBOU DEFENDANTS' MOTION TO DISMISS; 3:23-cv-01742-RFL

the clinical trial context." *Id*. at \*9. Nor do Plaintiffs need to plead each Defendant "actually received" data contradicting their statements. *Id*. at \*11. "Where a strong inference suggests that a defendant was on notice of clinical findings before making contradictory public statements, the defendant's conduct is at least 'deliberately reckless' under [§] 10(b)."

## A.    The Core Operations Doctrine Contributes to the Inference of Scienter

Under the core operations doctrine, knowledge of facts critical to a company's core operations may be imputed to its key officers "where the nature of the relevant fact is of such prominence that it would be 'absurd' to suggest that management was without knowledge of the matter." *See S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 782-86 (9th Cir. 2008); *Berson*, 527 F.3d at 988-89 ("absurd to suggest" management did not know facts involving significant losses on the company's largest contract); *Mulligan*, 36 F. Supp. 3d at 970 (inferring knowledge of facts involving a critical element of business). There can be no dispute that CB-010 was Caribou's key product and that Defendants would have been aware of the Gracell Trial and the 6-month durability threshold.[8] ¶¶46, 72.

### 1.    Defendants' Motive to Raise Capital Contributes to Scienter

Because an IPO provides a unique opportunity for a substantial payday, courts recognize that sale of shares in an IPO can serve as motive in support of a strong inference of scienter. *See, e.g., Evoqua Water*, 450 F. Supp. 3d at 379, 419–20. With no saleable products, Defendants raised nearly $300 million from investors, enabling the Exchange Act Defendants to continue collecting handsome salaries and bonuses totaling over $1 million per year. *See* Reg. Stmt., p. 185-88.[9] Courts also find motive sufficient to support scienter where stock sales provide desperately needed funding. Indeed,

---

[8] In *In re Nektar Therapeutics,* 2020 WL 3962004, at \*12 (N.D. Cal. 2020) (MTD fn. 21) the court declined to credit the core operations theory because the complaint did not allege defendants' admissions of detailed involvement in the minutia of a company's operations. Here, Defendants' alleged misstatements provide such admissions. Indeed, the Exchange Act Defendants demonstrated their knowledge of and involvement in the ANTLER Trial and the development of CB-010 in the transcripts of the conferences Defendants attach as Exhibits X-Z of the Shapiro Dec. *See also, e.g.* ¶¶80-81, 113, 116-17, 121-22, 124, 126-27 (discussing details of CB-10 and ANTLER).

[9] https://www.sec.gov/Archives/edgar/data/1619856/000119312521221318/d145328ds1a.htm

PLAINTIFFS' OPPOSITION TO CARIBOU DEFENDANTS' MOTION TO DISMISS; 3:23-cv-01742-RFL

Caribou lost money each year before going public and had an accumulated deficit of $44 million the quarter before the IPO. Reg. Stmt. p. 15. *WPP Luxembourg Gamma Three Sarl v. Spot Runner, Inc.*, 655 F.3d 1039, 1052 (9th Cir. 2011) ("need[ing] continued infusion of investment capital" supported scienter); *Nguyen v. Radient Pharms. Corp.*, 2011 WL 13141630, at *2, 6 (C.D. Cal. Oct. 26, 2011) (falsely announcing test trials with Mayo Clinic to conduct a stock offering to fund continued operations supported scienter); *Skiadas v. Acer Therapeutics Inc.*, 2020 WL 3268495, at *11 (S.D.N.Y. 2020), *Skiadas v. Acer Therapeutics Inc.*, 2020 WL 4208442 (S.D.N.Y. July 21, 2020) (misrepresenting results of meeting with FDA to sell stock to fund operations supported scienter).[10]

### 2.    *Signatures, Quotes, SOX Certifications, and Admissions Contribute to Scienter*

Signatures, SOX certifications, and quotes in the misleading SEC filings also contribute to the compelling inference of scienter because Defendants put themselves forth as knowledgeable regarding CB-010 and the ANTLER data, triggering a duty to speak truthfully and completely. ¶¶16, 19, 35, 66, 80-81, 113, 116-17, 121, 124, 126-27, 132-33. Additionally, Defendants' disclosure, for the first time at the close of the Class Period, that "the results of these other clinical trials may not be comparable to clinical results for CB-010" because the Company has only reviewed publicly available reports of those trials" is a direct admission that supports scienter (and falsity) as to Defendants' consistent statements comparing Caribou's results to those of competitors. *See, e.g., In re Apple Inc. Sec. Litig.*, 2020 WL 6482014, at *9 (N.D. Cal. 2020).

### 3.    *Defendants' Other Arguments Do Not Undermine Scienter*

First, Defendants contend that scienter cannot be found because there was no insider trading. MTD 22. But that is not the law. *See, e.g., Baker v. SeaWorld Entm't, Inc.*, 423 F. Supp. 3d 878, 943 (S.D. Cal.2019) ("[T]he lack of stock sales by a defendant is not dispositive as to scienter.").

---

[10] Defendants rely on *In re Gilat Satellite Networks, Ltd.*, 2005 WL 2277476 (E.D.N.Y. 2005), to argue that motive to complete an IPO is too general. But this out-of-circuit case predates the above precedent from this and other circuits.

23

PLAINTIFFS' OPPOSITION TO CARIBOU DEFENDANTS' MOTION TO DISMISS; 3:23-cv-01742-RFL

Second, Defendants recast the AC's theory as alleging that Caribou knew "that CB-010 was doomed," citing cases rejecting such a theory. MTD 24. Because this is not what the AC alleges, Defendants' cases are of no help to them. As the Court explained in *Homyk*, "Plaintiffs' theory is not that Defendants knew that the FDA would withhold approval, but rather that Defendants knew of and concealed adverse facts regarding trial results from investors in order to buy time and finance the Company's operations while trying to alter the potential effect of those adverse facts on the NDA process." 2023 WL 3579440, at *19-20 (finding plausible motive and rejecting defendants' assertion that plaintiffs' theory of motive was "illogical"). So too here. The IPO proceeds allowed Caribou fund development of its other product candidates. *See*, *e.g.*, *In re BioMarin*, 2022 WL 164299, at *14 (finding plausible motive where "the allegations are not that defendants were *convinced* the FDA would deny approval, it is that they withheld important *warning signs* from the market") (emphasis in original); *City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*, 527 F. Supp. 3d 1151, 1185 (N.D. Cal. 2021) (finding plausible motive where "Plaintiff does not allege that Defendants engaged in a fraud scheme to cover up the inevitable reveal of a critical problem ... [but] that Defendants attempted to buy themselves time" to turn around flagging sales).

### The AC Adequately Pleads Loss Causation As to the §10 Claim

"Loss causation is simply 'a causal connection between the material misrepresentation and the loss.'" *Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal.*, 730 F.3d 1111, 1119 (9th Cir. 2013). Plaintiffs may also plead "materialization of the risk," alleging that corrective disclosures revealed the true extent of relevant risks—*e.g.*, the likelihood of adverse clinical trial results—that were obscured by Defendants' misrepresentations and omissions statements. *See In re WageWorks, Inc. Sec. Lit.*, 2020 WL 2896547, at *8 (N.D. Cal. June 1, 2020). The AC alleges Caribou shares fell in response two corrective disclosures: 1) Caribou's release of ANTLER's 6-month data on June 10, 2022 which revealed that after 6 months of treatment, few of the remissions were durable, which caused a $3.62 (41%) stock drop; and 2) Caribou's July 13, 2023 release of long-term follow

PLAINTIFFS' OPPOSITION TO CARIBOU DEFENDANTS' MOTION TO DISMISS; 3:23-cv-01742-RFL

up data from the dose escalation portion of ANTLER which revealed that higher dosing of CB-010 failed to yield long-term durability, which caused a $1.84 (23%) stock drop. ¶¶134-41. Both corrective disclosures represented materialization of the risks about which Defendants misled investors. The June 10 disclosure represented a materialization of the concealed risk that 5.3 months of data was not an indication of durability and that CB-010's PD-1 knockout was insufficient to induce positive outcomes. Likewise, the July 13 disclosure was a materialization of the concealed risk that CB-010's PD-1 knockout mechanism would not yield long-term durability. Defendants counter by arguing that these disclosures "at most suggest[ ]that CB-010 may not be as durable as the market had hoped." MTD 25. But Defendants prior statements and omissions misled investors as to the true magnitude of the risk that CB-010 would not show durability.[11]

### The AC Sufficiently Pleads Control Person Liability

Plaintiffs have adequately alleged violations of §10(b) and Rule 10b-5 and §11, thus the Court should sustain the §20(a) and §15 control person claims.

### CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny the MTD. Alternatively, if the Court grants any part of the MTD, Plaintiffs respectfully request leave to amend. *Harris v. Amgen, Inc.*, 573 F.3d 728, 737 (9th Cir. 2009); *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003).

Dated:    January 22, 2024

**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen (SBN 219683)
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 225-4684
Email: lrosen@rosenlegal.com

---

[11] *In re Nektar*, 34 F.4th at 840 (MTD 25) is inapt. There, plaintiffs failed to plead any false statements and did not allege that the disclosure of trial results uncovered the falsity of any statements or that failing to disclose the inclusion of outlier data affected the ultimate results of the clinical trial. Unlike in *Nektar*, where "the clinical trial could have still shown excellent results" even without data from outlier patient, the omitted facts here would have demonstrated to investors that responses would not be durable and affected the investing public's assessment of CB-010.

PLAINTIFFS' OPPOSITION TO CARIBOU DEFENDANTS' MOTION TO DISMISS; 3:23-cv-01742-RFL

Sara Fuks (*pro hac vice*)
275 Madison Avenue, 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Email: sfuks@rosenlegal.com


By:     */s/ Sara Fuks*
         Sara Fuks

**THE SCHALL LAW FIRM**
Brian Schall (290685)
Ivy T. Ngo (249860)
Rina Restaino (285415)
2049 Century Park East, Suite 2460
Los Angeles, CA 90067
Telephone: (310) 301-3335
brian@schallfirm.com
ivy@schallfirm.com
rina@schallfirm.com

*Co-Lead Counsel for Lead Plaintiffs and the Class*

PLAINTIFFS' OPPOSITION TO CARIBOU DEFENDANTS' MOTION TO DISMISS; 3:23-cv-01742-RFL

**CERTIFICATE OF SERVICE**

I hereby certify that I caused to be electronically filed the foregoing with the Clerk of the

Court for the United States District Court for the Northern District of California by using the

CM/ECF system on January 22, 2024. I further certify that all participants in the case are registered

CM/ECF users and that service will be accomplished by the CM/ECF system.


*/s/Sara Fuks*
SARA FUKS

PLAINTIFFS' OPPOSITION TO CARIBOU DEFENDANTS' MOTION TO DISMISS; 3:23-cv-01742-RFL