# EXHIBIT 19

Jeffrey C. Block, *pro hac vice*
Brendan T. Jarboe, *pro hac vice*
Mark B. Byrne, *pro hac vice*
**BLOCK & LEVITON LLP**
260 Franklin Street, Suite 1860
Boston, MA 02110
(617) 398-5600 phone
jeff@blockleviton.com
brendan@blockleviton.com
mark@blockleviton.com

*Attorneys for Lead Plaintiff*
*Rick Keiner and the Class*

Jacob A. Walker (SBN 271217)
**BLOCK & LEVITON LLP**
400 Concar Drive
San Mateo, CA 94402
(650) 781-0025 phone
jake@blockleviton.com

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### OAKLAND DIVISION

| | |
|---|---|
| In re Lyft, Inc. Securities Litigation, <br><br> This document relates to: <br><br> ALL ACTIONS | Lead Case No.: 4:19-cv-02690-HSG <br><br> **Declaration of Jeffrey C. Block In Support Of: (1) Lead Plaintiff's Motion for Final Approval of Class Action Settlement; (2) Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses; (3) Lead Plaintiff's Motion for an Award of Reasonable Costs** <br><br> Date: June 22, 2023 <br> Time: 2:00 p.m. <br> Courtroom: Courtroom 2, 4th Floor <br><br> Hon. Haywood S. Gilliam, Jr. |

DECLARATION OF JEFFREY C. BLOCK
CASE NO. 4:19-CV-02690-HSG

I, JEFFREY C. BLOCK, declare as follows:

1. I am an attorney admitted to practice before this Court *pro hac vice.* I am a partner in Block & Leviton LLP, counsel for Lead Plaintiff Rick Keiner ("Lead Plaintiff") and Lead Counsel for the certified Class in the above-captioned action. I make this declaration in support of Lead Plaintiff's and Lead Counsel's motions for: (1) Final Approval of Class Action Settlement and Plan of Allocation (the "Final Approval Motion"), which provides for a cash payment of $25,000,000 (the "Settlement"); and (2) an Award of Attorneys' Fees and Reimbursement of Litigation Expenses (the "Fee Motion"). I have personal knowledge of the matters stated herein and, if called upon, I could and would competently testify thereto.

## I. PRELIMINARY STATEMENT

2. Lead Plaintiff has reached a substantial Settlement of this Action after three years of hard-fought litigation, extensive motion practice, and vigorous arm's-length settlement negotiations that took place over the course of several months and were mediated by a distinguished private mediator (David Murphy of Phillips ADR). This Court preliminarily approved the Settlement and the proposed method of providing notice to the Class (the "Preliminary Approval Order") on December 16, 2022. ECF No. 297.

3. The Settlement was achieved only after vigorous litigation. Lead Counsel, among other things: (i) conducted a comprehensive investigation into the alleged misstatements and omissions; (ii) drafted a detailed Consolidated Amended Class Action Complaint (the "FAC"); (iii) briefed an opposition to Defendants' motion to dismiss the FAC; (iv) researched, briefed and argued Lead Plaintiff's motion in support of class certification; (v) briefed an opposition to Defendants' motion for judgment on the pleadings; (vi) engaged in comprehensive document and written discovery; (vii) briefed four discovery disputes; (viii) deposed a key witness and prepared to depose nearly twenty more; (ix) briefed a motion to file and drafted a Second Amended Class Action Complaint ("SAC"); (x) worked closely with experts to analyze damages issues; (xi) engaged in thorough mediation efforts, which included the exchange of comprehensive mediation statements, a full-day mediation session, and several follow-up mediated negotiations over the course of three months; and (xii) engaged in extensive negotiations regarding the terms of the Settlement. At the time the

DECLARATION OF JEFFREY C. BLOCK                                                         1
CASE NO. 4:19-CV-02690-HSG

parties agreed to the Settlement, Lead Counsel had a thorough understanding of the strengths and weaknesses of the Parties' relative positions.

4. As discussed more fully below, there were substantial obstacles remaining in this case. These challenges included, in particular, damages and negative causation issues that could have considerably reduced, or eliminated, the class's recovery at summary judgment or trial. In deciding to settle, Lead Plaintiff and Lead Counsel took into consideration the significant risks associated with establishing liability, as well as the duration and complexity of the remaining proceedings. Defendants raised serious arguments over the course of this litigation concerning, among other things, the size and scope of damages, whether the Registration Statement contained material misstatements, and the adequacy of Lyft's disclosures. In the absence of a settlement, there was a substantial risk that the Class could have recovered in an amount significantly less than the Settlement Amount or received no recovery at all.

5. The Plan of Allocation was developed with the assistance of our testifying damages and causation expert, Global Economics Group, and provides for the fair and equitable distribution of the Net Settlement Fund to Class Members.

6. For the reasons set forth below and in the Final Approval Motion, Lead Counsel believes that the Court should grant final approval of the Settlement and Plan of Allocation.

## II. SUMMARY OF LEAD PLAINTIFF'S CLAIMS

7. Lead Plaintiff's claims arise from Lyft, Inc.'s ("Lyft" or the "Company") March 28, 2019 Initial Public Offering ("IPO"). Lyft went to market at a price of $72 per share and sold 32.5 million shares to the public. However, Lyft's stock price declined over the next several months and never returned to its IPO level.

8. Lead Plaintiff purchased 121,352 shares of Lyft common stock during the Class Period.

9. Lead Plaintiff alleges that Lyft's IPO Registration Statement contained misstatements and omitted to disclose material facts in violation of Section 11 of the Securities Act of 1933. In particular, Lead Plaintiff alleges that the Registration Statement failed to disclose that (i) Lyft faced an existential threat to its business and reputation in the form of a pervasive sexual violence problem occurring on its platform; (ii) Lyft's nascent bikeshare fleet was plagued with defects and

maintenance issues that jeopardized the Company's growth plans; and (iii) Lyft was losing market share to its main competitor, Uber, because the companies were in the midst of a price war.

10. Lead Plaintiff also alleges that the above information constituted undisclosed trends or uncertainties in violation of SEC Regulation S-K Item 303 as well as undisclosed risks in violation of Item 105.

### III. PROCEDURAL HISTORY

11. Lyft shares began trading publicly after Lyft's Registration Statement became effective on March 28, 2019. Defendants Logan Green, John Zimmer, Brian Roberts, Prashant (Sean) Aggarwal, Ben Horowitz, Valerie Jarrett, David Lawee, Hiroshi Mikitani, Ann Miura-Ko, and Mary Agnes (Maggie) Wilderotter (the "Individual Defendants") signed Lyft's Registration Statement.

12. Lyft's IPO was underwritten by: J.P. Morgan Securities LLC, Credit Suisse Securities (USA) LLC, Jefferies LLC, UBS Securities LLC, Stifel, Nicolaus & Company, Incorporated, RBC Capital Markets, LLC, KeyBanc Capital Markets Inc., Cowen and Company, LLC, Raymond James & Associates, Inc., Canaccord Genuity LLC, Evercore Group L.L.C., Piper Jaffray & Co. (now "Piper Sandler & Co."), JMP Securities LLC, Wells Fargo Securities, LLC, KKR Capital Markets LLC, Academy Securities, Inc., Blaylock Van, LLC, Penserra Securities LLC, Siebert Cisneros Shank & Co., LLC (now, along with The Williams Capital Group, L.P., "Siebert Williams Shank & Co., LLC"), The Williams Capital Group, L.P. (now, along with Siebert Cisneros Shank & Co., LLC, "Siebert Williams Shank & Co., LLC"); CastleOak Securities, L.P., C.L. King & Associates, Inc., Drexel Hamilton, LLC, Great Pacific Securities, Loop Capital Markets LLC, Mischler Financial Group, Inc., Samuel A. Ramirez & Company, Inc., R. Seelaus & Co., LLC, and Tigress Financial Partners LLC (collectively, the "Underwriters").

13. On May 17, 2019, Matias Malig, represented by Block & Leviton LLP, filed the first of two consolidated securities class actions in this District alleging violations of Sections 11, 12(a)(2), and 15 of the Securities Act against Defendants and the Underwriters on behalf of all investors who purchased or otherwise acquired Lyft common stock in connection with the IPO. ECF No. 1.

14. On March 4, 2020, this Court appointed Rick Keiner as Lead Plaintiff and the firm of Block & Leviton LLP as Lead Counsel. ECF No. 64.

15.     On April 16, 2020, Lead Plaintiff filed his FAC, alleging that Defendants violated the Securities Act because the Registration Statement contained material misrepresentations or omitted to disclose material facts concerning: 1) rider safety; 2) Lyft's market share; 3) bookings metrics and first quarter losses; 4) Lyft's bikeshare program; and 5) driver benefits. ECF No. 74.

16.     On May 14, 2020, Defendants filed a motion to dismiss the FAC, ECF No. 78, which Lead Plaintiff opposed on June 11, 2020. ECF No. 84.

17.     On June 16, 2020, Lead Plaintiff voluntarily dismissed the Underwriters and his Section 12(a)(2) claim against them from this action without prejudice. ECF No. 85.

18.     On September 8, 2020, the Court granted in part and denied in part Defendants' motion to dismiss, partially upholding Lead Plaintiff's allegations concerning the omission of information regarding rider safety and Lyft's bikeshare program. ECF No. 96.

19.     On October 2, 2020, Defendants filed their Answer, denying all material allegations of the remaining claims. ECF No. 99.

### *Class Certification*

20.     On September 25, 2020, Lead Plaintiff filed a motion for class certification. ECF No. 98. Defendants opposed this motion on January 19, 2021, ECF No. 117, and Lead Plaintiff filed his reply on February 5, 2021, ECF No. 127. The Court held oral argument on the motion for class certification on March 11, 2021.

21.     On August 20, 2021, the Court granted Lead Plaintiff's motion for class certification and certified a class consisting of:

> All persons and entities who purchased or otherwise acquired the common stock of Lyft issued and traceable to the IPO Registration Statement [between March 28, 2019 and August 19, 2019]. Excluded from the Class are defendants and their families, the officers, directors and affiliates of defendants, at all relevant times, members of their immediate families and their legal representatives, heir, successors or assigns, any entity in which defendants have or had a controlling interest and any entity that underwrote the Lyft IPO including any officer, director or affiliate of any Lyft IPO underwriter.

*See* ECF No. 177.

*Defendants' Motion for Judgment on the Pleadings*

22.     On April 21, 2021, Defendants filed a motion for judgment on the pleadings. ECF No. 152. Lead Plaintiff opposed this motion on May 24, 2021, ECF No. 159, and Defendants filed a reply on June 15, 2021, ECF No. 170.

23.     On August 20, 2021, the Court denied Defendants' motion for judgment on the pleadings. ECF No. 179.

*The Second Amended Complaint*

24.     On September 30, 2021, Lead Plaintiff moved for leave to file the SAC. ECF No. 206. Defendants filed their opposition on December 20, 2021, ECF No. 230, and Lead Plaintiff filed his reply on January 18, 2022, ECF No. 237.

25.     The SAC proposed to add claims stemming from an alleged deterioration in Lyft's market share in the lead-up to the IPO, brought on by an undisclosed price war with rival Uber.

26.     As of February 8, 2022, the Court had not yet reached a decision on Lead Plaintiff's fully briefed motion to file the SAC when, on that date, the parties informed the Court that they had reached an agreement in principle to settle this action.

27.     The Court terminated Lead Plaintiff's motion to file the SAC as moot on February 10, 2022. ECF No. 242.

28.     On June 16, 2022, the parties stipulated, for the purposes of settlement, to designate the SAC as the operative complaint. ECF No. 248. The Court granted the parties joint stipulation the same day, ECF No. 250, and Lead Plaintiff filed the SAC on the docket, ECF No. 252.

*Written Discovery*

29.     On September 8, 2020, when the Court issued an order denying in part Defendants motion to dismiss, the automatic discovery stay imposed by 15 U.S.C. § 78u-4(b)(3)(B) lifted.

30.     On September 30, 2020, counsel for the parties conducted a conference pursuant to Fed. R. Civ. P. 26(f). *See* ECF No. 101.

31.     On October 10, 2020, the parties filed their Joint Rule 26(f) Report and [Proposed] Case Management Order. ECF No. 101.

32.     On October 27, 2020, Lead Plaintiff served his First Set of Interrogatories on all Defendants. Defendants served their objections and responses on December 21, 2020. On March 17, 2021, Defendants served supplemental objections and responses to five of Lead Plaintiff's interrogatories.

33.     On October 27, 2020, Defendant Lyft served its First Set of Interrogatories on Lead Plaintiff, consisting of 15 interrogatories. On November 14, 2020, Lead Plaintiff served his responses and objections. On April 16, 2021, Lead Plaintiff served supplemental responses to three of Lyft's interrogatories.

34.     On November 13, 2020, the parties exchanged their Initial Disclosures pursuant to Fed. R. Civ. P. 26(a).

35.     On July 22, 2021, Lead Plaintiff served his Second Set of Interrogatories to Defendant Lyft. Lyft served its objections and responses on August 23, 2021.

36.     On September 14, 2021, Lead Plaintiff served his Third Set of Interrogatories to Defendant Lyft. Lyft served its objections and responses on October 14, 2021.

37.     On December 2, 2021, Lead Plaintiff served his Fourth Set of Interrogatories to Defendant Lyft. Lyft served its objections and responses on January 14, 2022.

38.     On February 2, 2022, Defendant Lyft served its First Set of Requests for Admission and its Second Set of Interrogatories, consisting of 48 requests for admission and 10 interrogatories. Lead Plaintiff had not yet served his responses as of February 8, 2022.

***Document Discovery***

39.     On September 30, 2020, Lead Plaintiff made his first production of documents, which consisted of his brokerage statements and his retainer agreement with Lead Counsel.

40.     On October 14, 2020, Defendant Lyft served its First Set of Requests for Production of Documents on Lead Plaintiff, consisting of 27 document requests. Lead Plaintiff served his responses and objections on October 28, 2020.

41.     On October 20, 2020, Plaintiff served his First Set of Requests for Production of Documents to All Defendants ("Plaintiff's RFPs"). The Parties agreed to extend Defendants'

deadline for a response, and Defendants served their responses and objections on December 21, 2020.

42.     On December 21, 2020, Lead Plaintiff made a second production of documents, consisting of his resume, and excel files Lead Plaintiff downloaded from his brokerage accounts.

43.     On January 18 and 19, 2021, Defendants made their first and second productions of documents, which consisted of certain roadshow materials and IPO data room documents.

44.     On January 29, 2021, Defendants made their third production of documents, which consisted of Lyft directors' indemnification agreements.

45.     On July 12, 2021, Defendants made their fourth production of documents, which consisted of a chart tallying incidents of sexual assault reported to Lyft by month.

46.     On July 19, 2021, Defendants made their fifth production of documents, which consisted of documents Lyft provided in response to law enforcement subpoenas.

47.     On August 20, 2021, Defendants made their sixth production of documents, which consisted of civil complaints against Lyft.

48.     On September 8, 2021, Defendants made their seventh production of documents, which consisted of documents that hit upon search terms related to Lead Plaintiff's claims.

49.     On September 20, 2021, Defendants made their eighth production of documents, which consisted of a revised version of the chart originally produced on July 12, 2021.

50.     On October 4, 2021, Defendants made their ninth production of documents, which consisted of documents that hit upon search terms related to Lead Plaintiff's claims.

51.     October 8, 2021, Defendants made their tenth production of documents, which consisted of a revised version of the chart originally produced on July 12, 2021, and reproduced on September 20, 2021.

52.     On October 28, 2021, Defendants made their eleventh production of documents, which consisted of documents that hit upon search terms related to Lead Plaintiff's claims.

53.     On November 13, 2021, Defendants made their twelfth production of documents, which consisted of documents that hit upon search terms related to Lead Plaintiff's claims.

54.     On November 16, 2021, Defendants made their thirteenth production of documents, which consisted of a revised version of the chart originally produced on July 12, 2021, and reproduced on September 20, 2021, and October 8, 2021.

55.     On November 19, 2021, Defendants made their fourteenth production of documents which consisted of documents that hit upon search terms related to Lead Plaintiff's claims.

56.     On November 30, 2021, Defendants made their fifteenth production of documents, which consisted of a revised version of the chart originally produced on July 12, 2021, and reproduced on September 20, 2021, October 8, 2021, and November 16, 2021.

57.     On December 13, 2021, Defendants made their sixteenth production of documents, which consisted of documents that hit upon search terms related to Lead Plaintiff's claims.

58.     On December 23, 2021, Defendants made their seventeenth production of documents, which consisted of documents redacted based on privilege and other protections.

59.     On January 18, 2022, following the deposition of Lyft employee Tanya Braun, Lead Plaintiff served his Second Set of Requests for Production of Documents to All Defendants. Defendants had not yet served responses to these requests as of February 8, 2022.

60.     On February 2, 2022, Lead Plaintiff served his Third Set of Requests for Production of Documents to All Defendants. Defendants had not yet served responses to these requests as of February 8, 2022.

61.     In all, between September 8, 2020, and February 8, 2022, Defendants produced over 20,000 documents.

**_Discovery Disputes and Negotiations_**

62.     Between January 4, 2021, and January 24, 2022, the parties held no fewer than twenty-three meet and confers on discovery issues.

63.     Lead Plaintiff filed a motion to compel document production on February 17, 2021. ECF No. 131.

64.     Defendant Lyft filed a motion to compel contention interrogatory responses on March 9, 2021. ECF No. 139.

65. The motions to compel filed by Lead Plaintiff on February 17, 2021, and by Defendant Lyft on March 9, 2021, were summarily dismissed after the disputes were referred to Magistrate Judge Laurel Beeler. *See* ECF Nos. 150, 151.

66. The parties filed joint discovery letter briefs, in accordance with Magistrate Judge Beeler's Standing Orders, on May 21, 2021, and September 2, 2021. *See* ECF Nos. 157, 198.

67. As of February 7, 2022, the parties remained at odds on a number of discovery issues and were still negotiating additional search terms and the scope and timing of depositions.

**Deposition Discovery**

68. On November 17, 2020, Lead Plaintiff Rick Keiner sat for a deposition at Defendants' request. The deposition began at 10:15 a.m. EST and concluded at 6:02 p.m. EST.

69. On January 14, 2022, Lead Plaintiff, through Lead Counsel, took the deposition of Tanya Braun, Senior Manager, Safety Analytics at Lyft. Defendants had previously informed Lead Plaintiff that Ms. Braun was the individual at Lyft responsible for aggregating and analyzing data on sexual violence.

70. On or before January 19, 2022, Lead Plaintiff served subpoenas and notices for the depositions of nineteen additional persons, including the Individual Defendants and other current and former Lyft employees.

71. On January 31, 2022, Lead Plaintiff served a Rule 30(b)(6) notice on Defendant Lyft.

72. As of February 7, 2022, the parties were still negotiating the timing and extent of the depositions Lead Plaintiff had noticed.

**Third-Party Discovery**

73. Lead Plaintiff served subpoenas for the production of documents on the following third-parties:

| Third-Party | Subpoena Notice Date | Production Date |
|---|---|---|
| Underwriters[1] | Oct. 27, 2020 | May 3, 2021 |

---

[1] "Underwriters" as used here identifies the same twenty-seven entities defined in the Stipulation and Agreement of Class Action Settlement at ¶ 1.32.

| Rakuten, Inc. | Dec. 10, 2020 | Contested Service. Had not produced as of Feb. 8, 2022. |
|---|---|---|
| Jonathan Christodoro | Dec. 10, 2020 | Had not produced as of Feb. 8, 2022. |
| D.A. Davidson & Co. | Dec. 22, 2020 | Jan. 19, 2021 |
| Wedbush Securities Inc. | Dec. 22, 2020 | Jan. 22, 2021 |
| HSBC Securities (USA) Inc. | Dec. 22, 2020 | Feb 2, 2021 |
| Guggenheim Partners Asset Management, Inc. | Dec. 22, 2020 | Had not produced as of Feb. 8, 2022. |
| Seaport Global Holdings LLC | Dec. 22, 2020 | June 17, 2021 |
| Susquehanna Financial Group, L.P. | Dec. 22, 2020 | Feb. 18, 2021 |
| Shimano North America Holdings | Dec. 22, 2020 | March 11, 2021 |
| Maplelane | Feb. 12, 2021 | Withdrawn |
| Kingdon | Feb. 12, 2021 | Withdrawn |
| Gilder Gagnon Howe | Feb. 12, 2021 | Withdrawn |
| Alliance Bernstein L.P. | Nov. 4, 2021 | Withdrawn* |
| Alyeska Investment Group | Nov. 4, 2021 | Jan. 7, 2022, Withdrawn* |
| American Century Investments | Nov. 4, 2021 | Dec. 14, 2022, Withdrawn* |
| Columbia Management Investment Advisors, LLC | Nov. 4, 2021 | Dec. 13, 2021, Jan. 11, 2021, Withdrawn* |
| Davidson Kempner Capital Management LP | Nov. 4, 2021 | Withdrawn* |
| Element Capital Management LLC | Nov. 4, 2021 | Withdrawn* |
| Federated Hermes, Inc. | Nov. 4, 2021 | Withdrawn* |
| Fidelity Management & Research Company LLC | Nov. 4, 2021 | Withdrawn* |
| Franklin Advisers, Inc. | Nov. 4, 2021 | Withdrawn* |
| Investco Ltd. | Nov. 4, 2021 | Withdrawn* |
| Investment Group of Santa Barbara | Nov. 4, 2021 | Withdrawn* |
| Ivy Investment Management Company | Nov. 4, 2021 | Withdrawn* |
| Janus Capital Management LLC | Nov. 4, 2021 | Withdrawn* |
| Jennison Associates | Nov. 4, 2021 | Withdrawn* |
| J.P. Morgan Investment Management Inc. | Nov. 4, 2021 | Jan. 7, 2022, Withdrawn* |
| Lakewood Capital Management LP | Nov. 4, 2021 | Withdrawn* |
| Laurion Capital Management L.P. | Nov. 4, 2021 | Withdrawn* |
| Lord Abbett & Co. LLC | Nov. 4, 2021 | Jan. 13, 2022, Withdrawn* |
| Millennium Management LLC | Nov. 4, 2021 | Withdrawn* |
| Third Point LLC | Nov. 4, 2021 | Withdrawn* |
| Winslow Capital Management LLC | Nov. 4, 2021 | Withdrawn* |
| Capital Group | Dec. 8, 2021 | Withdrawn* |

*These entities had submitted declarations supporting Defendants' opposition to class certification. Lead Plaintiff served subpoenas to test the validity and credibility of the defenses Defendants previewed in their class opposition. Lead Plaintiff withdrew these subpoenas on January 19, 2022 because, after the entities elected to remain in the Class, after extensive telephonic conversations with the entities' representatives, and after several of the entities produced documents evidencing their interactions with Defendants' counsel both before and after*

*class certification, Lead Plaintiff was satisfied that the entities did not have interests adverse to the Class and had no information that would support Defendants' defenses.*

74. In all, third parties produced over 3,000 documents in response to Lead Plaintiff's subpoenas by February 8, 2022.

75. Lead Plaintiff also served a subpoena on Defendants' counsel, Latham & Watkins LLP, on November 11, 2021, requesting communications Latham & Watkins had with certain Class Members who put in declarations supporting Defendants' opposition to class certification in this action. Latham & Watkins served objections and responses on December 20, 2021. As of February 8, 2022, Latham & Watkins had not yet produced documents in response to Lead Plaintiff's subpoena.

76. Defendants attempted to serve a subpoena on Lead Counsel, Block & Leviton LLP, on January 12, 2022, requesting all communications Lead Counsel had with any Lyft investor. Lead Counsel objected to service as improper. Defendants corrected the deficiencies in service and re-served the subpoena on January 26, 2022. Lead Counsel served its responses and objections on January 31, 2022. As of February 8, 2022, Lead Counsel had not yet produced documents in response to Defendants' subpoena.

### The State Action

77. On April 15, 2019, Fredric Lande filed the first of several actions in California Superior Court alleging Securities Act claims arising out of Lyft's IPO. The state court Securities Act cases were consolidated before Judge Andrew Y.S. Cheng in the California Superior Court, County of San Francisco and captioned *In re Lyft, Inc. Securities Litigation*, Case No. CGC-19-575293 (the "State Action").

78. The State Plaintiffs are represented by three law firms acting as co-lead counsel, and five additional law firms.

79. Counsel for the State Plaintiffs and Defendants attended a mediation in November 2020 and expressly excluded Lead Plaintiff and Lead Counsel from participating in those settlement discussions. The State Plaintiffs and Defendants did not reach a settlement at the November 2020 mediation session.

80. On October 7, 2021, the State Plaintiffs filed an administrative motion in this Court for an order delaying notice of class certification to the Class. ECF No. 212. Both Lead Plaintiff and Defendants opposed State Plaintiffs' motion. *See* ECF Nos. 213, 214. On October 13, 2021, this Court denied the State Plaintiffs' administrative motion. ECF No. 215.

81. In support of their motion for class certification in the State Action, the State Plaintiffs filed documents stating that Palm Bay Police & Firefighters' Pension Fund held 287 shares of Lyft common stock, Greater Pennsylvania Carpenters' Pension Fund held 900 shares, and Frederic Lande held 5,300.

82. On January 25, 2022, Judge Cheng stayed the State Action and denied the State Plaintiffs' pending motion for class certification without prejudice.

83. Both the Defendants in this action and the Underwriters are defendants in the State Action.

84. Defendant Lyft has indemnification agreements with the Underwriters that obligate Lyft to pay both legal fees and liability incurred in connection with the IPO.

## IV. THE SETTLEMENT

### *Settlement Negotiations*

85. Lead Plaintiff retained Global Economics Group, LLC in June 2021 to perform a damages analysis. On June 16, 2021, Global Economics Group provided its initial damages analysis, which provided different analyses depending on whether April 15, 2019, or May 17, 2019, controlled as the case's first-filed date for the purposes of Section 11(e)'s damages formula. Global Economics Group calculated $535.3 million in total possible statutory damages, under Section 11(e)'s damages formula, assuming April 15, 2019, was used as the first-filed date, and $777.6 million assuming a May 17, 2019 first-filed date. Lead Counsel discussed with Global Economics Group potential causation issues in the case as they related to damages and Global Economics Group relayed their opinions to Lead Counsel regarding potential negative causation defenses.

86. On August 31, 2021, the Court held a Case Management Conference. The Court discussed private mediation with the parties. In a minute entry following the Case Management Conference, the Court "direct[ed] the parties to meet and confer and e-file by 9/8/21 a stipulation and proposed order selecting an ADR process." ECF No. 195.

87. On September 8, 2021, in compliance with the Court's instructions, the parties filed their Stipulation and [Proposed] Order Selecting ADR Process. The parties selected "Private ADR," specifying that they would undergo private mediation with a to-be-determined mediator by December 15, 2021. *See* ECF No. 200.

88. The parties thereafter selected David Murphy of Phillips ADR to serve as mediator. The parties jointly scheduled a mediation with Mr. Murphy for November 2, 2021.

89. On October 28, 2021, the parties exchanged mediation statements outlining the strengths and challenges of their respective litigating positions. The mediation statements were accompanied by evidentiary exhibits.

90. In preparation for the mediation, Lead Counsel again discussed damages issues and causation issues with Global Economics Group.

91. On November 2, 2021, the parties participated in a full-day mediation with Mr. Murphy. The mediation session began at 10:30 a.m. EST on November 2, 2021, and ended at approximately 5:30 p.m. EST. The parties were not able to reach an agreement to settle the case at this mediation session.

92. Within a few days after the November 2, 2021 mediation, I contacted Darren Robbins, counsel for State Plaintiffs, by telephone. I proposed that, moving forward, the plaintiffs in the federal and state actions would work together equally to continue to prosecute the case. Mr. Robbins indicated he would discuss with his co-counsel. Mr. Robbins telephoned me back approximately a week later and declined my offer.

93. Lead Plaintiff and Defendants continued to have intermittent settlement discussions throughout November and December 2021. However, these discussions did not result in an agreement to settle the case.

94. In January 2022, the parties reengaged Mr. Murphy to facilitate settlement negotiations but failed to reach agreement through their facilitated discussions.

95. The parties again engaged Mr. Murphy to mediate negotiations in February 2022. On February 4, 2022, Mr. Murphy made a mediator's recommendation to settle the action for $25 million. On February 7, 2022, the parties mutually agreed to settle the case for $25 million on the

basis of Mr. Murphy's recommendation. **The Declaration of David Murphy is attached hereto as Exhibit 1**.

96. In conjunction with the agreement to settle the case, Lead Plaintiff requested and Defendants agreed to provide the same documents that had been produced in discovery to the State Plaintiffs on the market share theory. Upon review of those documents, I believe there are substantial challenges in pursuing the market share theory of Section 11 liability on the merits, although the primary challenge with that theory remains loss causation, as discussed below.

*The Stipulation and Preliminary Approval*

97. On February 8, 2022, the parties filed a letter with the Court indicating that the parties had reached an agreement in principle to settle this action. *See* ECF No. 240.

98. On March 8, 2022, I emailed Defendants' counsel a draft Stipulation and Agreement of Class Action Settlement ("Draft Stipulation") laying out the terms of the proposed Settlement.

99. On April 5, 2022, Defendants' counsel returned the Draft Stipulation with proposed edits. On April 8, 2022, I responded to Defendants' counsel that one of their proposed edits was not acceptable to Lead Plaintiff. Defendants agreed to modify the term we had taken issue with and we accepted their proposed modification.

100. On April 12, 2022, we sent a revised Draft Stipulation to Defendants counsel which we believed contained terms that the parties had fully agreed to.

101. On April 25, 2022, Defendants' counsel returned the Draft Stipulation to myself and my colleagues with additional edits.

102. On May 10, 2022, Lead Counsel sent revised versions of the Draft Stipulation back to Defendants' counsel for review and approval.

103. On May 18, 2022, I followed up with Defendants' counsel via email inquiring as to the status of the Draft Stipulation. I subsequently received a phone call from Andrew Clubok, counsel for Defendants, telling me that Defendants wanted to make further changes to the Draft Stipulation.

104. On May 19, 2022, Defendants' counsel sent us substantive revisions to the Draft Stipulation regarding the distribution of the Settlement Fund. Defendants also returned edits to the Notice.

105.    On May 23, 2022, I sent the Draft Stipulation back to Defendants with some modifications to their additional edits.

106.    On June 2, 2022, Defendants' counsel requested a minor edit to the Draft Stipulation. We agreed that their edit was reasonable.

107.    On June 6, 2022, I sent to Defendants' counsel via email a signed copy of the Draft Stipulation.

108.    On June 8, 2022, Defendants' counsel requested another minor edit to the Draft Stipulation. That same day, I informed Defendants' counsel that the edit was acceptable and sent Defendants' counsel a copy of the Draft Stipulation bearing my signature.

109.    On June 16, 2022, Defendants informed us that they would not oppose Lead Plaintiff's Motion for Preliminary Approval of Settlement. That same day, June 16, 2022, Lead Plaintiff filed his Notice of Motion, Unopposed Motion for Preliminary Approval of Settlement, and Memorandum of Points and Authorities in Support Thereof ("Preliminary Approval Motion"). ECF No. 249.

110.    On August 19, 2022, three of the State Plaintiffs – Greater Pennsylvania Carpenters' Pension Fund, Frederic Lande, and Palm Bay Police & Firefighters' Pension Fund (the "Proposed Intervenors") – filed a motion to intervene in this action for the purpose of opposing preliminary approval.

111.    On September 2, 2022, Lead Plaintiff and Defendants separately filed oppositions to the Proposed Intervenors' motion. *See* ECF Nos. 262, 264. The Proposed Intervenors filed a reply brief on September 9, 2022. ECF No. 265.

112.    On September 15, 2022, the Court held a hearing on the Preliminary Approval Motion. The Court did not consider the motion to intervene during the hearing, but counsel for the Proposed Intervenors were present at the hearing.

113.    Following the hearing, also on September 15, the Court entered a minute entry stating:

> Parties are directed to meet and confer and e-file within one week from today (September 22, 2022) (1) any revised release or a statement that the parties decline to revise the release; and (2) a stipulation and proposed order regarding whether the individuals that previously opted out of the class may

now opt back into the class. Counsel for proposed intervenors are directed to be a part of the meet and confer on this issue. The Court advises that it will decide later whether to set a further hearing on the motion for preliminary approval of settlement.

114. The Parties and counsel for the Proposed Intervenors met and conferred on September 15, 2022, following the hearing. The parties agreed to revise the release in the Stipulation to clarify that the State Action would not be terminated or precluded by the Settlement. The parties also agreed to enter a stipulation providing for persons who had previously requested exclusion from the Class to rescind that request, and to revise the Stipulation and Notice accordingly.

115. On September 27, 2022, after this Court granted an extension of time, ECF No. 274, the parties filed a joint stipulation permitting persons who previously opted out of the Class to rescind their exclusion requests. Lead Plaintiff also on September 27, 2022, filed a Stipulation with revised language in the release of claims (the "Revised Stipulation"). A redline version of the Revised Stipulation demonstrating the changes made is available at ECF No. 276-2.

116. On September 28, 2022, the Court issued an order directing the Proposed Intervenors to show cause why their motion to intervene was not moot in light of the Court's order granting the stipulation to permit persons who previously opted out of the Class to rescind their exclusion requests. ECF No. 279. The Proposed Intervenors submitted their response on October 5, 2022. ECF No. 283. The Court terminated as moot the Proposed Intervenors' pending motion to intervene on October 6, 2022. ECF No. 284.

117. On November 2, 2022, the Court set another hearing on the Preliminary Approval Motion for November 17, 2022. ECF No. 285.

118. On November 17, 2022, the Court held the second hearing on the Preliminary Approval Motion. The Court suggested certain additional changes to a paragraph in the Notice referencing the State Action. The parties met and conferred following the hearing and agreed to amend the Notice.

119. On November 22, 2022, the parties filed a revised Notice with the Court. A version of the Notice with the changes in redline is available at ECF No. 291-2.

120.    On November 28, 2022, the Court issued an order stating: "the Court is of the view that there is not a sufficient 'driving nexus' between the plaintiff class and the parties' proposed cy pres recipient, the National Women's Law Center," and directing the parties to either file a revised Stipulation with a different cy pres recipient or to file a supplemental brief explaining how the National Women's Law Center satisfied the standard of *Dennis v. Kellogg Co.*, 697 F.3d 858 (9th Cir. 2012). ECF No. 292.

121.    On November 30, 2022, Lead Plaintiff filed a Further Revised Stipulation and Agreement of Class Action Settlement (the "Stipulation"), replacing National Women's Law Center with the Bluhm Legal Clinic Center for Litigation and Investor Protection at Northwestern University Pritzker School of Law as cy pres recipient. ECF No. 293.

122.    On December 6, 2022, the Court directed the parties to file "the Supplemental Agreement Regarding Requests for Exclusion referred to in Section 8.3 of the Settlement Agreement [(the "Supplemental Agreement")] for the Court's review." ECF No. 294.

123.    The parties filed the Supplemental Agreement with the Court, under provisional seal, on December 12, 2022. *See* ECF Nos. 295, 296. The Supplemental Agreement is the only additional agreement the parties made that affects the Stipulation's validity and enforcement.

124.    On December 16, 2022, the Court granted Lead Plaintiff's Preliminary Approval Motion.

***Compliance With the Preliminary Approval Order and Settlement Administration***

125.    Lead Plaintiff and Lead Counsel selected A.B. Data for Court approval to serve as Claims Administrator. A.B. Data provided notice of the pendency of the class action to members of the class and has familiarity with the action having already properly provided notice to the class. A.B. Data was selected among numerous administrators to serve as Notice Administrator to the Class after providing a competitive quote for notice and administrative services. Lead Counsel has engaged A.B. Data to serve as notice or claims administrator two times over the past two years (which includes serving as notice administrator previously in this action).

126.    **The Declaration of Adam D. Walter Regarding Mailing of Notice of (I) Pendency of Proposed Settlement; (II) Motion for an Award of Attorneys' Fees and Reimbursement of**

**Litigation Expenses; and (III) Settlement Hearing ("Walter Declaration") is attached hereto as Exhibit 2**.

127. Pursuant to the Court's Preliminary Approval Order, Lead Counsel, through the Claims Administrator, implemented a comprehensive notice program whereby, by January 6, 2023, A.B. Data caused the Notice and Claim Form (together the "Notice Packet") to be mailed to potential Class Members. *See* Walter Declaration of at ¶ 2.

128. As of February 10, 2023, a total of 303,727 Notice Packets have been mailed. *See* Walter Declaration at ¶¶ 5–9.

129. In accordance with the Court's Preliminary Approval Order, the Notice and Claim Form were also posted to www.lyftIPOlitigation.com (the "Settlement Website"). *Id.* at ¶ 13.

130. On January 20, 2023, the Summary Notice was published online in PR Newswire and in print in *The Wall Street Journal*. *Id.* at ¶ 11.

131. The Notice describes, among other things, the claims asserted in the Action, the contentions of the Parties, the terms of the Settlement, the Settlement Amount, the maximum amounts that would be sought in attorneys' fees and Litigation Expenses, the Plan of Allocation, and the procedures for objecting to or opting out of the Settlement. The Notice as mailed to Class Members in its final form is attached to the Walter Declaration as Exhibit A.

132. The Summary Notice clearly and concisely provided information concerning the Settlement and explained how to obtain a copy of the Notice. The Summary Notice as it appeared in The *Wall Street Journal* and PR Newswire, respectively, is attached to the Walter Declaration as Exhibits B and C.

133. In addition to the Notice and Claim Form, the Claims Administrator posted other relevant documents to the Settlement Website, provided a phone number for Class Members to call with questions, and established a dedicated email address for inquiries about the Settlement. *Id.* at ¶ 13.

134. As set forth in the Court's Scheduling Order, the deadline for Class Members to object to the Settlement and/or Lead Counsel's application for attorneys fees and costs is March 30, 2023, and the deadline for Class Members to opt-out of the Settlement is April 13, 2023. ECF No. 299. While these deadlines have not yet passed, to date, no Class Members have objected to the

Settlement, and no Class Members have requested exclusion. *Id.* at ¶ 14. One individual who previously requested exclusion at the class certification stage has requested to revoke that exclusion request and re-enter the Class. *Id.* Should any objections or requests for exclusion be received, Lead Plaintiff will address them in his reply papers, due April 27, 2023.

135. The Claims Administrator estimated that 20–25% of Class Members will submit a claim in this action. The Claims Administrator based this estimate on its experience as claims administrator in other recent federal securities class actions.

136. The $25 million settlement represents approximately $0.79 per share of Lyft issued in the IPO.

### The Risks of Continued Litigation

137. Lead Plaintiff and Lead Counsel believe they and the Class have viable claims against Defendants. However, Lead Plaintiff and Lead Counsel also realized that continued litigation would have been costly, risky, and drawn out. Lead Plaintiff and Lead Counsel carefully considered these risks during the period leading up to the the settlement negotiations with Defendants.

138. In agreeing to settle, Lead Plaintiff and Lead Counsel weighed, among other things, the substantial and immediate cash benefit to the Class against: (i) the uncertainties associated with trying a complex securities case; (ii) the difficulties and challenges involved in establishing materiality misleading statements and in countering Defendants' negative causation defense, including the unpredictable outcome of a "battle of the experts;" (iii) the concern that, even if Lead Plaintiff prevailed at summary judgment or trial, any monetary recovery could have been substantially less than, or not meaningfully more than, the Settlement Amount; and (iv) the inevitable delays that would follow even a favorable final judgment, including appeals.

139. Although Lead Plaintiff succeeded, in part, in defeating Defendants' motions to dismiss and for judgment on the pleadings, some of the arguments Defendants raised in these motions involved disputed issues of material facts and would have arisen again at a later stage in the litigation, such as summary judgment or trial. For instance, Defendants challenged damages and loss causation in their motion to dismiss, ECF No. 78, but the Court found that it was "not clear on the face of the pleadings" that the Class lacked damages, ECF No. 96 at 22. Defendants also argued

that Lyft's disclosures about "assault" and "trust and safety issues" adequately disclosed driver sexual misconduct, but the Court ruled that "[t]he adequacy of the disclosures is not 'so obvious' that the Court may resolve this dispute at the motion to dismiss stage." *Id.* at 9. The Court's findings did not foreclose Defendants from raising their negative causation or adequacy of disclosure arguments at the appropriate time when they could present evidence rather than attacking the pleadings as facially defective.

140.	Likewise, although the Court found that Defendants had not presented evidence to prove an affirmative knowledge defense with respect to any Class Members at the class certification stage, ECF No. 177 at 10, this did not foreclose Defendants from attempting to present evidence at trial that some investors – particularly large institutions with the largest losses – had individual knowledge of the omitted facts. Lead Plaintiff and Lead Counsel expected Defendants to continue pressing their affirmative knowledge defense at trial.

141.	The Class would also have had to carry its burden on materiality against Defendants' counter-arguments. Lyft's bikesharing business was relatively new to the Company and, according to Lyft, was not a meaningful contributor to Lyft's overall revenue at the time of the IPO. According to Defendants, then, the defects plaguing Lyft's bikes would not have been material to an investor. *See* ECF No. 96 at 18. The Court did not reach the merits of this argument in resolving the motion to dismiss because a court "cannot resolve the parties' materiality and adequacy disagreements at the pleading stage." *Id.* Although Lead Plaintiff and Lead Counsel believe the safety and reliability problems and Lyft's nascent bikeshare business were significant for reasons beyond bikesharing's immediate contribution to Lyft's overall revenue, they also recognize that a jury could find differently.

142.	Defendants also argued that the prevalence of sexual assault by Lyft drivers was not material because, they claimed, the sexual assault figures were small in a relative sense when compared with the overall number of rides on the Lyft platform. ECF No. 152 12–13. While Lead Plaintiff and Lead Counsel disagree with Defendants and maintain that investors would have been

alarmed by the true scope of the Company's sexual misconduct problem, they acknowledge that a jury could side with Defendants.[2] Failure on materiality would preclude recovery.

143. The Class also would have to prove at trial that the statements at issue were misleading. Because most of the statements in this case were allegedly misleading by omission, falsity would not have been as simple as demonstrating facts that cut against an affirmative representation. Instead, Lead Plaintiff would have to convince the jury that Defendants' statements gave a misleading impression by failing to disclose additional information. For example, if Defendants had stated affirmatively that the brakes on their e-bikes were working perfectly, or that sexual assault was not a problem on the Lyft platform, Lead Plaintiff and Lead Counsel believe falsity may have been easier to prove. But to convince a jury that, *e.g.* Lyft should have disclosed the defects with its bike brakes in its Registration Statement, Lead Plaintiff would have to prove that the problem existed at the time of the IPO and had developed to such an extent that statements such as "[our bikes] may experience quality problems or defects from time to time" would have given reasonable investors a false impression. *See* SAC ¶ 171.

144. Lead Plaintiff and Lead Counsel believe that Defendants' loss causation affirmative defense (also known as "negative causation") was the most significant risk the Class faced. Section 11 creates a presumption that all declines in the price of a security during a class period are caused by the alleged misstatements or omissions in a registration statement. Defendants may rebut this presumption by presenting evidence that other factors were the true cause, in full or in part, of the class period price declines. The Class had not yet had to meaningfully grapple with the merits of this fact intensive defense. Although Defendants did press it prematurely at the pleading stage, *see* ECF Nos. 78, 152, the merits of the negative causation defense would have come into play at summary judgment and at trial.

---

[2] Lead Plaintiff's Item 303 and 105 theories included materiality standards as well. Item 303's materiality standard is linked to sales, revenues, or income in particular. *See* 17 C.F.R. § 229.303(b)(2)(ii) (requiring disclosure of trends and uncertainties that are "reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."). Item 105, 17 C.F.R. 229.105, requires the disclosure of the "most significant" factors making an offering risky. *See* ECF No. 96 at 9 n.4.

145.    While the stock price declines during the Class Period amounted to $777.6 million in investor losses ($535.3 million if the Court concluded that April 15, 2019 – the date the State Action was filed – was the first filed date) Lead Plaintiff and Lead Counsel believe it would be exceedingly unlikely for the Class to recover this full amount at trial.

146.    In deciding to settle this case, Lead Plaintiff and Lead Counsel considered the strength of Defendants' negative causation defenses and the likely arguments Defendants would make with respect to the declines in Lyft's share price during the class period.

147.    Lead Counsel discussed the likely negative causation defenses Defendants could assert at trial during the course of the litigation with their testifying damages and causation expert, Global Economics Group. Lead Counsel engaged Matt Cain to prepare a report setting forth the likely negative causation defenses and the risks the Class faced in establishing damages. In the (we believe unlikely) event the settlement is not approved, Global Economics Group will provide expert testimony at trial regarding causation and damages.

148.    As explained more fully in the **Expert Report of Matthew D. Cain, PHD attached hereto as Exhibit 3** ("Cain Declaration"), Defendants could present credible arguments that factors other than the alleged misstatements in the SAC drove the declines in Lyft's share price during the Class Period rendering the Class' ability to prove recoverable damages difficult.

149.    Defendants also would have argued that the May 8, 2019 losses were not recoverable at all under Section 11(e) because they occurred after the filing date of the State Action. *See* ECF No. 264 at 16. Lead Plaintiff would have argued that (i) this action should not import the filing date of a separate action filed by different parties in a different forum; and (ii) even if the State Action's filing date controlled for the purposes of Section 11(e), the statutory formula measures damages as the difference between the "amount paid for the security" and the "value," rather than the price, "thereof as of the time such suit was brought." *See* 15 U.S.C. 77k(e). Although these arguments had been presented to the Court over the course of this litigation, the Court had not found them to be ripe for resolution. Accordingly, it remained uncertain which party would prevail.

150.    Lead Plaintiff and Lead Counsel do not concede Defendants' negative causation defense would or should have succeeded. However, they do recognize that the Class would have had to

overcome the loss causation narrative Defendants could have assembled using the information summarized above and in the Cain Declaration. Loss causation, even as an affirmative defense, was a serious and legitimate threat to the Class's recovery. Resolving the loss causation disputes would require a "battle of the experts" and it would be impossible to predict with any certainty whose expert the jury would believe.

### *The Proposed Plan of Allocation*

151. Lead Plaintiff and Lead Counsel prepared the Plan of Allocation in careful consultation with Global Economics Group with the objective of equitably distributing the Net Settlement Fund to Class Members.

152. The Plan of Allocation was fully described in the Notice. *See* Walter Decl. Ex. A at 9–11.

153. The Plan of Allocation provides for distribution of the Net Settlement Fund to Authorized Claimants who submit timely and valid Claim Forms demonstrating a loss on their Lyft securities transactions during the Class Period. The formula to apportion the Net Settlement Fund precisely follows the statutory damages formula of Section 11(e), *compare* Walter Decl. Ex A at 9–11 *with* 15 U.S.C. 77k(e), and provides for a *pro rata* distribution to Authorized Claimants.

154. Because the proposed Plan of Allocation does not unjustly favor any Class Member, segment of the Class, or Lead Plaintiff, Lead Counsel believes that the plan is fair, reasonable, and adequate and should be approved.

### V. LEAD COUNSEL'S APPLICATION FOR ATTORNEYS' FEES IS FAIR AND REASONABLE

155. For Lead Counsel's efforts on behalf of the Class, Lead Counsel is applying to the Court for an award of attorneys' fees of 25% ($6,250,000) to be paid from the Settlement Fund. The percentage method is the standard and appropriate method of fee recovery in a common fund case such as this action because it aligns the lawyers' interests with those of the class in achieving the maximum recovery with as little delay as possible under the circumstances. Use of the percentage method has been endorsed by the Ninth Circuit.

156. Based on the quality of the result achieved, the extent and quality of the work performed, and the significant risks of this litigation which Lead Counsel undertook on a fully contingent basis,

Lead Counsel respectfully submits that the requested fee award is reasonable and should be approved.

157. To date, there have been no objections to the request for attorneys' fees and reimbursement of litigation expenses previewed in the Notice and Summary Notice.

***The Result Achieved***

158. Courts in this Circuit have consistently recognized that the result achieved is a significant factor to be considered in assessing a fee award. Here, the $25,000,000 Settlement is an excellent result. The decision to settle was made based on a thorough understanding of the strengths and weaknesses of the case and avoids substantial risk, expense, delay, and the uncertainty of continued litigation and trial.

159. NERA Economic Consulting releases an annual report on trends in securities litigation. **True and correct copies of NERA's reports for 2020, 2021, and 2022 are attached hereto as, respectively, Exhibits 4** (Janeen McIntosh & Svetlana Starykh, *Recent Trends in Securities Class Action Litigation: 2020 Full-Year Review*, NERA (Jan. 25, 2021)) ("NERA 2020"), **5** (Janeen McIntosh & Svetlana Starykh, *Recent Trends in Securities Class Action Litigation: 2021 Full-Year Review*, NERA (Jan. 25, 2022)) ("NERA 2021") **and 6** (Janeen McIntosh, Svetlana Starykh, & Edward Flores, *Recent Trends in Securities Class Action Litigation: 2022 Full-Year Review*, NERA (Jan. 24, 2023)). According to NERA, the average settlement in a securities class action, excluding settlements over $1 billion, was $30 million in 2020, $21 million in 2021, and $38 million on 2022. *See* Exs. 4 at 16 (NERA 2020), 5 at 18 (NERA 2021), 6 at 14 (NERA 2022).

160. Despite excluding settlements over $1 billion, these averages are still inflated by outliers. In 2020, 2021, and 2022, respectively, 68%, 79%, and 67% of securities class actions settled for less than $20 million. *See* Ex. 6 at 14 (NERA 2022). The median settlements in 2020, 2021, and 2022, respectively, excluding settlements over $1 billion were $13 million, $8 million, and $13 million. *See* Exs. 4 at 17 (NERA 2020), 5 at 20 (NERA 2021), 6 at 15 (NERA 2022). The Settlement achieved here is therefore greater than the overwhelming majority of settlements obtained in securities class action cases in the past 3 years.

161. Cornerstone Research also publishes annual reports on securities class action settlements. **A true and correct copy of Cornerstone Research's annual report of 2021 settlements is attached hereto as Exhibit 7** (Laarni T. Bulan & Laura E. Simmons, *Securities Class Action Settlements: 2021 Review and Analysis*, Cornerstone Research (2022)) ("Cornerstone 2021").

162. Cornerstone calculated the median settlement value for Securities Act of 1933 claims as $8.6 million in 2020 and $8.4 million in 2021. Ex. 7 at 7 (Cornerstone 2021).

163. Here, the Settlement represents approximately 3.2–4.7% of the total, presumed statutory damages in this case (depending on whether May 17, 2019, or April 15, 2019, control as the first-filed date for the purposes of Section 11(e)'s damages formula). According to NERA, the median ratio of settlements to investor losses was 1.8% in 2020, 2021, and 2022. *See* Ex. 6 at 18 (NERA 2022). According to Cornerstone, for Securities Act cases over a ten-year period (between 2012 and 2021), the median settlement as a percentage of simplified statutory damages for cases, like this one, with potential damages greater than $150 million, was 4.4%. Ex. 7 at 8. If the April 15, 2019 filing date controlled for cutting off statutory damages, the settlement here represents almost 4.7% of statutory damages.

164. The Settlement is even more favorable when considering the negative causation defenses Defendants would present at trial which could dramatically reduce the amount of recoverable damages.

165. Lead Counsel believes the Settlement provides an immediate and substantial benefit to the Class and supports Lead Counsel's baseline fee request.

***The Risks of the Litigation***

166. As detailed above in ¶¶ 137–50, this litigation carried substantial risk.

167. This was a challenging case. Even at the outset, there was a risk that the action would not proceed past the motion to dismiss stage, as evidenced by the Court's decision dismissing several of Lead Plaintiff's alleged misstatements. Defendants challenged the pleadings again through their motion for judgment on the pleadings.

168. Convincing a jury that Defendants made material misrepresentations or omitted to disclose material facts was far from guaranteed. Many of the arguments Defendants sought to raise were

fact-based and would have come into play at summary judgment and at trial. Defendants likely would have argued that the omitted information was either adequately disclosed or not required to be disclosed, was immaterial, and did not cause the declines in Lyft's share price. Resolving the last of these arguments would have come down to an expensive, unpredictable "battle of the experts."

169. Although Lead Counsel believed in the merits of this action, there would be many challenges in establishing the requisite elements of the Class's claims. Defendants would have had several opportunities to foreclose recovery altogether or greatly reduce the Class's recovery.

***The Skill Required and Quality of Work***

170. The requested fee is also warranted in light of the extensive efforts on the part of Lead Counsel, as outlined above, required to produce this result.

171. Lead Counsel is highly experienced in securities litigation and has a long and successful track record of representing investors in such cases. Lead Counsel has successfully prosecuted securities class actions and complex litigation in federal and state courts throughout the country, including in this Circuit. **A true and correct copy of Block & Leviton LLP's Firm Resume is attached hereto as Exhibit 8.**

172. Lead Counsel believes its experience and skill was critical to getting the case through Defendants' motions to dismiss and for judgment on the pleadings and to successfully achieving class certification.

173. Additionally, Lead Counsel's reputation as experienced counsel in complex cases, successful litigation, and discovery efforts greatly enhanced Lead Counsel's ability to negotiate the Settlement in an efficient manner to the benefit of the Class.

174. The quality and vigor of opposing counsel also supports Lead Counsel's fee request. Defendants are represented by Latham & Watkins LLP, highly experienced counsel who vigorously represented their clients.

175. Lead Counsel spent over 6,300 hours of time on this case. By the time the Settlement was reached, Lead Counsel had, among other things: (i) reviewed and analyzed publicly available documents such as Lyft's SEC filings, news article, press releases, complaints and other legal filings

against the Company, and reports prepared by securities and financial analysts; (ii) drafted the initial complaint in this action and the detailed FAC; (iii) researched and briefed an opposition to Defendants' motion to dismiss the FAC; (iv) served and responded to requests for written and document discovery; (v) met and conferred with Defendants at least twenty-three times on discovery issues; (vi) represented Lead Plaintiff during his full-day deposition; (vii) researched and briefed Lead Plaintiff's motion for class certification; (viii) researched and briefed an opposition to Defendants' motion for judgment on the pleadings; (ix) received and reviewed tens of thousands of pages of documents from Defendants and third parties; (x) briefed and brought discovery disputes before the Court four times; (xi) deposed a Lyft employee and prepared to depose numerous additional persons; (xii) drafted and moved for leave to file the SAC; (xiii) drafted and exchanged detailed mediation statements; (xiv) engaged in a full-day mediation facilitated by David Murphy; (xv) conducted protracted negotiations to reach a settlement-in-principle and to finalize the terms of the Settlement; (xvi) drafted the initial version of the Stipulation and its exhibits and (xvii) responded to State Plaintiffs' objections to preliminary approval and appeared at two hearings to address the Court's concerns regarding the proposed settlement.

176. Lead Counsel will continue to work towards effectuating the Settlement in the event the Court grants final approval. No additional compensation will be sought for this work.

177. Lead Counsel expended a total of 6,337.4 hours prosecuting this action. The billing rates for partners range from $900 to $1,200, associates' rates range from $375 to $605, and paralegals' rates are $250 to $300.

178. I believe that the time reflected in the firm's lodestar calculation and the expenses for which payment is sought as stated herein are reasonable in amount and were necessary for the effective and efficient prosecution and resolution of the litigation. These expenses are all of a type that courts have routinely approved in similar class action cases.

179. The information regarding my firm's time was prepared from time records regularly maintained by my firm in the ordinary course of business. I oversaw and participated in the day-to-day activities in the litigation and I, together with my partners, reviewed the daily time records to confirm their accuracy. In some cases (such as when attorneys spent time correcting an inadvertent

DECLARATION OF JEFFREY C. BLOCK                                                           27
CASE NO. 4:19-CV-02690-HSG

filing), I wrote off time billed to this case. In addition, time for attorney timekeepers who had worked only a de minimus total amount of time on this case was removed form the time report. As a result of this review and the adjustments made, I believe the time reflected in the firm's lodestar calculation is reasonable in amount and was necessary for the effective and efficient prosecution and resolution of the litigation.

180.    The hourly rates for our attorneys and professional support staff are their standard rates and are the same as, or comparable to, the rates submitted by my firm and accepted by courts for lodestar cross-checks in other class action fee applications. My firm's rates are set based on periodic analysis of rates used by firms performing comparable work and that have been approved by courts.

181.    As set forth below, and as **broken down by categories of activities by each biller in Exhibit 9** attached hereto, attorneys and professional support staff at Block & Leviton LLP billed the following aggregate hours to this matter as of the date of filing, with fees applied at the firm's current billing rates,[3] equating to a lodestar of $4,247,394.50:

| Timekeeper | Hours | Hourly Rate | Lodestar |
|---|---|---|---|
| Block, Jeffrey (P) | 734.1 | $1,200 | $880,920.00 |
| Byrne, Mark (A) | 2395.3 | $525 | $1,257,532.50 |
| Davey, Elizabeth (PL)* | 3.8 | $250 | $950.00 |
| Gaines, Michael (A) | 189.9 | $595 | $112,990.50 |
| Gray, Jeffrey (A) | 155 | $495 | $76,725.00 |
| Jarboe, Brendan (A) | 552.3 | $605 | $334,141.50 |
| Jordan, Connie (A)* | 168 | $395 | $66,360.00 |
| Murphy, Rachel (PL) | 10.9 | $300 | $3,270.00 |
| Newman, Elizabeth (A)* | 528 | $375 | $198,000.00 |
| Silver, Nathaniel (A)* | 353.1 | $550 | $194,205.00 |
| Street, Whitney (P)* | 565.6 | $900 | $509,040.00 |

---

[3] The hourly fees listed herein are the current fees used by Block & Leviton LLP, except in the cases of Elizabeth Davey, Connie Jordan, Elizabeth Newman, Whitney Street, and Nathaniel Silver, whose hourly rates are the last hourly rates assigned to them prior to their departure from the firm.

| Walker, Jacob (P) | 681.4 | $900 | $613,260.00 |
| **Total** | **6337.4** | **$670.21** | **$4,247,394.50** |

P = Partner; A = Associate; PL = Paralegal
\* denotes hourly rate listed is individual's final hourly rate at end of time with firm

182.    The requested fee of 25% ($6,250,000) represents a lodestar multiplier of 1.47, which is well within the range of one to four frequently used as a cross-check by courts in this Circuit. Given the excellent result achieved in this action, Lead Counsel's 6,337.4 hours, valued at $4,247,394.50, support the reasonableness of the fee request.

### *The Contingent Nature and Financial Burden*

183.    This Declaration, the Final Approval Motion, and the Fee Motion describe the substantial risks of the litigation. Those same difficulties also constituted risks that Lead Counsel might never be paid for their efforts. Indeed, Lead Counsel has not been compensated for any time or expense since this case began in May 2019.

184.    Courts consistently recognize that the risk of receiving little or no recovery is a major factor in considering an award for attorneys' fees. This risk is even more pronounced in securities class actions where the PSLRA makes surviving past the motion to dismiss stage particularly challenging.

185.    Lead Counsel knows from experience that despite the most vigorous and competent of efforts, attorneys' success in contingent litigation such as this is never assured. Even plaintiffs who get past summary judgment and succeed at trial may find a judgment in their favor overturned on appeal or on a post-trial motion. Because the fee to be awarded in this matter is entirely contingent, the only certainty from the outset was that there would be no fee without a successful result and that such a result would be realized only after a lengthy and difficult effort. As discussed in greater detail above, this case was fraught with significant risk factors concerning liability and damages.

*The Awards in Similar Cases*

186. Courts also look at awards in similar cases in determining whether the requested fee is reasonable.

187. In the Ninth Circuit, courts routinely permit awards of attorneys' fees ranging from 20-30% of settlement funds, with 25% considered the "benchmark" award. According to NERA, from 1996 to 2012 and from 2013 to 2022, the median fees granted in securities settlements of $25-100 million were 25.8% and 25.0% respectively. *See* Ex. 6 at 21.

### VI. REIMBURSEMENT OF THE REQUESTED LITIGATION EXPENSES IS FAIR AND REASONABLE

188. Lead Counsel is also moving for reimbursement of Litigation Expenses that were reasonably and necessarily incurred in prosecuting this action.

189. As detailed below, Lead Counsel is seeking reimbursement of a total of $498,683.75 in out-of-pocket costs and expenses, all of which were advanced by Lead Counsel from the inception of this action through February 8, 2023:

| Category | Amount expended |
|---|---|
| **Class Notice fees** (A.B. Data charges for class notice services through preliminary approval on 12/16/22, billed to Block & Leviton, payable at end of case) | $287,721.53 |
| **Court Fees** (Filing fees and PHV fees in United States District Court, Superior Court of California, and California Courts of Appeal) | $8,823.00 |
| **Court reporters, deposition, and court transcript fees** | $7,283.95 |
| **Electronic discovery** (fees paid to third-party vendor for hosting and processing documents and review platform) | $40,270.98 |
| **Consulting and testifying expert fees** | $90,988.75 |
| **Legal research charges** | $10,150.79 |

| | |
|---|---|
| (Westlaw, Pacer, West Publishing) | |
| **Mediation fees** | $25,473.49 |
| **Postage and shipping fees** | $1,557.45 |
| **Process servers** | $4,053.17 |
| **Travel** (airfare, lodging, transportation, parking; includes travel to final approval hearing) | $21,174.29 |
| **Meals** (while working or traveling) | $1,186.35 |
| **Total Expenses** | **$498,683.75** |

190.    Class Notice fees, which represents by far the largest share of expenses for reimbursement, are the actual costs charged by A.B. Data to Block & Leviton LLP for providing services related to the intial class notice, up to the date of preliminary approval. This fee is due to A.B. Data upon the final resolution of this case and will be paid accordingly. Block & Leviton assumed the risk and obligation to pay these significant fees regardless of the outcome of this matter.

191.    The expenses and charges pertaining to this case are reflected in the books and records of my firm. These books and records are prepared from receipts, expense vouchers, check records, and other documents, and are an accurate record of the expenses.

192.    From the beginning of the case, Lead Counsel was aware that it might never recover any of its expenses, and, at the very least, would not recover anything until the action was successfully resolved. Lead Counsel also understood that, even assuming the case was ultimately successful, reimbursement for expenses would not compensate it for the lost use of funds advanced by Lead Counsel to prosecute this action. Thus, Lead Counsel was motivated to, and did, take steps to assure that only necessary expenses were incurred for the vigorous and efficient prosecution of the case.

193.    In view of the complex nature and length of this action, Lead Counsel believes the litigation expenses were reasonable and necessary to pursue and protect the interests of the Class.

## VII. LEAD PLAINTIFF'S REASONABLE COSTS AND EXPENSES SHOULD BE REIMBURSED

194. The PSLRA authorizes courts to award class representatives their "reasonable costs and expenses (including lost wages) directly relating to the[ir] representation of the class." 15 U.S.C. § 77z-1(a)(4).

195. Here, Lead Plaintiff Rick Keiner was an exemplary representative of the Class. He spent no fewer than 60 hours in his role as Lead Plaintiff, time he spent, among other things: (i) reviewing relevant documents, including filings, (ii) providing Lead Counsel with documents and information in response to Defendants' discovery requests, (iii) sitting for a full-day deposition, (iv) conferring with Lead Counsel monthly (and sometimes more frequently), (v) evaluating and approving the Settlement. Further details of Lead Plaitniff's litigation-related activities are detailed in the **Declaration of Rick Keiner, attached hereto as Exhibit 10**.

196. Lead Plaintiff seeks reimbursement in the amount of $10,000 for his reasonable costs and expenses incurred in his representation of the Class.

I declare under penalty of perjury that the foregoing is true and correct. Executed on February 13, 2022.

/s/ Jeffrey C. Block
Jeffrey C. Block

# EXHIBIT 9

Case 3:19-cv-01226-RFL   Document 95-20   Filed 02/17/23   Page 35 of 36

# In re Lyft, Inc. Securities Litigation
Time and Billing by Category
Inception through February 5, 2023
Block & Leviton LLP

| Timekeeper | Position | A | B | C | D | E | F | G | H | I | J | K | Total | Rate | Lodestar |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Block, Jeffrey | Partner | 5 | 31.5 | 17.5 | 10 | 182.5 | 212.6 | | 11.5 | 36 | 107 | 120.5 | 734.1 | $ 1,200 | $ 880,920.00 |
| Byrne, Mark | Associate | 38.5 | 125.9 | 71.8 | 87 | 545.6 | 743.6 | 99.8 | 185.8 | 123.7 | 62.6 | 311 | 2395.3 | $ 525 | $ 1,257,532.50 |
| Davey, Elizabeth | Paralegal | 3.8 | | | | | | | | | | | 3.8 | $ 250 | $ 950.00 |
| Gaines, Michael | Associate | | 1.4 | 0.2 | 9 | 5.4 | 34.4 | 14 | 0.3 | 106.2 | 15 | 4 | 189.9 | $ 595 | $ 112,990.50 |
| Gray, Jeffrey | Associate | | | | | | | 155 | | | | | 155 | $ 495 | $ 76,725.00 |
| Jarboe, Brendan | Associate | | | 2.5 | 11.7 | 1.6 | 177 | 13.5 | 170.7 | 69.4 | 32.7 | 73.2 | 552.3 | $ 605 | $ 334,141.50 |
| Jordan, Connie | Associate | | | | | | | 168 | | | | | 168 | $ 395 | $ 66,360.00 |
| Murphy, Rachel | Paralegal | | | 3.4 | | 1.5 | 3 | | | | | 3 | 10.9 | $ 300 | $ 3,270.00 |
| Newman, Elizabeth | Associate | | | | | | | 528 | | | | | 528 | $ 375 | $ 198,000.00 |
| Silver, Nathaniel | Associate | | 63.3 | 3.1 | 16.8 | 96 | 126 | 5 | 37.8 | 3.8 | 1.3 | | 353.1 | $ 550 | $ 194,205.00 |
| Street, Whitney | Partner | 3 | 19.4 | 26.7 | 11.1 | 171.1 | 323.3 | 1 | 2.8 | 7 | 0.2 | | 565.6 | $ 900 | $ 509,040.00 |
| Walker, Jacob | Partner | 8.7 | 37.6 | 8.4 | 4.6 | 110.2 | 178.8 | 6.5 | 150.9 | 74.7 | 53.1 | 47.9 | 681.4 | $ 900 | $ 613,260.00 |
| | | | | | | | | | | | | | | | |
| Total Hours | | 59 | 279.1 | 133.6 | 150.2 | 1113.9 | 1798.7 | 990.8 | 559.8 | 420.8 | 271.9 | 559.6 | 6337.4 | $ 670.21 | $ 4,247,394.50 |
| % of Total Hours | | 1% | 4% | 2% | 2% | 18% | 28% | 16% | 9% | 7% | 4% | 9% | | | |
| Lodestar | | $ 37,693 | $ 190,846 | $ 94,642 | $ 93,479 | $ 816,041 | $ 1,295,153 | $ 419,478 | $ 373,917 | $ 288,939 | $ 238,659 | $ 398,551 | | | |
| % of Lodestar | | 1% | 4% | 2% | 2% | 19% | 30% | 10% | 9% | 7% | 6% | 9% | | | |

| Category Codes | |
|---|---|
| A | Initial investigation, research, initial complaint, leadership |
| B | Amended complaints |
| C | Case management, client updates |
| D | Legal research (not specific to a particular motion) |
| E | Non-discovery research, briefing, and motions |
| F | Discovery negotiations, research, briefing, and motions |
| G | Document review |
| H | Preparing for and conducting depositions |
| I | Litigation in California state court |
| J | Settlement negotiations, mediation |
| K | Settlement (through February 5, 2023, including response to State Plaintiffs Motion for Intervention) |